**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Champion Power Equipment Incorporated, | No. CV-23-02371-PHX-DWL |
| Plaintiff, | |
| v. | **ORDER** |
| Firman Power Equipment Incorporated, | |
| Defendant. | |

Pending before the Court are a pair of related motions: (1) Champion's motion for leave to amend its infringement contentions (Doc. 198); and (2) Firman's motion for leave to amend its invalidity and unenforceability contentions and its counterclaims (Doc. 176). Both sides seek permission to add references to a dual-fuel generator that Champion offered to sell to non-party Cabela's in October 2014 (hereinafter, "the Cabela's generator"). For the reasons that follow, Champion's motion is denied and Firman's motion is granted.

## RELEVANT BACKGROUND

I. <u>Montgomery</u>

The individual at the heart of the current dispute is Greg Montgomery. As discussed in previous orders (Doc. 124), Montgomery occupies a unique role in this litigation. From 2004 to 2014, Montgomery worked for Champion, eventually serving as Champion's Vice President of Sales and Business Development. (Doc. 192-1 at 2 ¶ 8; Doc. 198-3 at 7 ¶ 2.) According to Champion, "Montgomery was actively involved in the marketing and sales

strategy for Champion's multi-fuel generators and was aware of their development, successes, and challenges" and "also provided substantive input on mechanical issues relating to the multi-fuel technology." (Doc. 198-3 at 27.) Firman, however, contends that Montgomery was a mere "salesperson" who "was neither familiar with nor proficient in the technical details" of the products he was selling. (Doc. 192 at 8-9.)

In 2015, after leaving Champion, Montgomery briefly worked for non-party Generac Power Systems, Inc. ("Generac")—a company that Champion has now separately sued in a patent infringement action pending in the Eastern District of Wisconsin. That lawsuit has resulted in a number of discovery disputes related to Champion's attempts to depose Montgomery. *Champion Power Equip. Inc. v. Generac Power Sys. Inc.*, Case No. 2:25-mc-00015-DWL (D. Ariz.); *Champion Power Equip. Inc. v. Generac Power Sys. Inc.*, Case No. 2:25-mc-00037-DWL (D. Ariz.).

Finally, in or around July 2015, Montgomery joined Firman, where he continues to work and currently serves as the company's CEO.

II.    The Cabela's Meeting

On September 26, 2014, Montgomery sent an email to several other Champion employees, including Mark Sarder and Dennis Trine. (Doc. 186-1 [redacted version]; Doc. 214-1 at 3-4 [sealed, unredacted version].) Sarder, who was then a Champion vice president of engineering, "is a named inventor on the Champion Patents" at issue in this lawsuit and "has knowledge surrounding the design and development of the technology underlying the Champion Patents and the inventions disclosed in the Champion Patents." (Doc. 176-1 at 67; Doc. 198-3 at 7 ¶ 1.)[1] Trine was, and still is, Champion's CEO. (Doc. 198-3 at 8 ¶ 3; Doc. 198-3 at 10 ¶ 1.) In the email, Montgomery stated that Trine had "given his blessing to show the Dual Fuel Inverter" to Cabela's. (Doc. 214-1 at 3.)[2] The

---

[1]    Sarder stopped working for Champion in 2019. (Doc. 198-3 at 3 ¶ 2.) However, Sarder has remained available to Champion during this litigation. (*See, e.g., id.* at 7-8 [declaration from Sarder].) Indeed, Champion's disclosure statements, which list Sarder as a witness with knowledge, state that Sarder may be contacted "c/o Snell & Wilmer," which is Champion's counsel in this action. (Doc. 176-1 at 67.)

[2]    Although this order periodically cites and quotes from sealed documents, the quoted portions are not competitively sensitive and do not, themselves, meet the sealing standard.

email also provided various logistical details regarding the planned meeting with Cabela's, which was scheduled for October 9, 2014. (*Id.* at 3-4.)

That same day, Sarder forwarded Montgomery's email to Trine and two other Champion employees (while removing Montgomery from the email chain). (*Id.* at 2-3.) Sarder stated that he "want[ed] to be on record with [his] concerns," one of which was "[t]he patent has not yet been applied for. I hope at minimum we can get a non-disclosure signed to protect our IP." (*Id.* at 2.)[3] In response, Trine wondered whether Sarder "really think[s] there is any IP to protect." (*Id.*) Another recipient then recommended, in an email sent on September 27, 2014, that Sarder attend the Cabela's meeting because "he can speak engineer language." (*Id.*)

On October 1, 2014, a Champion engineer, Jim Dehn, drafted an internal "Request for Analysis" regarding the dual-fuel generator that Champion was planning to display during the "Cabela's sales visit with Greg Montgomery." (Doc. 215-1 at 2 [sealed].) This document includes the following passage: "At first we decided not to send the [dual-fuel generator] concept to Cabelas because of these (2) reasons," the first of which was: "the patent paperwork is not ready and we should not disclose the concept to the public for sale until the patent application is filed." (*Id.*) The next bullet point reads: "On 9/29/14 Dennis Trine agreed to send the [dual-fuel generator] concept to Cabela's. The potential to get into Cabela's line review is more important than patent protection . . . ." (*Id.*)

On October 6, 2014, "[a]n internal Champion meeting took place," which "was attended by several Champion employees and executives, including Mr. Sarder, Mr. Montgomery, and [Trine]. At this meeting Mr. Montgomery agreed and acknowledged that he would acquire the necessary NDA signature from Cabela's prior to the Cabela's meeting." (Doc. 198-3 at 11 ¶ 8.) Trine then caused another Champion employee "to send

---

[3] Trine's publicly filed declaration also discusses this recommendation from Sarder. (Doc. 198-3 at 11 ¶¶ 6-7 ["I was alerted by Champion's VP of Engineering, Mark Sarder, on September 26, 2014 that the technology incorporated into the device that Mr. Montgomery desired to show to Cabela's on October 9, 2014 had certain features that had not yet been the subject of a filed patent application. Mr. Sarder recommended to me on October 1, 2014 that Champion ensure that a [NDA] be executed by Cabela's prior to such showing on October 9, 2014."].)

Champion's standard form for an NDA to Mr. Montgomery one hour after the internal meeting on October 6, 2014." (*Id.* at 11 ¶ 9.)

On October 9, 2014, the Cabela's meeting took place. (*Id.* at 8 ¶ 5.) The three attendees from Champion were Montgomery, Sarder, and Scott Stefanik. (*Id.*) "Montgomery led the Cabela's meeting on behalf of Champion," while Sarder "demonstrated the Cabela's generator to approximately six (6) people who [he] was not familiar with." (*Id.* at 8 ¶¶ 6-7.)

At the time, Sarder was under the impression that Montgomery had caused Cabela's to sign an NDA before the meeting. (*Id.* at 8 ¶ 8.) So was Trine. (*Id.* at 11-12 ¶¶ 10-12.)

III.    Relevant Developments During This Case

On November 10, 2023, Champion initiated this action. (Doc. 1.)

On April 16, 2024, Firman served its first set of interrogatories. (Doc. 176-1 at 6.) Interrogatory No. 4 required Champion to "[i]dentify by name, manufacturer, model number, and any other identifying indicia each Dual Fuel Engine or Dual Fuel Generator that Champion . . . (i) sold, (ii) offered for sale, or (iii) used, demonstrated, or disclosed to anyone (whether or not under a duty of confidentiality) before January 1, 2017, including an identification of the date and location of each sale/offer for sale/use/demonstration/disclosure, and all persons involved in or with knowledge of each sale/offer for sale/use/demonstration/disclosure before January 1, 2017." (*Id.* at 9.)

During May and June 2024, in an attempt to respond to Firman's discovery requests, Champion engaged in a search for "all multi-fuel generator models sold by Champion and the related patent marking information and dates of first sale." (Doc. 198-2 at 88 ¶¶ 2-3.) Champion "spent at least 15 hours" performing this search, which "identified nearly 100 multi-fuel generators that were sold by Champion" but did not uncover "any documents related to the meeting between Champion and Cabela's, Inc. on October 9, 2014." (*Id.* at 88 ¶¶ 4-6.)

On June 12, 2024, Champion responded to Firman's interrogatories. (Doc. 176-1 at 6-24.) In response to Interrogatory No. 4, Champion objected on various grounds,

including that "the prior sale, offer for sale, use, demonstration, or disclosure of every Dual Fuel Engine or Dual Fuel Generator is not relevant to any parties' claims or defenses unless the Dual Fuel Engine or Dual Fuel Generator practices the inventions claimed in one or more of the asserted claims of the Patents-in-Suit, thus making it an Embodying Product." (*Id.* at 10.)  Champion then added: "Subject to the foregoing objections, and construing Interrogatory No. 4 as such, Champion has not identified any information indicating that there was any disclosure, sale, or offer for sale of any Embodying Products before the priority dates of the Asserted Patents applicable to the Embodying Products." (*Id.* at 11.)

June 21, 2024 was Champion's deadline under the scheduling order to serve its "Disclosure of Asserted Claims and Infringement Contentions."  (Doc. 33 at 2.)  The scheduling order further specifies that if Champion "asserts or wishes to preserve the right to rely, *for any purpose*, on the assertion that its own apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party must identify, separately for each asserted claim, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim." (*Id.* at 3, emphasis added.)  In its contentions served on June 21, 2024, Champion did not identify the Cabela's generator.

Between July 26, 2024, and August 7, 2024, Champion engaged in a renewed search of its "records to identify any and all Champion multi-fuel generators, whether previously disclosed, sold, or offered for sale, that embody elements disclosed in any of Champion's patents asserted in" this lawsuit.  (Doc. 198-2 at 91 ¶ 3.)  "Collectively, Champion team members spent over 100 hours on this task." (*Id.*)  It appears that Champion uncovered, during this search, emails related to the Cabela's meeting.  (Doc. 198-3 at 3 ¶ 3.)  As a result, in August 2024, Champion's counsel "reviewed Champion documents" related to the Cabela's meeting.  (*Id.*)  However, Champion contends the documents it uncovered during this time period lacked the sort of "technical information" necessary "to determine whether any such generator embodied elements disclosed in any of Champion's patents asserted in [this] litigation." (Doc. 198-2 at 91 ¶ 5.)  Champion also contends that, at the

time it "evaluated the Cabela's Emails in August 2024," it "did not know whether the meeting actually occurred, or, even if it did, Champion believed the meeting was covered by an NDA." (Doc. 198 at 11.)

On August 12, 2024, Champion provided its first amended response to Firman's interrogatories. (Doc. 176-1 at 31-61.) This amendment was apparently prompted by Firman's objection to Champion's earlier attempt to limit its response to Interrogatory No. 4 to embodying products—in a subsequent meet-and-confer letter, Firman clarified that "[t]his interrogatory expressly seeks information regarding Champion duel fuel engines and generators that you contend do not embody the Asserted Patents. These products are relevant to validity under 35 U.S.C. §§ 102 and 103. Please amend your response to withdraw the relevance objection and provide the requested information." (*Id.* at 27.) In its first amended response to Interrogatory No. 4, Champion wrote: "Champion did not sell, offer to sell, use, demonstrate, or disclose any dual fuel engines or dual fuel generators which are not disclosed in Exhibit A before January 1, 2017." (*Id.* at 35.) The Cabela's generator was not disclosed in Exhibit A. (*Id.* at 38-61.)

August 30, 2024 was Firman's deadline under the scheduling order to serve its "Noninfringement, Unenforceability, And Invalidity Contentions." (Doc. 33 at 4.) In its contentions served that day, Firman did not identify the Cabela's generator.

On September 27, 2024, Champion produced over 2,300 pages of documents to Firman. (Doc. 181 at 5; Doc. 192 at 4.) This production included the emails from September 2014, referenced above, in which Montgomery discussed his plan to "show the Dual Fuel Inverter" to Cabela's on October 9, 2014, in which Sarder then went "on record with [his] concern[]" that "[t]he patent has not yet been applied for," and in which Sarder was identified as good presenter at the planned meeting because "he can speak engineer language." (Doc. 214-1 at 2-3.)

Between November 19-22, 2024, in response to Rule 45 subpoenas issued by Firman, "Generac produced 521 Documents spanning 2,525 pages and including thirty-five native files and numerous emails discussing Generac's purchase of dual fuel

generators from at least two different manufacture[r]s."  (Doc. 116 ¶ 9.)  One of those emails, dated April 7, 2015, included Montgomery (who was then working for Generac) as one of the cc'd recipients. (Doc. 121-2 at 2-3 [sealed].)

On November 26, 2024, Firman notified Champion that it intended to seek leave to amend its invalidity contentions based on "some of the prior art included in Generac's production [which] was not previously discovered by us."  (Doc. 116 ¶ 10.)

On January 7, 2025, Champion hired a third-party IT firm, Consilien, to "run searches of Champion's employee email boxes for emails related to Mr. Montgomery's involvement in Champion's dual-fuel generator development prior to his departure from Champion."  (Doc. 198-3 at 4 ¶ 12.)  "Those searches did not include Mr. Montgomery's email box."  (*Id.* at 31 ¶ 5.)  After the initial search resulted in limited information, Champion asked Consilien to run a more exhaustive search, including "unarchiving" Montgomery's old Champion email file and including it in the search.  (*Id.* at 4-5 ¶¶ 13-14, 19; *id.* at 12 ¶¶ 16-19; *id.* at 31 ¶ 7-11.)  Based on that renewed search, Champion discovered "similarities between the Cabela's generator" and certain other generators that Firman had identified in its November 2024 amended invalidity contentions.  (*Id.* at 4 ¶ 17.)

On February 4, 2025, Firman filed a motion for leave to amend its invalidity contentions "to include four new prior art references," including prior art references it discovered for the first time upon receipt of the Generac production in November 2024. (Doc. 115.)

On February 28, 2025, after Firman's amendment request became fully briefed (Docs. 120, 122), the Court issued an order granting it.  (Doc. 124.)  Among other things, the Court disagreed with Champion's argument "that because Montgomery, Firman's CEO, was cc'd on the April 2015 email discussing two of the new prior art references at issue, 'he obviously had actual knowledge of [them] . . . many years before Firman's initial infringement contentions were served, [and] waiting until now to disclose them is the direct opposite of diligence,'" concluding that although "it is easy in hindsight to fault

Montgomery for not remembering that email and bringing it to Firman's attention before the August 30, 2024 deadline for serving Invalidity Contentions," "[i]t is perfectly understandable that Montgomery would not have grasped the significance of (or even recalled) an email on which he was merely cc'd, while working for a different employer, nearly a decade earlier, and his failure to do so is particularly inconsequential in light of the affirmative showing that Firman has made as to the robust, diligent nature of its search." (*Id.* at 6, 9.)

Meanwhile, during February and March 2025, Champion conducted a search for the NDA that Sarder and Trine had believed was in place at the time of the October 2014 Cabela's meeting.  (Doc. 198-3 at 4-5 ¶ 19.)  No executed NDA was ever found.  (*Id.*; *id.* at 12 ¶ 14.)  This came as a surprise to Sarder and Trine.  (*Id.* at 8 ¶ 8; *id.* at 12 ¶ 12.)

On March 18, 2025, Champion served its second supplemental disclosure statement. (Doc. 176-1 at 63-73.)  In this document, Champion disclosed, for the first time, that various witnesses were "expected to have knowledge regarding an October 2014 visit Champion made to Cabela's . . . where Champion disclosed and offered for sale a dual-fuel generator."  (*Id.*)

On April 18, 2025, Champion served its third amended response to Firman's interrogatories.  (*Id.* at 87-94.)  This version included the following new statements in response to Interrogatory No. 4: "Champion employees Mr. Greg Montgomery, Mr. Mark Sarder, and Mr. Scott Stefaniak publicly disclosed and demonstrated a dual fuel inverter generator to [Cabela's] . . . on October 9, 2014 . . . .  On June 19, 2014, Champion assigned [two] engineers . . . to develop a new, dual fuel inverter generator for an upcoming sales meeting with Cabela's. . . .  On October 9, 2014, Mr. Montgomery, Mr. Sarder, and Mr. Stefaniak met at Cabela's in Sidney, NE.  They presented the dual fuel inverter generator at the meeting in an outdoor location next to the public parking lot and a public road leading to a Cabela's retail store.  After Mr. Sarder demonstrated the dual fuel inverter generator, those present gathered inside for a presentation.  The dual fuel inverter generator remained in the outdoor location unattended, and in plain view of the public. . . .  Mr. Montgomery

left Champion on December 12, 2014.  On December 30, 2014, Mr. Dennis Trine, Champion's CEO, made an internal request for an update on the quote (offer for sale) given to Cabela's on the dual fuel inverter generator.  On January 8, 2015, Mr. Trine had a call with Mr. Hausmann [from Cabela's] to reiterate the offer for sale, and to provide an update on the production of the dual fuel inverter generator shown to Cabela's in October.  Mr. Hausmann confirmed that Cabela's would be purchasing that new dual fuel inverter generator from Champion."  (*Id.* at 90-92.)

On April 28, 2025, Champion served its fourth amended response to Firman's interrogatories.  (*Id.* at 113-23.)  This version included, for the first time, an assertion that "[t]his dual fuel inverter generator"—*i.e.*, the Cabela's generator—"contained inventions disclosed in the Asserted Patents."  (*Id.* at 118.)

On April 29, 2025, Firman objected on the ground that this response failed to provide sufficient technical details.  (*Id.* at 108.)

On May 6, 2025, after the parties were unable to resolve their dispute informally, they filed a joint notice of discovery dispute.  (Doc. 163.)

On May 7, 2025, the Court held a hearing to address the discovery dispute.  (Doc. 167.)  At the conclusion of the hearing, the Court ordered Champion to provide new claim charts related to the Cabela's generator at the same time it provided certain other claim charts.  (*Id.* at 14-15.)

On May 21, 2025, Champion provided the claim charts.  (Doc. 169.)

On May 29, 2025, Firman provided its proposed amended invalidity and unenforceability contentions and its proposed amended counterclaims to Champion and asked if Champion would consent to amendment.  (Doc. 176-1 at 223.)

On June 3, 2025, Champion responded by providing its own proposed amended infringement contentions and clarifying that "it would not oppose Firman's request if Firman agreed not to oppose Champion's similar request."  (Doc. 181 at 2.)

On June 12, 2025, after the parties could not come to an agreement, Firman filed its pending amendment request.  (Doc. 176.)  That request is now fully briefed.  (Docs. 186,

- 9 -

192.)

On June 25, 2025, Champion sought to raise its amendment request via a notice of joint discovery despite.  (Doc. 181.)

On July 10, 2025, the Court held a hearing regarding the notice of joint discovery dispute.  (Doc. 190.)  At the conclusion of the hearing, the Court stated that it would benefit from additional briefing before reaching a decision and thus authorized Champion to file a formal amendment request.  (*Id.* at 48.)

On July 24, 2025, Champion filed its pending amendment request.  (Doc. 198.)  That request is now fully briefed.  (Docs. 202, 205, 208, 216.)[4]

## DISCUSSION

### I.   <u>Legal Standard</u>

As noted, the scheduling order set deadlines for Champion to file its infringement contentions (which also required Champion to identify any embodying product of its own on which it intended to rely "for any purpose") and for Firman to file its noninfringement, unenforceability, and invalidity contentions.  (Doc. 33 at 2-4.)  Those deadlines expired, respectively, on June 21, 2024 and August 30, 2024.  (*Id.*)

The scheduling order also specifies the standard for amending either set of contentions.  It provides:

> Amendment of the "Disclosure of Asserted Claims and Infringement Contentions" or the "Noninfringement, Unenforceability, And Invalidity Contentions" may be made only by order of the Court upon a timely showing of good cause.  Non-exhaustive examples of circumstances that may, absent undue prejudice to the non-moving party, support a finding of good cause include: (i) a claim construction by the Court different from that proposed by the party seeking amendment; (ii) recent discovery of material, prior art despite earlier diligent search; and (iii) recent discovery of nonpublic information about the Accused Instrumentality which was not discovered, despite diligent efforts, before the service of the "Disclosure of Asserted Claims and Infringement Contentions."  The duty to supplement discovery responses does not excuse the need to obtain leave of court to amend

---

[4]    Although Champion (but not Firman) requested oral argument, the Court concludes that further oral argument is unnecessary in light of the extended oral argument on July 10, 2025 touching on these issues.

- 10 -

1    contentions.

2    (*Id.* at 6.)

3        Moreover, even putting aside this provision in the scheduling order, any request to

4    modify the deadlines set forth in a scheduling order is governed by Rule 16(b)(4)'s "good

5    cause" standard. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir.

6    1992). This "standard primarily considers the diligence of the party seeking the

7    amendment." *Id.* at 609. "Although the existence or degree of prejudice to the party

8    opposing the modification might supply additional reasons to deny a motion, the focus of

9    the inquiry is upon the moving party's reasons for seeking modification." *Id.* "If that party

10   was not diligent, the inquiry should end." *Id.*

11       Courts in the Northern District of California have further elaborated on how this

12   standard applies when, as here, a litigant seeks to extend the deadline in a scheduling order

13   for providing contentions in a patent infringement action. Those decisions are instructive

14   because the scheduling order in this case is based in significant part on the Northern District

15   of California's model scheduling order for patent infringement actions. (Doc. 47 at 5.) As

16   those courts have explained, "[t]he moving party has the burden of demonstrating good

17   cause. . . . [T]he good cause inquiry is two-fold, asking: (1) whether the moving party was

18   diligent in amending its contentions; and (2) whether the non-moving party would suffer

19   prejudice if the motion to amend were granted." *Karl Storz Endoscopy-Am., Inc. v. Stryker

20   Corp.*, 2016 WL 2855260, *3 (N.D. Cal. 2016). "Diligence is the critical issue in the good

21   cause determination. The diligence required for a showing of good cause has two subparts:

22   (1) diligence in discovering the basis for amendment; and (2) diligence in seeking

23   amendment once the basis for amendment has been discovered. The party seeking to

24   amend its contentions bears the burden of establishing diligence." *Id.* (cleaned up).

25   "Prejudice is typically found when amending contentions stand to disrupt the case schedule

26   or other court orders." *Id.*

27       …

28       …

## II. Champion's Amendment Request

The Court will begin by addressing Champion's amendment request because the diligence analysis as to that request is straightforward. Champion was not diligent in discovering the basis for its amendment request.

Although Champion has offered an array of explanations (which are addressed in more detail below) for its belated determination that the Cabela's generator may support its position in this litigation, the bottom line is that the information necessary to support this contention has always been available to Champion—it simply failed to perform a diligent review of its own records and a diligent canvass of its own employees. Many cases from the patent infringement context recognize the commonsense principle that it is difficult for a party to establish diligence, for purposes of an amendment request, when claiming it didn't know about its own records and products. *See, e.g., Aurinia Pharms. Inc. v. Sun Pharm. Indus., Inc.*, 2022 WL 3040950, *6 (D.N.J. 2022) (denying portion of amendment request relating to the plaintiff's "own practicing product (for which Plaintiff itself presumably has possessed the relevant information)"); *Fox Factory, Inc. v. SRAM, LLC*, 2017 WL 4658063, *2 (N.D. Cal. 2017) ("FOX arguably lacked diligence in seeking some of its proposed amendments . . . [because] it could and should have known earlier which of its own products purportedly practice the patents in suit."); *Twilio, Inc. v. TeleSign Corp.*, 2017 WL 3581186, *3 (N.D. Cal. 2017) ("TeleSign has failed to establish diligence. The prior art at issue is TeleSign's own products . . . . The essential information TeleSign needed to satisfy the Local Rule was the priority date of the asserted patents and its own product information. Thus, TeleSign now seeks to include charts based on information TeleSign, and only TeleSign, has had all along."); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 587098, *1 (N.D. Cal. 2014) ("Magistrate Judge Corley denied MediaTek's Motion to Amend Infringement Contentions and determined that MediaTek had not offered sufficient reasons for its failure to disclose its own product practicing the claims at an earlier point."); *Silver State Intell. Techs., Inc. v. Garmin Int'l, Inc.*, 32 F. Supp. 3d 1155, 1163 (D. Nev. 2014) ("Garmin also has not shown it was diligent

in amending its contentions following the Court's claim construction Order. . . . Garmin's lack of diligence is particularly egregious with respect to StreetPilot, NavTalk, and 250XL—three of its own products."); *Symantec Corp. v. Acronis Corp.*, 2013 WL 5368053, *6 (N.D. Cal. 2013) ("This conduct is not diligence. These are Acronis's own products—information about their existence and release dates was not a secret. Merely because Acronis did not initially believe that these products were relevant does not allow them to now, at the close of fact discovery, argue that they are invalidating prior art . . . ."); *Cardsoft, Inc. v. Verifone Sys., Inc.*, 2012 WL 12895724, *2 (E.D. Tex. 2012) ("The Court is not satisfied that VeriFone acted diligently to discover the Omni 300 and OTA prior art. These references are related to VeriFone's own products, which it should have uncovered even if CardSoft never accused the Omni 3200 payment terminals of infringement.").

For this reason, Champion arguably should have discovered the Cabela's generator, and adjusted its litigation strategy accordingly, even before it chose to initiate this lawsuit in November 2023. Indeed, Firman informed Champion, via pre-lawsuit correspondence, that Firman intended to rely on Champion's 2015 sale of the RD9000E as invalidating prior art. (Doc. 68 ¶ 38 ["Champion admits that Firman sent counsel for Champion a letter on October 8, 2019 wherein Firman alleged, without any proof, that an older Firman model, the RD9000E, allegedly had certain features associated with the Champion Patents."].) This correspondence underscored the need for Champion, should it hope to raise a defense under 35 U.S.C. § 102(b) to Firman's anticipated invalidity counterclaims premised on the RD9000E, to scour its records for any disclosures or offers for sale of an embodying product that predated the RD9000E, such as the Cabela's generator.

Yet even giving Champion the benefit of the doubt regarding its failure to become aware of the Cabela's generator until after this case began, Champion displayed a lack of diligence once it obtained that awareness. Although Champion seemed to represent during an earlier hearing that it did not become aware of the Cabela's meeting until mid-February 2025,[5] Champion's counsel has now clarified that he reviewed, in August 2024, the emails

---

[5] During that hearing, Champion's counsel represented that Champion did not become aware of Montgomery's involvement in the Cabela's presentation until mid-

- 13 -

1    regarding the Cabela's meeting.  (Doc. 198-3 at 3 ¶ 3 ["In August 2024, I reviewed
2    Champion documents from 2014 suggesting that a meeting was being scheduled at
3    [Cabela's] in October 2014."].)  Champion then produced those emails to Firman on
4    September 27, 2024.  (Doc. 181 at 6; Doc. 192 at 5.)

5            Those emails speak for themselves.  They reflect that in late September 2014,
6    Montgomery informed various Champion employees, including Champion's CEO Trine,
7    that he would be displaying a dual-fuel generator to Cabela's on October 9, 2014, which
8    prompted Sarder to express concern to Trine that this display could create problems
9    because Champion had not yet applied for a patent.  (Doc. 214-1.)  Even acknowledging
10   that "hindsight is often '20/20'" and that "perfect diligence" is not required, *Fujifilm Corp.*
11   *v. Motorola Mobility LLC*, 2014 WL 491745, *4 (N.D. Cal. 2014), the potential importance
12   of these emails should have been apparent to Champion, and triggered immediate further
13   investigation, given the nature of the claims and defenses in this action.

14           Champion, however, apparently did not pursue immediate further investigation.
15   Instead, the record reflects that after uncovering and reviewing the emails in August 2024,
16   Champion simply produced the emails to Firman about one month later (in September
17   2024), then waited about another four months (until January 2025) to ask Consilien to start
18   running searches for additional documents related to Montgomery's involvement in
19   Champion's dual-fuel generator development, then waited a few more weeks (until late
20   January 2025) to ask Consilien to expand the scope of the search, and then waited another
21   one or two months (until February and March 2025) to begin looking into whether Cabela's
22   had signed an NDA covering the presentation.  This was not diligent.

23           Champion seeks to defend its conduct on the ground that the emails it discovered in
24   February 2025, after Generac produced documents in response to a Rule 45 subpoena: "So
25   Generac produced these documents in mid-February [2025]. . . .  What was uncovered was
     the president of Firman, Greg Montgomery, when he was at Champion, he disclosed this
26   Cabela's unit to Cabela's.  *He was the lead sales guy who went to Cabela's to push for this*
     *disclosure, which we had no knowledge about until we saw the Generac documents*, which
27   appeared that Montgomery had violated his employment agreement with Champion."
     (Doc. 167 at 9, emphasis added.)  Counsel then added: "[W]hen we saw the Generac
28   disclosure, . . . we went back and we had additional searches done based on Montgomery
     and Cabela's, and then *that's when we discovered this disclosure, this meeting that*
     *happened*."  (*Id.* at 10, emphasis added.)

August 2024 do not conclusively show the Cabela's presentation even took place. (Doc. 198 at 11 ["When Champion evaluated the Cabela's Emails in August 2024, based on Champion's investigation to that point and information then in its possession, Champion did not know whether the meeting actually occurred . . . ."].) This explanation is unpersuasive for two reasons. First, nothing in the emails suggests the meeting was tentative—they state that "[t]he meeting will be on Oct 9th from 11am until 2pm," identify the expected attendees by name, explain that "we will have lunch brought in while we have a working meeting," provide a detailed agenda, and even give the address of the hotel where Montgomery would be staying the night before. (Doc. 214-1 at 3-4.) Second, and more important, diligence required Champion, upon learning of the emails, to take prompt action to inquire further. It was not diligent to remain idle for months based on the theoretical possibility that the meticulously planned meeting described in the emails somehow never occurred.

Another of Champion's proffered justifications for its conduct is that it erroneously believed, at the time it uncovered the emails regarding the Cabela's meeting, that the meeting was covered by an NDA. (Doc. 198 at 12 ["[F]or the Cabela's generator to serve as an exception to any prior art, it needed to be a *public* disclosure. Based on Champion's investigation up to August 2024, including its understanding that the Cabela's meeting, which it could not confirm at that time even happened, would have been under an NDA, Champion did not have any reason to believe at that time that it could use the Cabela's generator 'for any purpose,' as required under Section 5(A)(7) of the CMO."].) Champion further contends that "[i]n a case already mired in difficult, complicated issues with over a dozen patents, hundreds of claims, hundreds of prior art references cited by Firman, and nearly 100 other embodying products," it was not required to "chase every rabbit hole." (Doc. 205 at 5.)

As an initial matter, the Court agrees with Firman that "[i]t is odd that—after the parties met and conferred for months, fully briefed a joint discovery dispute statement, and presented oral argument at the hearing—Champion never once referenced this purported

intentional decision to *not* disclose the Cabela's generator based on a mistaken assumption about the existence of an NDA." (Doc. 202 at 9-10.) But even accepting this explanation on its own terms, it lacks merit. The relevant timeline is that Champion's contentions were due on June 21, 2024, Champion then discovered the emails related to the Cabela's presentation in August 2024, yet Champion did not even begin attempting to confirm an NDA was in place until February or March 2025. This half-year (or more) delay in looking into whether an NDA was in place amounted to a lack of diligence. *Cf. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1367 (Fed. Cir. 2006) (affirming district court's determination that a three-month delay amounted to a lack of diligence). Furthermore, Firman had propounded discovery requests to Champion that broadly covered all dual-fuel generators that Champion had offered to sell before its patent applications. Those discovery requests did not exclude offers covered by an NDA.

In a related vein, the Court is unpersuaded by Champion's assertion that it had no reason to inquire further into these issues until it received document productions from Generac that "reveal[ed] Montgomery's leadership of the development of dual fuel generators at Generac just months after leaving Champion" and "caused Champion to reexamine everything Montgomery was involved in during his final months with Champion." (Doc. 198 at 3.) As discussed above, the potential importance of the Cabela's emails—which, again, included Sarder going out of his way to raise concerns about how the Cabela's meeting might interfere with Champion's patent rights—should have been apparent to Champion and triggered immediate further investigation. The need for such investigation was not contingent on Champion's assessment of whether Montgomery was a loyal and honest employee during his final months at the company.

Champion also contends that "[i]f Firman could not conclude that the Cabela's generator practiced the claims of the asserted patents in September 2024—especially when Montgomery was the one with the most knowledge of the presentation—it would be unreasonable to demand that Champion do so in August 2024 with only the Cabela's Emails and no current employee who attended the presentation. The emails also do not

provide sufficient technical details to confirm that the Cabela's generator was an embodying product." (Doc. 198 at 12.)  But even accepting that the emails discovered in August 2024 do not, alone, contain enough technical information to determine whether the Cabela's generator practiced the claims of the asserted patents, the additional technical information necessary to make that determination has always been within Champion's exclusive control.  The diligence problem arises from Champion's failure to take prompt action, in the aftermath of its August 2024 discovery of the emails, to review its own records, canvass its own employees, and/or to inquire further with Sarder (to whom Champion still had access)—things that only Champion, and not Firman, had the ability to do.  Among other things, the internal records Champion belatedly discovered include a memorandum in which a current Champion engineer (Dehn) acknowledged that Champion's current CEO (Trine) "agreed to send the [dual-fuel generator] concept to Cabela's" because "[t]he potential to get into Cabela's line review is more important than patent protection." (Doc. 215-1 at 2 [sealed].)  As Firman correctly notes in its response brief, "Champion has always had access to detailed, written, and contemporaneous information about the Cabela's generator in the possession of current employees . . . . Indeed, keyword searching for 'Cabela's' or [the relevant project number] would have identified these documents, current employees, and the shared drive containing pictures and a video of the Cabela's generator.  Champion had the institutional knowledge— through current employees and their custodial documents—to timely investigate and identify the Cabela's generator as an Embodying Product well before serving its infringement contentions." (Doc. 202 at 4.)

Champion also raises various arguments that are, at bottom, premised on its disagreement with the scheduling order.  As noted, the scheduling order required Champion to disclose, in its contentions due on June 21, 2024, any embodying product of its own on which it intended to rely "for any purpose." (Doc. 33 at 2-3.)  Champion contends this disclosure requirement was overbroad and that it should have only been required to disclose embodying products that correspond to damages, as contrasted with

embodying products on which it intends to rely under § 102(b).  (Doc. 198 at 6-7.)
Champion also contends the scheduling order should not impose a good-cause requirement
for amendment.  (*Id.* at 8 ["Champion has consistently objected to the onerous N.D. Cal.
Local Patent Rules and their good cause requirement to amend their contentions. . . .  And
this dispute underscores Champion's objections to the imposition of a good cause
requirement."].)

As a threshold matter, these arguments fail because they are, in effect, disguised
requests for reconsideration.  During the early stages of the case, the parties disagreed over
the form the scheduling order should take, with Firman recommending a version modeled
in part on the local rules of the Northern District of California and Champion objecting to
Firman's proposal on various grounds, including that "the N.D. Cal. Rules would impose
unnecessary burdens on the Parties" and that the scheduling order should not require good
cause for amendments.  (Doc. 23 at 8-16.)  On April 24, 2024, after hearing argument from
the parties, the Court issued the final version of the scheduling order, which tracked
Firman's proposal in many respects.  (Doc. 33.)  Under LRCiv 7.2(g), any request by
Champion for reconsideration of that order was due within 14 days, could not be based on
the repetition of Champion's earlier arguments, and needed to be premised on "a showing
of manifest error or a showing of new facts or legal authority that could not have been
brought to [the Court's] attention earlier with reasonable diligence."  *Id.*  The arguments
related to the scheduling order raised in Champion's motion do not satisfy those
requirements—they amount to the untimely repetition of objections the Court previously
rejected after careful consideration.

Moreover, even putting aside LRCiv 7.2(g), Champion's criticisms of the
scheduling order fail on the merits.  The sequence of disclosures required by the scheduling
order, as well as the scheduling order's good-cause requirement for amendment, were
"designed to require parties to crystallize their theories of the case early in the litigation
and to adhere to those theories once they have been disclosed" and to "prevent a 'shifting
sands' approach to patent litigation."  *Richtek Tech. Corp. v. uPI Semiconductor Corp.*,

2016 WL 4269095, *1 (N.D. Cal. 2016).  *See also OpenTV, Inc. v. Apple Inc.*, 2016 WL 3196643, *3 (N.D. Cal. 2016) ("[T]he spirit of the patent local rules is to ensure early crystallization of the parties' theories, and specifically, to place the burden on the plaintiff to quickly decide on and disclose the contours of its case.").  It is unfortunate that enforcement of the good-cause requirement may sometimes require a party to forgo reliance on a particular piece of late-discovered evidence or a particular late-developed theory, but this is an inevitable consequence of having an enforceable schedule, the absence of which would create many other problems.  *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 5632618, *2 (N.D. Cal. 2012) ("The local rules . . . require parties to define their theories of infringement early on in the course of litigation . . . [and] serve[] to balance the parties' rights to develop new information in discovery along with the need for certainty in legal theories at the start of the case.").  Put simply, courts "expect patent plaintiffs to assert their theories of the case and stick to them, absent good cause to change course.  Amendments that are merely responsive to a defendant's noninfringement theories are often disallowed to avoid a 'running dialogue' between parties.  This is especially true where a plaintiff shifts or expands positions at a late stage."  *Advanced Micro Devices, Inc. v. LG Elecs., Inc.*, 2017 WL 2774339, *3 (N.D. Cal. 2017) (citations omitted).

Champion's final, related argument is that the "interests of justice" favor granting its amendment request because, otherwise, "the outcome would not be based on the merits but a procedural ruling.  Further, such an outcome could potentially affect other pending litigation by invalidating Champion's intellectual property rights where other courts find the Cabela's disclosure serves as a § 102(b) exception to alleged prior art within the 1-year grace period.  Such inconsistencies—because of a ruling on a procedural motion—would raise much confusion as to the validity and enforceability of the Champion Patents."  (Doc. 198 at 4, 9.)  This argument ignores that, as discussed above, the disclosure requirements set forth in the scheduling order must "have teeth.  Their design is not punitive, but they put structure to litigation that otherwise would be unmanageable."  *Sycamore IP Holdings LLC v. AT&T Corp.*, 2018 WL 1695231, *11 (E.D. Tex. 2018) (citation omitted).  *See also*

*O2 Micro Int'l Ltd.*, 467 F.3d at 1364 (acknowledging that local patent rules "are likely to directly affect the substantive patent law theories that may be presented at trial, being designed specifically to require parties to crystallize their theories of the case early in the litigation") (cleaned up).  As Firman correctly notes, "[i]f waiver-based rules cannot restrict a party's ability to make certain arguments, they have no practical effect. . . .  Patent litigation would be unworkable without sequenced and staggered patent disclosures." (Doc. 202 at 16.)  "Any inconsistencies between cases also will not cause problems on appeal.  Just as in any appeal, the Federal Circuit's job will be to adjudicate each case based on the record developed in each case, under each case's disclosure deadline."  (*Id.*)

For these reasons, the Court concludes that Champion failed to act diligently in discovering the basis for its amendment request.  Given this determination, it is unnecessary to address Firman's alternative bases for opposing Champion's amendment request (Doc. 202 at 12-15), which are that Champion waited too long to request leave to amend after discovering the basis for its amendment request and that Firman would suffer undue prejudice from amendment.  *Johnson*, 975 F.2d at 609 ("If that party was not diligent, the inquiry should end."); *Apple, Inc.*, 2012 WL 5632618 at *2 ("If the court finds that the moving party was not diligent in amending its infringement contentions, there is no need to consider the question of prejudice to the non-moving party, although a court in its discretion may elect to do so.").

III.    Firman's Amendment Request

  A.    **Diligence**

Firman contends that it acted diligently by performing a comprehensive search for prior art and by propounding an array of discovery requests to Champion aimed at ferreting out any offers to sell, sales, or disclosures of Champion's dual fuel generators before January 1, 2017; that it was entitled to rely on Champion's resulting denials that there was anything to disclose; and that when Champion belatedly disclosed, for the first time in March 2025, an intent to rely on the Cabela's generator as prior art, it took prompt action to seek further discovery regarding the Cabela's generator, to obtain updated claim charts

regarding the Cabela's generator, and to prepare proposed amended invalidity and unenforceability contentions and counterclaims based on the Cabela's generator. (Doc. 176 at 6-11.) Firman also contends that Champion "held a monopoly over the witnesses and documents needed to determine whether the Cabela's generator embodied the patents." (Doc. 192 at 1.) Firman thus argues that its search efforts should be deemed diligent in light of "Champion's assurances and Firman's lack of technical information." (*Id.*)

Champion contends that Firman was not diligent. (Doc. 186.) In making this argument, Champion relies almost exclusively on the fact that Montgomery oversaw the Cabela's presentation while he was still employed by Champion: "Montgomery, more than anyone at Champion, should have recalled the Cabela's demonstration because he spearheaded the disclosure, and the demonstration now falls at the center of Firman's invalidity and unenforceability counterclaims. Firman has argued in opposition to Champion's request to amend its contentions that Champion was not diligent for having earlier knowledge of the Cabela's generator. For the same reasons, Firman cannot in good faith argue it was diligent based on Montgomery's prior knowledge." (*Id.* at 4.) Champion continues: "[I]f Firman was diligently searching for prior art, Montgomery—Firman's CEO—would have informed Firman's counsel about his personal knowledge of the Cabela's demonstration, and Firman should have taken the disclosure into account when developing its prior art and invalidity contentions. If Champion could have identified the Cabela's generator in September 2024 from these emails, as Firman argues, then by the same reasoning, Firman could (and should) have done the same before serving its invalidity contentions in October 2024 or moving to amend its invalidity contentions in December 2024." (*Id.* at 4-5.) Champion concludes: "Firman cannot explain away Montgomery's knowledge and simultaneously argue Champion was not diligent." (*Id.* at 5.)

The Court concludes that Firman, unlike Champion, was diligent with respect to the Cabela's generator. As an initial matter, many of Champion's arguments rest on the premise that any knowledge Montgomery possessed regarding the Cabela's generator, by virtue of his work as a Champion employee in 2014, is automatically imputed to Firman in

this lawsuit due to his current role as Firman's CEO.  Although some courts have allowed

for such imputation, *see. e.g.*, *Grail Semiconductor v. Renesas Elecs. Am. Inc.*, 2012 WL

12920690, *12 (N.D. Cal. 2012) ("The facts of this case weigh against finding that Grail

lacked any notice of an adverse claim or interest.  Stern was a founder and officer of

Powergate.  Stern invented the technology in question.  Stern is a founder and officer of

Grail. . . .  Under the circumstances of this case, it is not credible that Grail (via Stern) had

no notice of a possible claim or interest in the technology."), other courts "have held that

notice to or knowledge acquired by an officer or agent of a corporation before the agent

becomes such is not notice to the corporation after the agent becomes such; the agent must

acquire the knowledge while the relation exists, unless it appears by clear and satisfactory

proof either that the knowledge was present in the mind of the officer or agent at the time

of the transaction in which the principal is sought to be charged with such knowledge, or

that such knowledge was received by the officer or other agent at so short a time before

such transaction that it is impossible to have forgotten it."  3 Fletcher Cyc. Corp. § 799.

*See also Gardiner v. Equitable Off. Bldg. Corp.*, 273 F. 441, 447 (2d Cir. 1921) ("[T]he

knowledge of Dunham cannot be imputed to the corporation.  At the time Dunham obtained

knowledge of the transaction, he was not a director.").

Nevertheless, even assuming Firman is deemed to have been aware of the Cabela's

generator (by virtue of its employment of Montgomery) at the time this lawsuit was filed

in 2023, such awareness is not the same thing as knowledge or even reasonable suspicion

on the part of Firman that the Cabela's generator was similar enough to the patents at issue

in this action to warrant further inquiry.  Montgomery was a salesman, not an engineer,

and it is telling that Champion arranged for Sarder (rather than Montgomery) to perform

the technical aspects of the Cabela's presentation because Sarder could "speak engineer

language."  (Doc. 214-1 at 2.)  Additionally, the internal Champion emails from 2014 that

have now come to light show that Montgomery was removed from the email chain before

Sarder began raising concerns to Trine about how the Cabela's presentation might raise

intellectual property concerns and undermine Champion's patent rights.   Given this

backdrop, Champion was in a much better position (by virtue of its access to Trine, Sarder, and Behn, not to mention its exclusive access to its own internal documents bearing on the technical aspects of the Cabela's generator) than Firman (by virtue of its access to Montgomery) to know at the time this lawsuit was filed in 2023 that the Cabela's generator might be relevant to the parties' claims and defenses. Thus, diligence did not require Firman to pursue discovery related to the Cabela's generator once Champion filed suit.

The next question is whether diligence required Firman to pursue further discovery related to the Cabela's generator once it received, in September 2024, the production from Champion that included certain internal Champion emails from 2014 pertaining to the Cabela's presentation. The Court concludes, albeit not without some hesitation, that the answer is no.[6] Although Champion contends the diligence analysis as to each side should be the same (Doc. 186 at 2 ["Firman's and Champion's Diligence Arguments Rise or Fall Together."]), this argument overlooks three important distinctions between the parties. First, Champion produced the emails pursuant to a "Confidential—For Counsel Only" designation under the protective order, such that Firman was not even allowed to show the emails to Montgomery to jog his memory unless Montgomery was a recipient. (Doc. 192 at 8 n.3, citing Doc. 95 ¶ 5(e).) As noted, although Montgomery sent the initial agenda email regarding the Cabela's meeting, he was not on the subsequent email chain in which Sarder expressed intellectual property concerns. (Doc. 214-1 at 2-3.) Second, as of September 2024, Champion had exclusive access to its internal technical documents discussing the Cabela's generator. Third, also as of September 2024, Champion had repeatedly avowed to Firman—in response to dogged efforts by Firman to obtain discovery on this exact topic—that Champion had not made any disclosures of embodying products during the timeframe of the Cabela's presentation.

In *Olaf Sööt Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395 (S.D.N.Y. 2017),

---

[6]    During the July 10, 2025 discovery dispute hearing, the Court expressed skepticism that Firman acted with diligence following its receipt in September 2024 of the Cabela's-related emails. (Doc. 190 at 45-46.) However, the Court also made clear that it was "not definitively deciding that now" because the issues were not yet fully briefed. (*Id.* at 46.) As discussed in this body of this order, the Court now concludes, with the benefit of full briefing and time for reflection, that Firman was diligent.

the district court addressed a similar situation. There, the plaintiff in a patent infringement action argued it should be allowed to amend its claims to rely on a particular patent and that it had been prevented from doing so earlier "due to misleading and delayed discovery disclosures on the part of Defendants." *Id.* at 398. The defendants, in turn, argued that the plaintiff failed to act with diligence because they had produced documents to the plaintiff earlier in the litigation that contained references to the patent at issue. *Id.* Although the court acknowledged that the defendants' argument on this point carried weight "[t]o a certain degree," it ultimately concluded that the earlier production did not trigger a need for immediate action by the plaintiff in light of the defendants' inaccurate "representations during the discovery process," which could have reasonably induced the plaintiff into believing that further inquiry "would be unnecessary":

> According to Plaintiff, the Hoffend Patents documents only indicate that Hoffend, not Defendants, had knowledge of the '485 Patent, and Plaintiff did not think it necessary to investigate further after relying on Defendants' discovery responses that Defendants first learned of the '485 Patent in the instant litigation and had disclosed all relevant and responsive documents. Plaintiff contends it was only after receiving later document disclosures from Defendants starting in June 2017, disclosures that contained communications between Defendants and the USPTO, that Plaintiff unearthed evidence of Defendants' knowledge, making Plaintiff's proposed claim actionable. To a certain degree, Defendants' argument against Plaintiff's diligence carries weight. Plaintiff received the Hoffend Patents from Defendants in mid-2016 and those documents referenced the '485 Patent. With knowledge of such documents, a litigator could have begun investigating the prosecution history of those patents herself. At the same time, Defendants' representations during the discovery process could reasonably have led Plaintiff to conclude additional fact-finding as to Defendants' patent prosecution history and Plaintiff's willfulness claim would be unnecessary—for example, when Defendants represented in mid-2016 that they had produced all documents responsive to Plaintiff's discovery requests, including any documents related to Defendants' patent applications and Defendants' prior knowledge of the '485 Patent, representations which were proven incorrect in the aftermath of a motion to compel granted in April 2017. Given the circumstances, . . . failing to perform particular research or in not asking particular questions of Defendants' 30(b)(6) witness do not establish a lack of diligence.

*Id.* at 398-99 (citations omitted).

For essentially the same reasons, diligence did not require Firman to immediately pursue further discovery related to the Cabela's generator upon receipt of Champion's production in September 2024. *See also Romero v. Regions Fin. Corp./Regions Bank*, 2019 WL 1954082, *2 (S.D. Fla. 2019) ("Plaintiff had been provided numerous opportunities to disclose this specific information to Defendant . . . at several points during the course of the litigation. She chose not to do so until her deposition, and Defendant, exercising diligence, shortly thereafter sought to amend its affirmative defenses. This satisfies the 'good cause' inquiry, and leave should therefore be given.") (citation omitted); *Dwellingham v. Mark A. Nestor, P.C.*, 2015 WL 13773082, *3 (N.D. Ga. 2015) ("Since Defendant's misleading discovery responses are the primary cause of the delay here, good cause exists to modify the scheduling order."). Accordingly, Firman has met its burden of establishing the diligence necessary to support its amendment request.[7]

## B. **Undue Prejudice**

Firman's showing of diligence does not end the inquiry, because the "evaluation of good cause is not coextensive with an inquiry into the propriety of the amendment under . . . Rule 15. . . . [T]he existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion . . . ." *Johnson*, 975 F.2d at 609 (cleaned up). *See also Advanced Micro Devices, Inc.*, 2017 WL 2774339 at *4 ("If the moving party is able to establish diligence, the Court should then consider prejudice to the non-moving party in determining whether to grant leave to amend.").

Champion contends it would suffer undue prejudice if Firman's amendment request were granted because "[t]he Cabela's generator is a Section 102(b)(1) defense to Firman's

---

[7]    As noted, "[t]he diligence required for a showing of good cause has two subparts: (1) diligence in discovering the basis for amendment; and (2) diligence in seeking amendment once the basis for amendment has been discovered." *Karl Storz*, 2016 WL 2855260 at *3. The Court construes Champion's response as only challenging the sufficiency of Firman's showing as to the first subpart. At any rate, Firman has also established diligence as to the second subpart—after Champion disclosed, for the first time in March 2025, an intent to rely on the Cabela's generator as prior art, Firman took prompt action to seek further discovery regarding the Cabela's generator, to obtain updated claim charts regarding the Cabela's generator, to prepare proposed amended invalidity and unenforceability contentions and counterclaims based on the Cabela's generator, and then to seek judicial relief.

- 25 -

invalidity and unenforceability counterclaims, but if Champion cannot amend its contentions, it would be precluded from asserting the defense. . . .  If only Firman's Motion is granted, the practical effect would be that Firman can raise its unenforceability and inequitable conduct arguments regarding the Cabela's generator, but Champion would be wholly unable to address or respond to these arguments because Champion could not argue anything related to the Cabela's generator."  (Doc. 186 at 7-8.)  Champion also accuses Firman of engaging in "gamesmanship"; disputes that it has ever "confirmed [that] the Cabela's generator invalidates or renders unenforceable the Asserted Patents"; and argues that "the only path that eliminates undue prejudice is if the Court grants both parties leave to amend their contentions," because otherwise "Champion could not use the witnesses and documents (which Firman argues are in Champion's sole possession and ostensibly eliminate any prejudice) to defend against Firman's proposed amendment."  (*Id.* at 8.)

These arguments lack merit.  Although Champion contends it will suffer undue prejudice if it is precluded from raising a § 102(b)(1) defense at trial, this is not a basis for opposing *Firman's* amendment request—instead, this is simply a consequence of Champion's failure to establish diligence as required to support *Champion's* amendment request.  Indeed, the sort of undue prejudice that is usually required to overcome a diligent adversary's amendment request is a showing that the amendment "stand[s] to disrupt the case schedule or other court orders."  *Karl Storz*, 2016 WL 2855260 at *3.  *See also Advanced Micro Devices, Inc.*, 2017 WL 2774339 at *4-5 (denying amendment request, even though the movant established diligence, in part because the opposing party showed that "its claim construction strategy relied on [the movant's] original complaint and infringement contentions").  Here, however, Champion concedes that allowing Firman's amendment request would not have a disruptive effect on the discovery or case schedules.  (Doc. 186 at 6-7 ["Champion agrees there is ample time in discovery—including expert discovery—before trial, which would allow both parties to complete discovery and allow Champion to respond to Firman's invalidity and unenforceability contentions and counterclaims.  And . . . Champion agrees adding the Cabela's generator to this case would

not disrupt the case schedule or other orders."].)

Nor is there any merit to Champion's contention that the "practical effect" of granting Firman's amendment request, while denying Champion's amendment request, would be to preclude Champion from "argu[ing] *anything* related to the Cabela's generator" and to render Champion "wholly unable to address or respond to" Firman's unenforceability and inequitable conduct arguments regarding the Cabela's generator. (*Id.* at 7-8.) As Firman correctly notes in its reply, "granting Firman's motion and denying Champion's motion will not muzzle Champion about the Cabela's generator or prevent Champion from defending itself. Champion will remain free to defend itself by, for example, arguing that the Cabela's generator is not prior art because it was never actually offered for sale. In other words, Champion will be free to challenge the merits of Firman's invalidity and unenforceability contentions—including those based on the Cabela's generator—so long as it does not do so by relying on the Cabela's generator in an attempt to move the date required to qualify as prior art under 35 U.S.C. § 102(b)." (Doc. 192 at 11, citation omitted.)

Accordingly,

**IT IS ORDERED** that:

1.    Firman's motion for leave to amend its invalidity and unenforceability contentions and its counterclaims (Doc. 176) is **granted**.

2.    Champion's motion for leave to amend its infringement contentions (Doc. 198) is **denied**.

Dated this 14th day of November, 2025.

_____
Dominic W. Lanza
United States District Judge