WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Champion Power Equipment Incorporated,

Plaintiff,

v.

Firman Power Equipment Incorporated,

Defendant.

No. CV-23-02371-PHX-DWL

**ORDER**

This is a patent infringement dispute between two direct competitors, Plaintiff Champion Power Equipment Incorporated ("Champion") and Defendant Firman Power Equipment Incorporated ("Firman"). Champion asserts that Firman infringed 13 of its patents (the "Asserted Patents") that "relate generally to multi-fuel portable generators, and the switching of fuels." (Doc. 155 at 7.)

Now before the Court is Champion's Opening Claim Construction Brief, which seeks the Court's construction of certain disputed terms and phrases in the Asserted Patents. (Doc. 155.) After the issues became fully briefed (Docs. 171, 175) and the parties filed various post-briefing stipulations (Docs. 261, 265), the Court issued a tentative ruling (Doc. 267) and held a *Markman* hearing (Doc. 270). This order sets forth the Court's construction of the disputed terms and phrases in the Asserted Patents.

## RELEVANT BACKGROUND

The following descriptions of the Asserted Patents are derived from the parties'

briefing (Docs. 155, 171, 175) and the Asserted Patents (Doc. 155-2).[1]  This section is intended only to provide relevant background on some of the mechanical aspects of the inventions.

I.    The Asserted Patents

"The Asserted Patents relate generally to multi-fuel portable generators, and the switching of fuels." (Doc. 155 at 7.)  "Multi-fuel portable generators can run on more than one fuel source to create electricity." (*Id.*)  "Typically, they can run on liquid fuel such as gasoline or gaseous fuels such as propane or natural gas." (*Id.*)  "The ability to switch between different fuel types provides consumers with the option to use fuels that may be more convenient or produce a higher power output (e.g., gasoline) or fuels that are cleaner (e.g., propane and natural gas)." (*Id.*)

At a high level, each of the Asserted Patents generally seeks to address a common problem with multifuel generators in the prior art—that the generator/engine may be supplied, at least for some time, with more than one fuel source, which can be unsafe and/or impair performance.   Thus, each of the Asserted Patents broadly covers multifuel generators designed to avoid such mixing of fuels. (*See, e.g.*, Doc. 155-2 at 10 ['780 Patent at 1:48-59]; *id.* at 28 ['034 Patent at 1:60-2:10]; *id.* at 48 ['101 Patent at 1:47-57]; *id.* at 69 ['398 Patent at 1:57-2:4]; *id.* at 90 ['120 Patent at 1:65-2:15]; *id.* at 115 ['145 Patent at 1:60-2:7]; *id.* at 137 ['667 Patent at 1:44-60]; *id.* at 152 ['985 Patent at 1:60-2:4]; *id.* at 171 ['654 Patent at 1:58-2:2]; *id.* at 189 ['390 Patent at 1:46-62]; *id.* at 204 ['970 Patent at 1:62-2:6]; *id.* at 223 ['895 Patent at 1:64-2:8]; *id.* at 241 ['896 Patent at 1:47-62].)

For conceptual purposes, the 13 Asserted Patents can be grouped into four families. (Doc. 171 at 2.)[2]

---

[1]    The 13 Asserted Patents are: (1) U.S. Patent No. 10,221,780; (2) U.S. Patent No. 10,393,034; (3) U.S. Patent No. 10,598,101; (4) U.S. Patent No. 10,697,398; (5) U.S. Patent No. 11,143,120; (6) U.S. Patent No. 11,143,145; (7) U.S. Patent No. 11,306,667; (8) U.S. Patent No. 11,492,985; (9) U.S. Patent No. 11,530,654; (10) U.S. Patent No. 11,761,390; (11) U.S. Patent No. 11,840,970; (12) U.S. Patent No. 11,905,895; and (13) U.S. Patent No. 11,905,896.  This order will refer to these patents by the last three digits of the patent number—e.g., "the '896 Patent."

[2]    This conceptual grouping of the Asserted Patents into families is derived from Firman's response brief.  (Doc. 171.)  Firman has represented, and Champion does not

### A.    The First Patent Family

The first patent family comprises the '101, '667, '390, and '896 Patents.  (*Id.* at 3.)

The '101 Patent describes the prior art as follows:

> Typical dual fuel generators utilize separate valves for each fuel type, such as an LPG [liquefied petroleum gas] valve and a gasoline valve, to control flow of the respective fuels to the engine.  While the existence of two separate valves allows one fuel type to have its valve "on" while the other has its valve "off," there is nothing to prevent both valves from being "on" at the same time.  As such, it possible for both valves to be in the "on" position, which can lead to a potentially unsafe condition resulting from the mixture of the fuels.

(Doc. 155-2 at 48 ['101 Patent at 1:41-50].)  The first patent family seeks to provide a solution to this problem:

> Therefore, it would be desirable to provide a dual fuel generator with a selector switch that would prohibit the mixing of two differing types of fuels.  It would further be desirable for such a selector switch to inhibit positioning/actuation of the valves in such a manner that the valve for a first fuel source is prevented from being "on" when the valve for a second fuel source is "on", and vice versa.

(*Id.* ['101 Patent at 1:51-57].)

Figures 5 and 6 from the '101 Patent (*id.* at 46-47) illustrate how this might work:



FIG. 5



FIG. 6

appear to dispute, that each patent "family" has identical written descriptions.  (*Id.* at 2.)

- 3 -

In both FIGS. 5 and 6, the "[p]ositioning of the selector switch **30** relative to the . . . first and second valve assemblies **24**, **26** is shown." (*Id.* at 50 ['101 Patent at 5:43-45.) In FIG. 5, the selector switch **30** is shown in the "first position." (*Id.* ['101 Patent at 5:63-64].) When the selector switch **30** is in the first position, the second fuel valve handle **38** is covered by the selector switch **30** and locked in an OFF position, such that the second valve assembly **26** (also covered by the selector switch) cannot be moved to the ON position. (*Id.* ['101 Patent at 5:64-6:2].) When, as in FIG. 5, the selector switch **30** is in the first position, the first valve assembly **24** "is able to move freely between the ON position and the OFF position," which may be done by actuation of the first fuel valve handle **34**. (*Id.* ['101 Patent at 6:2-6].)

The selector switch **30** is "translatable" or "movable" and may be moved, or slid back and forth, between first and second positions. (*Id.* ['101 Patent at 5:51-54, 5:59-61]. *See also id.* at 48 ['101 Patent at 2:51].) FIG. 6 illustrates what the selector switch **30** looks like once slid into second position. (*Id.* ['101 Patent at 6:19-20].) In the second position, the selector switch covers the first fuel valve handle **34** and first fuel valve assembly **24**— and prevents the first fuel valve assembly **24** from being in the ON position. (*Id.* ['101 Patent at 6:20-25].) Conversely, the second valve assembly **26** is now "able to move freely between the ON position and the OFF position," which may be done by actuation of the second fuel valve handle **38**. (*Id.* ['101 Patent at 6:25-29].)

In a nutshell, the selector switch and its positioning prevents both valve assemblies from being ON at the same time to avoid mixing fuels. The patents in the first patent family generally relate to this "selector switch" design.

B.    **The Second and Third Patent Families**

The second patent family comprises the '780, '654, '985, '970, and '895 Patents. (Doc. 171 at 3.) The third patent family comprises the '398 and '145 Patents. (*Id.*)[3] Unlike the first patent family, each of the patents in the second and third family uses one fuel valve

---

[3]    The only term disputed by the parties as it relates to the patents in the third patent family—"a switch to change operation"—does not require a mechanical background explanation and will simply be addressed in the Court's analysis section below.

instead of two.  (*Id.* at 12.)

The '780 Patent describes the issues in the prior art as follows:

In order to provide the liquid and gaseous fuel to the engine, the dual fuel engine may have a first fuel line for liquid fuel and a second fuel line for gaseous fuel.  A liquid fuel source and a gaseous fuel source may be coupled to the respective lines to provide fuel to the engine.  However, a common problem with such configurations that couple two fuel sources to a single engine is the engine can experience overly rich air-fuel ratio when both fuels are simultaneously engaged during cross-over switching between the fuel sources.  Further, such simultaneous delivery of fuel from the first fuel line and the second fuel line may make the engine hard to start or lead to unstable operating conditions.

(Doc. 155-2 at 10 ['780 Patent at 1:44-55].)  The '780 Patent then provides a brief description of the invention, including:

[A] mechanical fuel lockout switch for a dual fuel engine provides for the selection of a desired fuel to operate the engine.  The mechanical fuel lockout switch includes a mechanical fuel valve and a fuel lockout apparatus.  The mechanical fuel valve actuates between a first position and a second position to selectively control fuel flow to the dual fuel engine from a first fuel source through a first fuel line and a second fuel source through a second fuel line. The fuel lockout apparatus couples to the mechanical fuel valve ensuring individual communication of the fuel sources to the engine.  The mechanical fuel lockout switch communicates the first fuel source to the dual fuel engine and prevents communication between the second fuel source and the dual fuel engine when the mechanical fuel valve is in the first position, and communicates the second fuel source to the dual fuel engine and interrupts the first fuel source communication with the dual fuel engine when in the second position.

(*Id.* ['780 Patent at 1:63-2:14].)

Several figures help illustrate how this might work:



FIG. 2                    FIG. 3

(*Id.* at 6.)

For example, FIGS. 2 and 3 illustrate a mechanical fuel lockout switch **38** which includes a mechanical fuel valve **54**. (*Id.* at 12 ['780 Patent at 5:31-32].) "Mechanical fuel lockout switch **38** may . . . include a fuel lockout apparatus **58** coupled to mechanical fuel valve **54** to communicate fuel sources individually to generator **20**." (*Id.* ['780 Patent at 5:37-39].) In one embodiment of the invention, when the mechanical fuel valve **54** is in the first position **38***(a)*, as shown in FIG. 2, the fuel lockout apparatus **58** permits the first fuel source **28** to communicate with the engine while preventing the second fuel source **30** from connecting to the engine. (*Id.* ['780 Patent at 5:39-51].) Conversely, when the mechanical fuel valve **54** is in the second position **38***(b)*, as shown in FIG 3, the mechanical fuel valve **54** causes the fuel lockout apparatus **58** to permit communication of a second fuel source **30** to the engine and interrupts the first fuel source **28** from communicating with the engine. (*Id.* ['780 Patent at 6:42-50].)



FIG. 4A

FIG. 4B

Likewise, FIGS. 4A and 4B (highlighting added above) illustrate the same

overarching idea: when the mechanical fuel valve (green) is in the first or open position (as in FIG. 4A), the fuel lockout apparatus (yellow) permits the first fuel source (e.g., gasoline) to communicate with the engine and prevents the second fuel source (e.g., propane) from connecting.  At least in FIG. 4A, that is accomplished by the fuel lockout apparatus (yellow) blocking the fuel inlet (blue).  Conversely, when the mechanical fuel valve (green) is in the second or closed position (as in FIG. 4B), the first fuel source (e.g., gasoline) does not communicate with the engine and the fuel lockout apparatus permits the second fuel source (e.g., propane) to connect.  (*See, e.g.*, Doc. 171 at 13.)

### C. **Fourth Patent Family**

The fourth patent family comprises the '034 and '120 Patents.  (Doc. 171 at 3.)  A description of the mechanics of these patents is not necessary to address the parties' claim construction disputes.  In a nutshell, these patents seek to provide a solution to a common problem in prior-art dual-fuel and other multi-fuel internal combustion engines, which is that "with such configurations that couple two fuel sources to a single fuel inlet, such as a carburetor, of an engine . . . during cross-over switching between the fuel sources the engine can experience overly rich air-fuel ratio"—in particular, "when switching from a liquid fuel to a gaseous fuel," "because carburetors have a fuel bowl containing fuel that is drawn into the engine even after the liquid fuel source is cut-off," there exists "a period of time" in which "the engine is running on both liquid and gaseous fuels causing an overly rich fuel mixture," and "such simultaneous delivery of fuel from the first fuel line and the second fuel line, even if for a brief time, may make the engine hard to start and lead to unstable operating conditions."  (Doc. 155-2 at 28 ['034 Patent at 1:60-2:6].)

II.   Relevant Procedural History

On March 7, 2025, the parties filed their Joint Claim Construction Statement and Identification of Intrinsic and Extrinsic Evidence.  (Doc. 130.)

On April 11, 2025, Champion filed its Opening Claim Construction Brief.  (Doc. 155.)  On May 28, 2025, Firman responded (Doc. 171), and on June 11, 2025, Champion replied (Doc. 175).

On June 25, 2025, the parties filed a Joint Report on Proposed *Markman* Hearing Proceedings.  (Doc. 180.)

On March 5, 2026, the Court set a *Markman* hearing for May 5, 2026.  (Docs. 247, 249.)

On March 25, 2025, the parties filed a stipulation that, *inter alia*, "[t]he term 'fuel valve' shall be interpreted according to its plain and ordinary meaning, thereby mooting the parties' dispute as to this term's construction."  (Doc. 261.)

On April 17, 2025, the parties filed a stipulation that "Champion has agreed to withdraw from this action asserted claim nos. 11, 13, and 14 of U.S. Patent No. 10,393,034, and asserted claim nos. 13 and 15 of U.S. Patent No. 11,143,120," which "are the only asserted claims that include the term 'electro-mechanical valve system' . . . .  Accordingly, the parties respectfully request that the Court not construe this term . . . ."  (Doc. 265.)

On April 22, 2026, the Court issued a tentative ruling construing the disputed claim terms.  (Doc. 267.)

On April 30, 2026, the parties filed a stipulation that "[t]he Parties will rest on the briefing and will not present arguments on the following terms: (a) a switch to change operation; (b) simultaneously; (c) desired pressure; (d) prevent the mechanical fuel valve from opening/prevent actuation of the mechanical fuel valve to the first position; and (e) coupled to [verb]."  (Doc. 268 at 1-2.)[4]

On May 5, 2026, the Court held a *Markman* hearing.  (Doc. 270.)

**DISCUSSION**

## I.    Legal Standard

"It has long been understood that a patent must describe the exact scope of an invention and its manufacture to secure to the patentee all to which he is entitled, and to apprise the public of what is still open to them."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) (cleaned up).  "Under the modern American system, these

---

[4]    In light of the parties' stipulation, for the five terms identified in Doc. 268, the Court's constructions in this order remain the same as in the Court's tentative order, with only minor changes made to the Court's analysis.

objectives are served by two distinct elements of a patent document." *Id.* The first element is the patent specification, which describes the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." *Id.* (quoting 35 U.S.C. § 112). The second element is the patent claims, which "particularly point out and distinctly claim the subject matter which the applicant regards as his invention." *Id.* (cleaned up). "The claim defines the scope of a patent grant, and functions to forbid not only exact copies of an invention, but products that go to the heart of an invention but avoids the literal language of the claim by making a noncritical change." *Id.* at 373-74 (cleaned up).

To prevail in a patent infringement suit, one must show that the "patent claim 'covers the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean.'" *Id.* at 374 (cleaned up). That determination is made through a process called "claim construction," which is designed "to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (cleaned up). "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.*

"Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *Id. See also Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("We have made clear . . . that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). A "person having ordinary skill in the art," or a "POSITA,"[5] is a "hypothetical person," similar to the "'reasonable person' used as a reference in negligence determinations." *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir.

---

[5] This order will refer to a "person having ordinary skill in the art" as a "POSITA"—although some courts use interchangeable acronyms such as "POSA" or "PHOSITA."

1998).[6]

"Importantly, the [POSITA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (citation omitted). Such "intrinsic evidence . . . is the primary tool to supply context for interpretation of disputed claim terms" and "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).

"In some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.* However, in cases where "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (citation omitted). "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

---

[6] Although the parties dispute the applicable POSITA's level of education and skill in this case (Doc. 155 at 7-8; Doc. 171 at 2), the Court agrees with Firman that "neither [party's] claim construction depends on the differences in their proposed level of skill" (Doc. 171 at 2). Thus, the Court will decline to determine the applicable POSITA skill level, at least at this time, without prejudice to either party re-raising the issue in the future. *See, e.g.*, *Factory Direct Wholesale, LLC v. Off. Kick, Inc.*, 2023 WL 5916472, at *2 n.2 (S.D. Ga. 2023) (declining to resolve dispute over POSITA definition at the claim construction stage where "resolution would not impact any of their claim construction arguments"); *Takeda Pharms. Amerca, Inc. v. Apotex, Inc.*, 2023 WL 179965, *3 n.4 (D.N.J. 2023) (same); *Billups-Rothenberg Inc. v. Associated Reg'l Univ. Pathologists, Inc.*, 2009 WL 10675798, *2 (C.D. Cal. 2009) (same).

(cleaned up).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* "To begin with, the context in which a term is used in the asserted claim can be highly instructive." *Id.* Additionally, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.* "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.*

Although the focus is always on the claims, "[t]he claims, of course, do not stand alone. Rather, they are part of a fully integrated instrument . . . [and] must be read in view of the specification, of which they are a part." *Id.* at 1315 (cleaned up). The specification "is always highly relevant" to, and "[u]sually . . . dispositive" of, the claim construction analysis, and it remains "the single best guide to the meaning of a disputed term." *Id.* (cleaned up). "Consistent with that general principle, . . . the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* However, "[c]onstruing the claims in light of the specification does not . . . imply that limitations discussed in the specification may be read into the claims. It is therefore important not to confuse exemplars or preferred embodiments in the specification that serve to teach and enable the invention with limitations that define the outer boundaries of claim scope." *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010).

"In addition to consulting the specification, we have held that a court should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (cleaned up). The prosecution history, like the specification, is considered part of the intrinsic evidence. *Id.* "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent;" however, the prosecution history

"often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Although the principal focus of claim construction is on the intrinsic evidence, district courts may also "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (cleaned up). Although extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (cleaned up). Extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318. In exercising its discretion to consider extrinsic evidence, a district court must "keep in mind the flaws inherent in each type of evidence and assess that evidence accordingly." *Id.* at 1319.

"[T]here is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

II.     Timeliness Dispute

As a preliminary matter, the parties dispute whether Firman's amended constructions for certain terms were timely and, in turn, whether Champion's supplemental expert report in response to those amended constructions was timely. Champion argues that "[p]roposed claim construction exchanges were due on January 17, 2025, which was designed to give adequate time for the parties and their experts to consider the other parties' positions and prepare appropriately" and that "on March 5, 2025 (two days before expert reports and the joint claim construction statement were due), Firman changed its position on . . . three terms"—i.e., "selector switch," "fuel lockout apparatus," and "electro-

- 12 -

mechanical valve system." (Doc. 155 at 6.) Champion argues that "[t]his eleventh-hour change was prejudicial . . . because it did not provide an adequate opportunity to address Firman's new positions." (*Id.* at 6-7.) Champion then served a "supplemental expert report on March 14, 2025, to address Firman's" amended constructions; however, Firman "objected to Champion supplementing its expert report." (*Id.*) Champion asks the Court to strike Firman's amended constructions or, in the alternative, to overrule Firman's timeliness objections to Champion's supplemental expert report. (*Id.* at 7 & n.4.)

In response, Firman argues that the Court "should deny Champion's request to strike" Firman's "allegedly untimely constructions." (Doc. 171 at 5 n. 8.) Firman argues that the Case Management Order ("CMO") authorized amendment of preliminary constructions and that Champion did the same thing. (*Id.*) In contrast, Firman argues that the CMO "does not permit Champion to serve an untimely 'supplemental' report without leave of Court." (*Id.* at 7 n.9.) Nevertheless, "[t]o streamline the Markman process, Firman does not formally request striking the [supplemental] report. Instead, Firman has undergone the expense of analyzing and responding to it, but reserves its right to seek appropriate relief under, for example, 35 U.S.C. § 285." (*Id.*)

At the *Markman* hearing, Firman reiterated that although it "noted" that the supplemental expert report was "out of sequence," it was "not objecting because [Firman] still w[as] able to address it." (Doc. 278 at 18.)

The Court declines to strike Firman's amended constructions. Under the CMO, the parties were required to simultaneously exchange their "*Preliminary* Claim Constructions" on January 17, 2025 and then, about two months later, to "complete and file a Joint Claim Construction Statement." (Doc. 33 at 6-7, emphasis added; Doc. 105.) Nothing in the CMO prohibits amendment during the period between the initial exchange and the compilation of the Joint Claim Construction Statement, and the word "preliminary" seems to connote the possibility of future change and refinement. Indeed, the CMO required the parties to "meet and confer" following the exchange of preliminary constructions "for the purposes of narrowing the issues and finalizing preparation of a Joint Claim Construction

and Prehearing Statement." (Doc. 33 at 7.) Firman provided its amended constructions before the Joint Claim Construction Statement was due, and Champion has not cited, nor is the Court aware of, any authority that would require striking the amended constructions under these facts. In fact, as Firman notes, courts have permitted parties to amend proposed constructions even after the Joint Claim Construction Statement was filed if the amendments would help the court construe the disputed terms. *See, e.g.*, *Nomura v. YouTube, LLC*, 2012 WL 6100230, *2 (N.D. Cal. 2012) ("[T]he [Patent Local Rules] require the parties to, *inter alia*, exchange proposed terms for claim constructions, exchange preliminary claim constructions and extrinsic evidence, and file a joint claim construction and prehearing statement. Patent L.R. 4. The rules do not speak to modifications to a joint claim construction statement. While the court generally does not condone changes to a JCCS after the filing deadline, the court will consider modifications to the parties' proposed claim constructions when those modifications help the court construe the disputed terms.").

Turning to Champion's supplemental expert report, although that report was served after the applicable deadline in the CMO, Firman acknowledges that it was able to analyze and respond to the report and does "not formally request striking" the report. (Doc. 171 at 7 n.9. *See also* Doc. 278 at 18.) Accordingly, Champion may rely on its expert's supplemental report for the purposes of claim construction. This conclusion is made without prejudice to Firman's ability to seek appropriate relief under 35 U.S.C. § 285 at a later date.

…

…

…

…

…

…

…

- 14 -

III.     Construction Of Disputed Terms

    A.     **First Patent Family Disputed Terms**

        1.     Selector Switch[7]

| **Champion's Briefed Proposal** | **Firman's Briefed Proposal** |
|---|---|
| Plain and ordinary meaning | A movable barrier whose positioning enables access for a subsequent user selection of only one fuel source |

        a.     **The Parties' Briefed Arguments**

Champion argues that "there is no need to construe the term 'selector switch' because it has a well-understood plain and ordinary meaning, examples of which are supported in Col. 5 Ln. 37 – Col. 6 Ln. 31 and FIGS. 2-4B of the '780 Patent." (Doc. 155 at 18.)  Champion argues that "Firman's proposed construction does not merely commit the cardinal sin of claim construction by attempting to rewrite the claim to import limitations from the specification, *the phrases in Firman's proposed construction do not even appear in the specification*." (*Id.* at 19.)  Champion argues that, as in *IQRIS Techs. LLC v. Point Blank Enters., Inc.*, 130 F.4th 998 (Fed. Cir. 2025), "given the claim language and the absence of lexicography or disavowal, it would be improper to adopt Firman's proposed construction that improperly imports extraneous limitations into the claims." (*Id.*, cleaned up.)

In response, Firman argues that "[t]he crux of the parties' dispute is whether the patents used the phrase 'selector switch' to mean any apparatus that makes a selection, or to mean a mechanical device that enables access to a different device that performs the actual selection." (Doc. 171 at 5.)  Firman argues that "[a]lthough Champion argues this term should have a 'plain and ordinary meaning,' it fails to cite any evidence to establish that the term has such an accepted meaning in the art." (*Id.*)  Firman argues that when, as here, "a disputed term has no previous meaning to those of ordinary skill in the prior art,

---

[7]     This term appears in the '101 Patent Claims 17-18; the '667 Patent Claims 1-2, 7-8, 10-12, 14, and 18; the '390 Patent Claims 1-4 and 6; and the '896 Patent Claims 21-23, 25, 27, 30-31, and 37.  (Doc. 130 at 6.)

its meaning, then, must be found elsewhere in the patent." (*Id.*, citation omitted.) Firman argues that "[t]he specification and claims make clear that the patentee used the term 'selector switch' to refer to a mechanical device that physically restricts a user's access to one fuel valve at a time, whereby the user must then rotate the valve's handle to select the fuel." (*Id.* at 5-6.) Citing the '101 Patent, Firman argues that "the specification explains that 'the fuel selector switch is translatable between the first position and the second position to selectively inhibit actuation of the first fuel valve handle and the second fuel valve handle"—i.e., "both fuels must be OFF for selector switch to move between positions." (*Id.* at 6.) Firman argues that "[t]he claims likewise require that the selector switch merely '*enable[]* a selection' or '*allow* a user to manually select." (*Id.*) Appearing to rely on the lexicographer exception, Firman argues that "[w]hen a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term." (*Id.*) Next, Firman argues that its "construction does not improperly import limitations, as Champion contends." (*Id.*) Firman argues that, "[c]onversely, Champion's construction—which requires the selector switch to 'select' the fuel—directly contradicts the claims themselves and the entire teaching of the specification and would exclude all of the disclosed embodiments. Namely, the specification discloses a 'selector switch' that *enables* but does not itself perform the selection." (*Id.* at 7.) Last, Firman rejects Champion's expert's opinions on the disputed term. (*Id.* at 7-8.) Specifically, Firman argues that the term "barrier" in its proposed construction is not vague or confusing, and clearly refers to a movable barrier, because "the patent specification *never* refers to *any* electrical components associated with the claimed 'selector switch.'" (*Id.* at 8.) Firman also argues that a POSITA would not be confused by the phrase "subsequent user selection" in its proposed construction because "the claims and specifications clearly state the subsequent action is selecting fuel, either by positioning one of the valve assemblies in the ON position or, more specifically, by actuation of the fuel valve handle." (*Id.*, cleaned up.)

In reply, Champion argues that "Firman sidesteps probably the most important

issue: Firman adds the words '*subsequent* user selection.'" (Doc. 175 at 2.)  Champion argues that the term "subsequent" is found nowhere in the patent and that "Firman is importing its own wishful limitations from thin air." (*Id.*)  Champion argues that "there is nothing in the specification that excludes the selector switch itself from making the fuel selection or excludes the fuel selection from being made (even if by a separate structure) at the same time the selector switch is being used." (*Id.* at 3.)  Champion also argues that fuel selection need not be made by a "*subsequent* user selection" because "it could be made at the same time the other selection is made unavailable, as one nonlimiting example." (*Id.*)  As for Firman's argument that the selector switch "enables but does not itself perform the selection," Champion argues this argument lacks any support. (*Id.* at 3-4.)  Moreover, Champion argues that its "plain meaning construction *allows* but does not *require* the action described by Firman's proposal," such that "Firman's argument that Champion's proposal 'exclude[s] embodiments expressly disclosed in the specification' is simply incorrect." (*Id.* at 4 n.5.)

b.    **The Court's Tentative Construction And The Parties'** *Markman* **Hearing Arguments**

The Court tentatively construed the term "selector switch" as "a translatable part that enables selection of either the first fuel source or the second fuel source and prohibits selection of both fuel sources at the same time." (Doc. 267 at 26.)

As an initial matter, during the *Markman* hearing, Champion reiterated its argument that "selector switch" has a plain and ordinary meaning and therefore does not require construction by the Court. (Doc. 278 at 12.)  Relying primarily on *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010), Champion argued that the Court can and should decline to construe a term that has a plain and ordinary meaning where the Court has rejected the opposing party's narrowing construction. (*Id.* at 10.)  Next, Champion argued that the terms "selector" and "switch" are commonly used words that do not require construction. (*Id.* at 12.)  Champion drew an analogy to the term "push-button start" for starting a car, arguing that even a layperson knows what a push-button start is.

(*Id.*)  In any event, Champion accepted the Court's inclination to provide a construction for the term "selector switch" and therefore provided a new proposed construction: "A movable or translatable part that enables selection of either the first fuel source or the second fuel source." (*Id.* at 13.)  As for changing the Court's tentative use of "translatable" to "movable or translatable," Champion argued that the term "movable" includes "translatable"—i.e., that "translatable" is narrower than "movable." (*Id.  See also id.* at 15.)  Champion also took issue with the Court's tentative construction that described the "selector switch" as "prohibit[ing] selection of both fuel sources at the same time." (*Id.* at 13.)  Champion argued this language was improper because "all the Court has been asked to construe is a selector switch" and "[a]ny construction should only explain what that thing is, if necessary, not what it does." (*Id.*)  Champion also argued that not all of the claims describe the "selector switch" as prohibiting selection of both fuel sources at the same time, so it would violate the doctrine of claim differentiation to import a limitation requiring the selector switch to prohibit selection of both fuels. (*Id.* at 14.)  Specifically, Champion pointed to Claim 1 of the '101 Patent, which calls for "a selector switch positioned on the valve assembly to allow a user to manually select one of the first fuel flow and the second fuel flow" (Doc. 155-2 at 51 ['101 Patent at 8:32-34]), arguing that this claim makes no mention of "prohibiting" (Doc. 278 at 14).  Champion then pointed to Claim 5 of the '101 Patent, arguing that this claim does introduce "prohibiting." (*Id.*)  Next, in what appears to be a common theme across Champion's arguments for several of the disputed terms, Champion argued that the selector switch does not by itself prohibit selection of both fuel sources at the same time, and so, by "requiring the selector switch to be defined as doing things that other components of the invention perform, it contradicts the specification because it says now selector switch is doing what, for example, mechanical fuel valve needs to do, and would thus be a legally improper construction to require the selector switch to do more than it is doing." (*Id.* at 15.)  Last, both parties provided slides to the Court to assist the parties' arguments, and the Court has reviewed and considered both parties' slides in full.  Although not argued orally at the hearing, Champion's slides argue that

requiring a "subsequent user selection" of fuel once the selector switch is moved contradicts the claims. Specifically, Champion's slides point to Claim 17 of the '101 Patent, which calls for:

> a selector switch having a first fuel mode and a second fuel mode . . . wherein, when the selector switch is in the first fuel mode, the solenoid switch and the fuel solenoid are in the closed positions and when the selector switch is in the second fuel mode, the solenoid switch and the fuel solenoid are in the open positions, wherein the selector switch triggers the solenoid switch when changed from the second fuel mode to the first fuel mode, so as to cause the solenoid switch and the fuel solenoid to operate in the closed positions.

(Doc. 155-2 at 52 ['101 Patent at 10:24-26, 28-35.).

As an initial matter, Firman argued that "selector switch" is not one of those terms, like a "push-button start on a car," that uses "plain English words" and thus requires no construction. (Doc. 278 at 21-22.) Firman argued that, instead, what's at issue here is "this idea of we've got a plain and ordinary meaning but we have to say what it is, we're sort of just in claim construction land" which requires "walk[ing] through the patents and the evidence and tr[ying] to figure out what that plain and ordinary meaning is." (*Id.* at 22.) Put simply, Firman argued that "[w]e're not dealing with a term that the jury will understand without any help from the Court and therefore needs no construction." (*Id.*) Next, Firman argued that the Court's tentative construction has two parts, which call for a selector switch that (1) "enables selection of either fuel source"; and (2) "prohibits selection of both" fuel sources. (*Id.* at 23.) Firman took no issue with the second part of the Court's construction and reiterated where it believed that construction was supported in the specification. (*Id.* at 23-24.) Firman also responded to Champion's argument that including the "prohibiting" language from the second half of the Court's tentative construction would violate claim differentiation. (*Id.* at 24.) Firman argued that claim differentiation "is a presumption that can kick in when there's some ambiguity" but that "before we even get to claim differentiation, we have to know what is this thing in the first place." (*Id.*) Firman also argued that defining something by its function as opposed to its

structure, as the Court's tentative construction did, is "a perfectly fair way of defining something." (*Id.* at 25-26.)  Next, Firman argued that defining the "selector switch" as prohibiting selection of both fuel sources is consistent with the "heart" of the invention, stating that "[t]he whole idea of this patent is we don't want two fuels in the engine at once" and that "[t]here is no world in which this patent lives that allows two fuel sources to be selected at the same time." (*Id.* at 26.)  Thus, Firman argues that even application of the doctrine of claim differentiation cannot "enable selection of both" fuel sources because that would be "absolutely contradicted by the heart of this invention." (*Id.*)  Next, Firman addressed Champion's argument that the "selector switch" cannot itself be defined as doing what several parts do in combination. (*Id.* at 27.)  Firman argued that there is nothing "that requires the [prohibition] to be solely attributed to the selector switch" because "[t]hat would be impossible in any mechanical system." (*Id.* at 28.)  Indeed, Firman agrees that there are several other things that might prevent selection of both fuel sources—e.g., the gas tank could be empty, or the fuel valve could be broken—but that does not detract from the fact that the selector switch functions to prevent selection of both fuel sources. (*Id.*)

Although Firman agreed with the second half of the Court's tentative construction, it disagreed with the first half. (*Id.*)  Firman noted that the Court's tentative construction allowed for two types of enabling fuel selection: (1) a subsequent user action that selects the fuel source; and (2) an automated selection that is performed by the selector switch itself. (*Id.* at 28-29.)  Firman agreed with the first of those types of enabling, but disagreed with the second. (*Id.* at 29.)  Firman specifically took issue with the tentative order's reliance on the '101 Patent at 6:66-7:4, which provides: "The interaction of the selector switch **30** with the first and second fuel valve assemblies **24**, **26**—with the selector switch **30** sliding back and forth to selectively cover/engage first and second fuel valve assemblies **24**, **26**—prohibits both valve assemblies from being in the 'ON' position at the same time." (Doc. 155-2 at 50-51 ['101 Patent at 6:66-7:4].)  The tentative order stated that this language "seems to at least suggest that as the selector switch is slid from one position to another, it both covers one valve assembly and *engages* the other" and thus found that "the

- 20 -

selector switch itself could perform the selection/engagement of the other fuel source." (Doc. 267 at 24.) Firman took issue with this portion of the tentative order for four reasons. First, Firman raised a procedural objection, arguing that Champion did not cite these lines of the '101 Patent specification and so Firman did not have a chance to address them. (Doc. 278 at 30-32.) As an aside, in response to the Court's question about the lexicographer exception, Firman argued that it was not relying on the lexicographer exception, nor was it arguing that the term "selector switch" does not have a plain and ordinary meaning. (*Id.* at 32-33.) Instead, Firman argued that the patents at issue do not use the term "selector switch" in accordance with its plain and ordinary meaning. (*Id.* at 33-35.) Firman referred to this argument as "implicit lexicography." (*Id.* at 35-36.) Second, turning back to the first half of the Court's tentative construction, Firman raised an interpretational objection, arguing that the tentative order applied the wrong definition of "engage." (*Id.* at 37.) Specifically, Firman argued that "engage," in the mechanical context, refers to mechanical parts interlocking or meshing together, e.g., "when you engage the clutch." (*Id.* at 38.) Thus, Firman argued that when the patent specification uses the word "engage," it is referring to the selector switch *meshing with* or *covering* one of the valve assemblies to keep that valve assembly in the OFF position—not that the specification is referring to the selector switch itself turning ON the other valve assembly. (*Id.*) This dovetails into Firman's third argument, which is that the tentative order imputed the "engaging" action to the wrong fuel valve—i.e., the uncovered valve as opposed to the covered valve. (*Id.* at 41-43.) Fourth, Firman argues that, by construing the "selector switch" to permit automated fuel selection, the tentative construction credits Champion for something it did not disclose or enable, in violation of 35 U.S.C. § 112(a). (*Id.* at 43-44.) Then, Firman explained why there would be significant engineering and mechanical problems should the selector switch be interpreted to permit automated fuel selection. (*Id.* at 45-49.) Next, Firman explained why the Court's construction must address that the selector switch plays some role in the selection process, and why it would not make sense to delete the first half of the Court's tentative construction entirely. (*Id.* at 50-51.) Last, Firman agreed that

changing "translatable" to "movable" would be acceptable.  (*Id.* at 51-52.)  Ultimately, Firman's slides provided an updated construction to address its position that the selector switch does not automate fuel selection: "a translatable part that enables [access to] selection of either the first fuel source or the second fuel source and prohibits selection of both fuel sources at the same time."

In reply, Champion argued that (1) Firman's presentation ignored the claims themselves (*id.* at 52); (2) Firman's § 112 argument is an improper invalidity argument (*id.* at 52-53); (3) Firman's reliance on the figures in the patents is an improper attempt to import the limitations of one embodiment (*id.* at 53); (4) Firman's proposal to change the tentative construction to state "enables *access to* selection" "is just a different way for [Firman] [to get] in their subsequent user action phrase that the Court already rejected" (*id.* at 55); (5) Firman itself disclosed the "engage" language from the '101 Patent cited in the tentative order (*id.* at 56-57); and (5) Firman's automation argument is without merit (*id.* at 57).

In surreply, Firman argued that its newly proposed construction added "enables *access to* selection" because the tentative order suggested that "'enables' might encompass two scenarios" and that Firman "wanted to clarify that it only . . . encompasses the scenario in which access to the valve was provided by the selector switch, but the selector switch does not in and of itself make the selection."  (*Id.* at 58.)  Nevertheless, in response to the Court's questioning, Firman agreed that so long as no one is permitted to argue to the jury that "enable" might refer to automation, "enables selection" is appropriate.  (*Id.* at 59.)

c.    **Analysis**

Upon further reflection and with the benefit of oral argument, the Court agrees with both parties that term "selector switch" *generally* has a plain and ordinary meaning—i.e., a switch for selecting something.  *Cf. Malvern Panalytical Inc v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1372 (Fed. Cir. 2023) ("[W]e conclude that 'pipette guiding mechanism' has a plain and ordinary meaning—a mechanism that guides the pipette assembly.  It is appropriate to construe this term by looking to the words 'pipette,'

'guiding,' and 'mechanism' individually. . . . Looking at the individual words in the claim, the immediately apparent meaning is that a 'pipette guiding mechanism' is a mechanism that guides the pipette."). Thus, under the "general rule," this claim term should "generally [be] given [that] ordinary and customary meaning." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). However, there are "two exceptions" to that "general rule"—namely, "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*

As discussed above, during the *Markman* hearing, Firman referred to its argument as "implicit lexicography" while at the same time disavowing that it was invoking the lexicography exception. This appears to be an attempt by Firman to avoid the burden placed upon the party seeking to invoke the lexicographer exception. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal. The standards for finding lexicography and disavowal are exacting. To act as his own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term.") (cleaned up); *Fortinet, Inc. v. Sophos, Inc.*, 2015 WL 877410, *5 (N.D. Cal. 2015) ("A patentee acts as its own lexicographer if it (1) clearly set forth a definition of a claim term other than its plain and ordinary meaning; and (2) clearly expressed an intent to redefine that claim term. . . . [Defendant] has the burden of showing both prongs are met."). Nevertheless, the Court concludes that Firman has met its burden to show implicit lexicography for the term "selector switch." In *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258 (Fed. Cir. 2001), the Federal Circuit explained that although claim terms are ordinarily given their plain and ordinary meaning, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning." *Id.* at 1268. A "court must examine the intrinsic evidence to determine whether the patentees have given the term an unconventional meaning." *Id.*

- 23 -

"The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* (internal quotations and citation omitted). Although the Federal Circuit has "previously held that, in redefining the meaning of particular claim terms away from the ordinary meaning, the intrinsic evidence must 'clearly set forth' or 'clearly redefine' a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim" and "that the specification must exhibit an 'express intent to impart a novel meaning' to claim terms," the Federal Circuit held that "a claim term may be clearly redefined *without an explicit statement of redefinition*." *Id.* (emphasis added, citations omitted). "Indeed, [the Federal Circuit] ha[s] specifically held that the written description of the preferred embodiments can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *Id.* (cleaned up). "In other words, the specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" *Id.* (citation omitted). "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Id.* at 1271 (citation omitted). As discussed in greater detail below, the patent specifications use the term "selector switch" in a manner consistent with only a single meaning, and thus Firman has met its burden of showing implicit lexicography.

Before moving to the specifications' use of the term "selector switch," it is necessary to address one other threshold matter. The tentative order noted that Champion's presentation was marred by what the Court perceived as an important omission—although Champion argued the term "selector switch" need not be construed because it has a plain and ordinary meaning, Champion did not actually specify in its portion of the Joint Claim Construction Statement (Doc. 130 at 6), in its opening brief (Doc. 155 at 18-19), or in its reply brief (Doc. 175 at 2-4) what that meaning is. The tentative order further observed that although Champion contended that "examples of" the "well-understood plain and

ordinary meaning" of this term may be found in "Col. 5 Ln. 37 – Col. 6 Ln. 31 and FIGS. 2–4B of the '780 Patent" (Doc. 155 at 18), this contention was confusing because the cross-referenced passages and figures do not use the term selector switch or purport to define it.[8]

The tentative order also noted that Champion's failure to specify the plain and ordinary meaning of the term "selector switch" posed a practical problem, because even if the Court agreed that this term should be accorded its plain and ordinary meaning, the Court would still need to determine what that plain and ordinary meaning is in the context of the Asserted Patents in order to resolve the parties' dispute. *Cf. Malvern*, 85 F.4th at 1374 ("[W]hether [a term] has a plain and ordinary meaning broadly in the art . . . does not answer the question of what plain and ordinary meaning a term has in the context of a patent."). Although the CMO did not expressly require the parties to specify the proposed meaning of any term for which a party contends the plain and ordinary meaning should apply, the tentative noted that a proposal from Champion on this point still would have been useful. Robert A. Matthews, Jr., 1 Annotated Patent Digest § 4:5 (Feb. 2026 update) ("[W]hen a discovery order, a case management order, or a local rule requires a party to provide its contentions relating to claim constructions it is generally improper for a party to state generally that the ordinary meanings of the claim terms should govern and then refuse to set forth what it contends are those ordinary meanings."). *See also JBS Hair, Inc. v. SLI Prod. Corp.*, 2024 WL 195257, *2 (D.N.J. 2024) ("Plaintiff proposes that all four sets of terms should have their plain meaning, but does not state what that plain meaning is. Nor does the Joint Claim Construction Statement say anything more . . . . The phrase 'plain meaning' is not a proposed construction. Plaintiff has failed to give the Court specific proposed constructions of the terms at issue."); *Hybrid Audio, LLC v. Asus Computer Int'l Inc.*, 2022 WL 3348594, *3 (N.D. Cal. 2022) (criticizing the parties for providing "a bizarre and totally unhelpful approach to claim construction" where one party "ask[ed] that these terms be given their plain and ordinary meaning, without saying what

---

[8] Champion explained during the *Markman* hearing that this citation was an error. (Doc. 278 at 16.)

that might be"); *In re Ermi LLC ('289) Pat. Litig.*, 2020 WL 13548563, *3 (S.D. Fla. 2020) ("[W]hile the Plaintiff may rely on the 'plain and ordinary' meaning of the Defendants' proposed terms, it must specify *precisely* what it believes that meaning is."); *Magna Donnelly Corp. v. 3M Co.*, 2012 WL 882799, *6-7 (E.D. Mich. 2012), *report and recommendation adopted*, 2012 WL 858628 (E.D. Mich. 2012) (explaining that although it may be "technically compliant" to argue in a claim construction brief that disputed terms should be "be accorded their 'plain and ordinary' meaning . . . without also specifying the 'plain and ordinary meanings,'" "as a practical matter, . . . in many cases it would be helpful for a Court to have in hand examples of 'plain and ordinary' meaning to make the determination of whether a claim term requires construction").    Indeed, a bare determination that the term "selector switch" should be given its plain and ordinary meaning, without specifying what that meaning is, would raise more questions than it answers and only lead to confusion during later stages of this case.  *See, e.g., WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,  2025 WL 2101946, *4 (Fed. Cir. 2025) (concluding that the "district court legally erred" where the "district court held that the plain and ordinary meaning of the limitation applies [but] also stated that the plain and ordinary meaning is 'not readily apparent' and never clarified what it viewed as the plain and ordinary meaning"); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318-20 (Fed. Cir. 2016) (concluding that the district court committed "legal error" where it agreed with the plaintiff, during the claim-construction phrase, "that neither [disputed] term needed construction, and both could simply be given their plain and ordinary meaning" and later "instruct[ed] the jury that the claims should be given their plain and ordinary meaning" while leaving the "question of claim scope unanswered, leaving it for the jury to decide" and emphasizing that "simply rejecting one proposed construction does not mean that a general jury instruction to give terms their plain and ordinary meaning resolves the relevant dispute"); *O2 Micro*, 521 F.3d at 1361 ("In deciding that [the disputed term] needs no construction because the term has a well-understood definition, the district court failed to resolve the parties' dispute . . . .  A determination that a claim term needs no

construction or has the plain and ordinary meaning may be inadequate . . . when reliance on a term's ordinary meaning does not resolve the parties' dispute.") (cleaned up).  After all, "[i]t is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial."  *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001).

During the *Markman* hearing, Champion argued that under *Finjan*, a court need not provide an explicit construction for a disputed term where the court determines the term should be given its ordinary meaning and rejects the opposing party's narrowing construction.  626 F.3d at 1206-07.  In light of the Court's revised conclusion that implicit lexicography applies here, *Finjan* appears inapplicable at least to the term "selector switch."

Following the *Markman* hearing, there remain three disputes between the parties arising from the construction set forth in the tentative order.  Again, the tentative construction for the term "selector switch" was: "a translatable part that enables selection of either the first fuel source or the second fuel source and prohibits selection of both fuel sources at the same time."  (Doc. 267 at 26.)  The remaining disputes are (1) whether the "selector switch" should be described as "movable" or "translatable"; (2) whether the selector switch "enables selection" or "enables access to selection" of either fuel source (i.e., whether the selector switch can itself perform the selection); and (3) whether the selector switch "prohibits selection of both fuel sources at the same time."  Each dispute is addressed below.

i.      "Movable" Or "Translatable"

The tentative order observed that the parties' briefing largely ignored Firman's proposal that the "selector switch" be construed as a "movable barrier."  Following the *Markman* hearing, it appears that Firman has abandoned its argument that the "selector switch" must be defined as a "barrier."  As discussed below, this part of the Court's tentative construction remains unchanged, and thus the Court is still unwilling to import

- 27 -

the term "barrier" into its proposed construction.

The tentative order also stated that the "selector switch" must be "translatable." However, Champion argued during the *Markman* hearing that the term "translatable" is narrower than "movable" and asked that the Court revise its construction to replace "translatable" with "movable or translatable." Both parties seem to agree that translatable is narrower than movable and that the "selector switch" need only be movable. Because "movable" is supported by the claims and patent specification, the Court will revise its construction to replace "translatable" with "movable.

ii.    "Enables Selection" Or "Enables Access To Selection"

During the *Markman* hearing, the parties continued to dispute whether the "selector switch" can itself perform the fuel selection. In its briefing, Firman focuses on the specification, arguing that it "make[s] clear that the patentee used the term 'selector switch' to refer to a mechanical device that physically restricts a user's access to one fuel valve at a time, whereby the user must then rotate the valve's handle to select the fuel." (Doc. 171 at 6.) Firman adds: "[T]he specification discloses a 'selector switch' that *enables* but does not itself perform the selection. After all, the heart of the invention is a 'selector switch' that forms a movable barrier whose positioning allows access for a subsequent user to select only one fuel source by manually turning one of the valve handles." (*Id.* at 7.)

The tentative order disagreed with these arguments. (Doc. 267 at 23.) The tentative order concluded that nothing in the patent claims or specification requires a *subsequent* user selection of a fuel source after the selector switch has been translated from one position to another, and thus it is possible that one embodiment of the invention could include a selector switch that itself makes the fuel selection. (*Id.*) The tentative order further concluded that it is also possible that some other apparatus makes the fuel selection *at the same time* the selector switch is translated. (*Id.*) For example, based on the specification, the tentative order stated that it appears possible that as the selector switch is translated from the first position to the second position, the selector switch could itself turn ON the second valve assembly; conversely, as the selector switch is translated from the second

position to the first position, the selector switch could itself turn ON the first valve assembly. (*Id.*)  In reaching that conclusion, the tentative order relied on the following language from the '101 Patent specification:

> Beneficially, the design of the fuel selector **22** and of the selector switch **30** described herein prevents differing fuels from two separate fuel sources from flowing to the engine of a dual fuel generator at the same time.  The interaction of the selector switch **30** with the first and second fuel valve assemblies **24**, **26**—with the selector switch **30** sliding back and forth to selectively cover/engage first and second fuel valve assemblies **24**, **26**— prohibits both valve assemblies from being in the "ON" position at the same time.  The selector switch **30** is thus a foolproof device that prevents the mixing of fuels so as to provide additional safety to the usage of dual fuel generators.

(Doc. 155-2 at 50-51 ['101 Patent at 6:63-7:7].)

The tentative order explained that this language provides that the "sliding back and forth" of the selector switch *both* "selectively cover[s]" *and* "engage[s]" the first and second valve assemblies, and that this seems to at least suggest that as the selector switch is slid from one position to another, it both covers one valve assembly and *engages* the other. (Doc. 267 at 24.)  In other words, the tentative order concluded that the fact that the selector switch is described here as performing the "engagement" at least suggests that the selector switch itself could perform the selection/engagement of the other fuel source. (*Id.*)

As noted, Firman advanced four arguments during the *Markman* hearing as to why the Court's reliance on this language of the specification was misplaced.  Firman's first argument is a procedural objection based on lack of notice.  The Court rejects this argument for several reasons.  First, in construing disputed terms, Courts must look at the patent instrument as a whole.  *Markman*, 517 U.S. at 389 ("[A claim] term can be defined only in a way that comports with the instrument as a whole.").  Firman does not cite, nor is the Court aware of, any authority that prohibits the Court from looking at portions of the patent specification outside of those portions cited by the parties when construing disputed claim terms.  Second, the Court's tentative order was, as its name indicates, only tentative.  Firman had the opportunity to, and did, argue at the *Markman* hearing why the Court's

reliance on this portion of the specification was misplaced.  And third, *Firman* cited this language as part of its support for its own proposed construction in the Joint Claim Construction Statement (Doc. 130 at 6 [citing '101 Patent at 5:12-7:17]), and Champion disclosed that it "may also use any materials referenced by Firman" (*id.* at 7).

Nevertheless, on reflection, the Court concludes that Firman's remaining three arguments have merit.  First, Firman is correct that the tentative order applied the wrong definition of "engage" and imputed the action of "engagement" to the wrong fuel valve. The specification of the '101 Patent provides: "The interaction of the selector switch **30** with the first and second fuel valve assemblies **24**, **26**—with the selector switch **30** sliding back and forth to selectively cover/engage first and second fuel valve assemblies **24, 26**— prohibits both valve assemblies from being in the 'ON' position at the same time."  (Doc. 155-2 at 50 ['101 Patent at 6:66-7:4].)  Firman is correct that, in mechanics, "engage" means "to interlock with: MESH" or "to cause (mechanical parts) to mesh."  Merriam-Webster, *Engage*, *available at* https://www.merriam-webster.com/dictionary/engage (last visited June 1, 2025) [https://perma.cc/48KW-HKH7].  Thus, when the specification refers to the selector switch "engaging" one of the valve assemblies, it is referring to the selector switch *meshing with* that valve assembly (i.e., covering it) and keeping that valve assembly in the OFF position—the specification is *not* referring to the ability of the selector switch to turn ON a valve assembly as it moves off of that valve assembly.  The use of "cover/engage" is referring to the selector switch keeping the covered valve assembly in the OFF position and makes no reference to the selector switch turning ON any valve assembly.  Second, during the *Markman* hearing, Firman provided an extensive and persuasive explanation of why, mechanically, it would be difficult (if not impossible) for the disclosed selector switch to itself automate fuel selection.

Thus, the Court concludes that the selector switch is *never* described—in the patent specification or the claims—as itself performing the fuel selection.  Rather, it is consistently described as permitting or enabling selection of one fuel source by preventing or inhibiting selection of the other fuel source.  *Bell Atl.*, 262 F.3d at 1271 ("[W]hen a

patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'").

Although Champion did not address this argument orally during the *Markman* hearing, the slides it provided during the hearing cite Claim 17 of the '101 Patent:

> a *selector switch* having a first fuel mode and a second fuel mode . . . wherein, when the selector switch is in the first fuel mode, the solenoid switch and the fuel solenoid are in the closed positions and when the selector is in the second fuel mode, the solenoid switch and the fuel solenoid are in the open positions, wherein *the selector switch triggers the solenoid switch* when changed from the second fuel mode to the first fuel mode, *so as to cause* the solenoid switch and the fuel solenoid to operate in the closed positions

(Doc. 155-2 at 52, emphases added ['101 Patent at 10:24-26, 28-35]). To the extent Champion is attempting to argue that this language suggests that the selector switch is itself performing the fuel selection in Claim 17, that argument is without merit. All this language does is explain that when the selector switch moves from second fuel mode to first fuel mode, it closes (or turns OFF) the fuel solenoid by triggering the solenoid switch. It says nothing about how the other fuel source is turned ON. Once again, the Court has not located, and Champion has not pointed to, any use of the term "selector switch" in the patents where the selector switch is itself performing the fuel selection. In sum, the Court now agrees with Firman that "enables a selection" (Doc. 155-2 at 52 ['101 Patent at 10:41-44]) and "allow[s] a user to manually select" (*id.* ['101 Patent at 10:51-53]) means that the selector switch permits *access to* selection of a fuel source but does not itself perform the selection. Accordingly, the Court will revise its tentative construction to include the following bracketed language: "enables [access to] selection of either the first fuel source or the second fuel source."

### iii.    "Prohibits Selection"

As discussed, during the *Markman* hearing, Champion took issue with the Court's inclusion of the language "prohibits selection of both fuel sources at the same time" in its proposed construction. As the tentative order explained, based on the specification,

preventing both fuel sources from being selected at the same time is, indeed, the "point" of the selector switch. (Doc. 155-2 at 48 ['101 Patent at 1:61-2:59: describing the translation/movement of the selector switch between positions as: (1) "enabl[ing] positioning of only one of the first fuel valve assembly and the second fuel valve assembly in the ON position at a given time, such that the first and second fuel valve assemblies cannot be in the ON position concurrently," (2) "selectively inhibit[ing] actuation of the first fuel valve handle and the second fuel valve handle, so as to prevent a simultaneous flow of fuels from the first and second fuel sources to the internal combustion engine," and (3) "caus[ing] the selector switch to cover the second fuel valve handle so as to prevent the second fuel valve handle from moving to the open position . . . [and] caus[ing] the selector switch to cover the first fuel valve handle so as to prevent the first fuel valve handle from moving to the open position"].) Indeed, as the tentative explained, if the selector switch were to permit selection of both fuel sources at the same time, that would defeat the very purpose of the invention. (*Id.* ['101 Patent at 1:51-53: "[I]t would be desirable to provide a dual fuel generator with a selector switch that would prohibit the mixing of two differing types of fuels."].) *Cf. KEYnetik, Inc. v. Samsung Elecs. Co.*, 837 F. App'x 786, 792 (Fed. Cir. 2020) (rejecting construction that "would eviscerate the stated purpose of the claimed invention").

During the *Markman* hearing, Champion raised two arguments as to why the "selector switch" should not be defined as "preventing selection" of both fuel sources, but neither argument has merit. First, Champion argued that the doctrine of claim differentiation shows that not all claims require the selector switch to prohibit selection of both fuel sources. "The doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (cleaned up). "[T]he doctrine is at its strongest where the limitation sought to be 'read into' an independent claim already appears in a dependent claim." *Id.* at 1368-69 (cleaned up). The doctrine of claim differentiation "only creates a

presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Id.* at 1369 (cleaned up). As one example, Champion argued that independent Claim 1 of the '101 Patent claims "a selector switch positioned on the valve assembly to allow a user to manually select one of the first fuel flow and the second fuel flow" and makes no mention of "prohibiting." (Doc. 155-2 at 51 ['101 Patent at 8:32-34].) In contrast, Champion argues that dependent Claim 5 introduces "prohibited": "when the selector switch is in the first position, the first valve handle is actuatable between the ON position and the OFF position and the second valve handle is *prohibited* from being in the ON position; and wherein, when the selector switch is in the second position, the first valve handle is prohibited from being in the ON position." (*Id.* at 52 ['101 Patent at 9:6-8].) Champion also argued that Claims 17 and 18 of the '101 Patent make no mention of "prohibiting." (*Id.* ['101 Patent at 10:24-65].)

This claim-differentiation argument is unpersuasive for at least two reasons. First, it's not clear that the independent claims cited by Champion are as broad as Champion argues they are. For example, Claim 1 provides that the selector switch "allow[s] a user to manually select *one* of the first fuel flow and the second fuel flow." (*Id.* at 51, emphasis added ['101 Patent at 8:33-34].) Although the word "prohibit" itself is not explicitly used in this claim, the selector switch in Claim 1 only allows for selection of *one* of two fuel sources—i.e., it does not allow selection of both fuel sources. And that makes sense in the context of the invention as a whole, which is to prevent delivery of both fuel sources to the engine. Similarly, Champion argues that independent Claims 17 and 18 do not use the word "prohibit." Although true, both of these claims still make clear that the selector switch is permitting selection of *only one* of the two fuel sources. (Doc. 155-2 at 52, emphasis added ['101 Patent at 10:41-44: "wherein positioning of the selector switch in the first fuel mode and the second fuel mode enables selection of *one* of the first fuel flow and the second fuel flow"]; *id.*, emphasis added ['101 Patent at 10:51-53 ["a selector switch positioned on the valve assembly to allow a user to manually select *one* of the first fuel flow and the second fuel flow"].) Thus, Champion's apparent argument that these

independent claims do not require the selector switch to inhibit or prevent selection of both fuel sources at the same time is contrary to the language of those independent claims.  In other words, the Court is not convinced that the presumption of claim differentiation is even implicated here.

Second, even if Champion were correct that the presumption is raised, Champion ignores that the presumption can be rebutted, including by the specification.  Here, the specification consistently refers to the selector switch as preventing or inhibiting selection of both fuel sources,  Most notably, the "Background of the Invention" section, which describes the invention as a whole, provides: "It would further be desirable for such a selector switch to inhibit positioning/actuation of the valves in such a manner that the valve for a first fuel source is prevented from being 'on' when the valve for a second fuel source is 'on', and vice versa." (Doc. 155-2 at 48 ['101 Patent at 1:53-57]. *See also id.*, emphasis added ['101 Patent at 2:6-11: "wherein translation of the selector switch between the first and second positions enables positioning of *only one* of the first fuel valve assembly and the second fuel valve assembly in the ON position at a given time, such that the first and second fuel valve assemblies cannot be in the ON position concurrently"]; *id.* ['101 Patent at 2:28-33: "wherein the fuel selector switch is translatable between the first position and the section position to selectively inhibit actuation of the first fuel valve handle and the second fuel valve handle, so as to prevent simultaneous flow of fuels from the first and second fuel sources to the internal combustion engine"]; *id.* ['101 Patent at 2:52-58: "Positioning of the selector switch in the first position causes the selector switch to cover the second fuel valve handle so as to prevent the second fuel valve handle from moving to the open position and positioning of the selector switch in the second position causes the selector switch to cover the first fuel valve handle so as to prevent the first fuel valve handle from moving to the open position."].)  Thus, the Court concludes that even if the presumption is raised, it is rebutted by the specification.  Moreover, and as discussed, because the specification consistently describes the selector switch as preventing selection of both fuel sources, the patentee has therefore acted as his own lexicographer and defined

the term by implication. *Bell Atl.*, 262 F.3d at 1271 ("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"). "[A]ny presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citation omitted). *See also Cornell Univ. v. Illumina, Inc.*, 2017 WL 89165, *8 (D. Del. 2017) ("Here, the claim-differentiation presumption is overcome by the patent's definition of 'ligase detection reaction.'"). Nevertheless, upon reflection and re-review of the specification, the Court believes that using "prohibit" is too narrow and inconsistent with the language of the specification. Therefore, the Court will revise its tentative construction to replace the word "prohibit" with "prevent."

Second, Champion argued during the *Markman* hearing that it would be a "legally improper construction" for the Court to adopt a construction for the term "selector switch" that requires the selector switch "to do by itself what other components contribute to." As noted above, this is an argument that Champion raises for several terms. Champion did not cite, nor is the Court aware of, any authority that holds that a Court's construction of a disputed term is "legally improper" if its construction overlaps with definitions which might be given to other, related components of a mechanical system. And Firman persuasively argued during the *Markman* hearing that when construing terms related to mechanical parts that all interact with one another, it would be illogical to conclude that a definition for one component cannot include language that might also apply to another component or to the interaction between several components.[9]

_____

[9]    In any event, it's not clear that the Court's revised construction that the selector switch "prevents selection of both fuel sources at the same time" actually overlaps with other component parts. Champion's slides points to the '101 Patent specification, which states: "Beneficially, the design of the *fuel selector* **22** *and* of the *selector switch* **30** described herein *prevents differing fuels* from two separate fuel sources *from flowing to the engine* of a dual fuel generator at the same time." (Doc. 155-2 at 50 ['101 Patent at 6:63-66].) This language refers to the fuel selector and selector switch working together to prevent fuel *flow*, whereas the Court's construction for the term "selector switch" refers to the selector switch preventing fuel *selection*. Thus, the overlap that Champion fears is not

### d.     The Court's Construction

Accordingly, the Court construes the term "selector switch" as follows: "a movable part that enables access to selection of either the first fuel source or the second fuel source and prevents selection of both fuel sources at the same time."

### 2.     Valve Assembly[10]

| Champion's Briefed Proposal | Firman's Briefed Proposal |
| --- | --- |
| Plain and ordinary meaning | An assembly including a fuel valve and handle that are separate and distinct from the selector switch |

### a.     The Parties' Briefed Arguments

First, Champion argues that "Firman proposes *adding* a limitation of a 'handle' into the construction of a 'valve assembly' when 'handle' does not appear in the claims." (Doc. 155 at 9.)  Champion notes that "Claim 10 of the '101 Patent separately refers to 'a valve assembly' and 'at least one valve handle positioned on and operably connected to the valve assembly'" and argues that "[t]herefore, the 'valve assembly' itself cannot be defined to have a handle because the patentee used separate language to call out when a handle is required." (*Id.* at 9-10.)  "As another example," Champion points to "Claim 29 of the '896 Patent," which "further limits dependent Claim 28 (depending from independent Claim 21 through dependent Claim 26), which has a 'valve assembly,' by further claiming 'a first valve handle' and 'a second valve handle.'" (*Id.* at 10.)  Relying on the doctrine of claim differentiation, Champion argues that "[t]he fact that dependent Claim 29 specifically adds 'handle[s]' means the claims from which it depends are not required to have handles. Otherwise, Claim 29 would be meaningless." (*Id.*)  Second, Champion argues that "these claims do not state components are 'separate and distinct from the selector switch.'" (*Id.* at 9.)  As one example, Champion cites Claim 17 of '101 Patent, which claims a "valve

_____

even present.

[10]     This term appears in the '101 Patent Claims 17 and 18; the '667 Patent Claims 1-3, 10, and 12-15; the '390 Patent Claims 3-7; and the '896 Patent Claims 21, 25-28, and 30-32. (Doc. 130 at 13.)

assembly positioned on or adjacent the selector switch." (*Id.*)  Champion also cites Claims 1, 10, and 14 of the '667 Patent as additional examples. (*Id.*)  Champion argues that these examples "inherently contradict[] Firman's proposal that they be 'separate and distinct.'" (*Id.*)  Champion reasons that "[a] rabbit may have ears that are said to be 'on' the rabbit or 'on' its head, but to say that the ears are 'separate' and 'distinct' from the rabbit or its head is illogical and not the ordinary meaning." (*Id.*)

In response, Firman argues that "[t]he parties dispute whether Champion limited this term during prosecution to obtain its patents." (Doc. 171 at 9.)  Firman argues that "[t]o give effect to the concessions Champion made when obtaining its patents, Firman proposes a definition that requires a valve handle, which must be separate and distinct from the claimed selector switch." (*Id.*)[11]  Specifically, Firman argues that during the prosecution of the '101 Patent, "the Patent Office rejected Champion's patent application, finding that the prior art's electrically controlled switches and valves, which were not controlled by a handle, disclosed the claimed 'valve assembly.'" (*Id.*)  Firman argues that "[t]o avoid this prior art, Champion argued the term 'valve assembly' required two limitations not found in the prior art": (1) "Champion argued it must be a mechanical valve with a handle";[12] and (2) "Champion argued that the claimed 'valve assembly' and 'selector

---

[11]    Firman's briefing appears to argue for two different constructions: one that requires the *valve assembly* to be separate and distinct from the selector switch, and one that requires the *valve handle* to be separate and distinct from the selector switch.  The Court questioned Firman at the *Markman* hearing about which construction it was proposing, and Firman argued that because it believes that all valve assemblies have handles, both the valve assembly and its handle must be separate and distinct from the selector switch. (Doc. 278 at 74.)

[12]    The Court assumes that, in light of the parties' stipulation (Doc. 261), Firman is no longer contending that the fuel valves in a valve assembly must necessarily be mechanical valves.  During the *Markman* hearing, the Court asked Firman whether it was still arguing that he valves in a valve assembly must be mechanical. (Doc. 278 at 73.)  Firman responded that it was not making that argument because "a mechanical valve would inherently include a handle" and "the patentee expressly states that the valve assembly includes a handle." (*Id.* at 74.)  To the extent Firman is arguing that the valves in a valve assembly must necessarily be mechanical valves *because* the valve assemblies have handles, this argument fails for two reasons.  First, as discussed in this section, "valve assemblies" need not have handles.  Second, Firman's argument rests on a faulty premise that only mechanical fuel valves have handles.  That argument is not supported by the language in Firman's expert report (Doc. 171-1 at 24-25 ¶ 62 [construing a different disputed term and nowhere stating or suggesting that any fuel valve with a handle must necessarily be mechanical]) and is rebutted by the declaration of Champion's expert, which

switch' were 'two separate and distinct elements/structures' and 'should not be confused with one another.'" (*Id.* at 10.) Firman argues that "[t]he examiner accepted both arguments and granted the patent application without further amendment to these limitations," and "Champion's arguments to the Patent Office therefore represented express disavowal of any claim scope in which the valve assembly (1) lacked a handle, and (2) is not 'separate and distinct' from the selector switch." (*Id.*) Firman argues that "[o]nce a patentee expressly disavows claim scope during prosecution, either by expressly limiting a term or by distinguishing the invention from the prior art as Champion did here, the patentee cannot later attempt to recapture that scope through claim construction." (*Id.* at 11.) In sum, Firman argues that "[t]o prevent Champion from recapturing what it expressly disclaimed to obtain its patents, the Court should define 'valve assembly' to mean a mechanical valve with a handle that is separate and district [sic] from the selector switch." (*Id.*)[13]

In reply, Champion first disputes Firman's contention that the valves must be mechanical, arguing that "electro-mechanical valves . . . can have handles" and, at any rate, "the term requested to be construed is NOT prefaced with 'mechanical.'" (Doc. 175 at 5.) Second, Champion argues that "in Firman's prosecution disclaimer argument, Firman carefully uses ellipses to cloud the actual prosecution history." (*Id.*) Specifically, Champion argues that "[t]he history does not make any particular emphasis on the 'handle' itself, and it is not clear whether the inclusion or omission of the 'handle' was important to the argument or to the examiner's determination." (*Id.*) Champion also argues that, as part of the prosecution history, it argued that the "examiner improperly interpreted 'valve assembly' to include 'electrical switching members' so that the reference would read on the pending claim language," but "[t]his argument did not 'exclude . . . electronic valves'

_____

provides several examples of electro-mechanical valves with handles (Doc. 175-1 at 4-7 ¶¶ 9-16).

[13] Firman again appears to seek different constructions—in this instance adding the word "mechanical" to its proposed definition. As explained in the preceding footnote, there is no support for Firman's conclusion that the fuel valves in the valve assembly must be mechanical.

from a valve assembly, as Firman alleges. For example, the argument did not take the position that the electronically-controlled valves cited by the examiner would not be considered part of the claim valve assembly." (*Id.* at n.8.) Third, Champion argues that the "main problem with importing" the limitation of the valve assembly being "separate and distinct" from the selector switch "is that it adds confusion." (*Id.* at 6.) Champion argues that "[g]iven that there can be 'corresponding operation' and that the 'selector switch' can be 'on the valve assembly,' it would confuse a jury to instruct them that these are 'separate' and 'distinct.'" (*Id.*) As for Firman's contention that the examiner accepted Champion's arguments, Champion argues "[t]his is blatantly false" because "[a]fter Champion filed the arguments discussed above, the examiner cited a new reference" and "did not specify what arguments were persuasive or why." (*Id.*) "Further, the 'valve assemblies' of claims 1 and 10 *were* amended prior to the examiner allowing the application such that the valve assembly of claim 1 included first and second mechanical fuel valves and the valve assembly of claim 10 included first and second fuel valves." (*Id.*) "Further, the amendment to claim 10 included at least one valve handle (not as an element of the claimed valve assembly) mechanically coupled to the first and second fuel valves." (*Id.*) "Thereafter the examiner allowed claims 1 and 10. Furthermore the examiner allowed two other independent claims (now issued claims 17 and 18) to issue with amendments. The claims were amended to include a valve assembly, but neither include a mechanical fuel valve or a valve handle, despite their appearance in claims 1 and 10." (*Id.*) Next, Champion argues that "even if a disclaimer might hypothetically apply to a single patent claim," Firman has the burden and "has made no argument supporting why it would apply to other claims with different formats and limitations." (*Id.* at 7.) Last, "Champion objects to Firman's prosecution disclaimer argument as not properly disclosed per the Court's Order" because "the prosecution disclaimer argument was omitted from the joint claim chart and never raised during the Parties' multiple meet-and-confers on this issue." (*Id.*)

…

…

b.    **The Court's Tentative Construction And The Parties'** *Markman* **Hearing Arguments**

The Court tentatively construed valve assembly as "an assembly of one or more valves." (Doc. 267 at 41.)  The Court also concluded that although Firman carried its burden of showing that Champion disclaimed any valve assembly in which the valve assembly and selector switch were not "separate and distinct" from one another in Claim 1 of the '101 Patent, Firman had not shown that this same limitation should apply to all claims in which "valve assembly" appears. (*Id.*)

During the *Markman* hearing, Firman reiterated its position that the patentee here made a clear disclaimer and that, as a result, a valve assembly is (1) composed of a fuel valve and fuel valve handle; and (2) separate and distinct from the selector switch. (Doc. 278 at 60-61.)  As for whether the "valve assembly" must include a handle, Firman again relied on the prosecution history of the '101 Patent, in which Champion stated to the Examiner:

> In the present case, the Specification of the present application clearly illustrates and describes that *the claimed "valve assembly" is comprised of one or more first valve assembly 24 and second valve assembly 26 – with the first valve assembly 24 including a first fuel valve handle 34* that is operatively connected to a first fuel valve 36 to control an opening and closing of the first fuel valve and *the second valve assembly 26 including a second fuel valve handle 38* that is operatively connected to a second fuel valve 40 to control an opening and closing of the second fuel valve.

(Doc. 171-1 at 98-99, emphases added.)  Firman argued that this statement tracks the statement made in *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004). (*See, e.g.*, Doc. 278 at 62-63.)  Firman also took issue with the tentative ruling, arguing that the disclaimer analysis does not turn on whether a patentee's statement was made in attempt to distinguish the prior art. (*Id.* at 65.)  Specifically, Firman argued that statements made during patent prosecution are not relevant *only* when made to distinguish prior art references; instead, citing *Fenner Invs. v. Cellco P'ship*, 778 F.3d 1320 (Fed. Cir. 2015), Firman argued that "[a]ny explanation, elaboration or qualification presented by the

inventor during patent examination is relevant." (Doc. 278 at 66.) Relying on *ERBE Elektromedizin GmbH v. Canady Tech., LLC*, 629 F.3d 1278 (Fed. Cir. 2010), Firman also argued that even if the doctrine of claim differentiation suggests that valve assemblies do not necessarily have handles, claim differentiation cannot overcome disclaimer. (Doc. 278 at 72-73.) Because the tentative order agreed with Firman that, for Claim 1 of the '101 Patent, the patentee disclaimed any valve assembly that was not separate and distinct from the selector switch, Firman next argued that the disclaimer as to both "handles" and "separate distinct" binds Champion across patents. (*Id.* at 67-70.) Relying primarily on *Multi-Tech Sys.*, Firman argued that here, as in *Multi-Tech Sys.*, the specification is identical for all of the patents and so any disclaimer as to one claim applies to all claims with that same term. (*Id.* at 71-72.) Firman also took issue with the tentative order's placement of the burden on Firman to show that any such disclaimer applies to other claims. (*Id.* at 67-72.) Firman also took issue with Champion's reliance on expert evidence, arguing that under *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996), it is improper to rely on extrinsic evidence when resort to the intrinsic evidence alone resolves the dispute. (*Id.* at 64-65.)

During the *Markman* hearing, Champion largely agreed with the analysis in the tentative order, including agreeing that the tentative construction—i.e., "an assembly of one or more valves"—was consistent with the plain and ordinary meaning set forth by its expert. (*Id.* at 75, 78.) As for whether a valve assembly must necessarily include handles, Champion reiterated that the claims themselves, and the doctrine of claim differentiation, support that valve assemblies need not have handles. (*Id.* at 77, 79-80.) Champion also argued that the tentative order's analysis of the prosecution history, including the patentee's attempts to overcome the prior art of Poehlman and Sugimoto, was correct. (*Id.* at 80-81.) And Champion emphasized that it is Firman's burden is to show that any disclaimer was "clear and unmistakable," which Firman failed to do with respect to whether valve assemblies must have handles. (*Id.* at 78.)

In reply, Firman emphasized that a clear and unambiguous disclaimer can still be

made in the prosecution history even if the examiner does not "buy[]" the argument.  (*Id.* at 83.)  Firman also argued that it would not have been useful to have its expert opine on what "valve assembly" means when "the patentee has already said [what] the valve assembly is." (*Id.* at 86.)

In surreply, Champion briefly addressed the "separate and distinct' issue.  (*Id.* at 87.)  Specifically, Champion argued that claim differentiation supports not including "separate and distinct" in the construction of "valve assembly," and Champion also argued that describing the valve assembly as "separate and distinct" from the selector switch "would create confusion" because the claims use the language "on the valve assembly" and "on or adjacent to." (*Id.*)  And Champion distinguished the caselaw cited by Firman.  (*Id.*)

c.    **Analysis**

i.    Proper Disclosure Of Prosecution History Argument

As an initial matter, Champion argues that the Court should not consider Firman's prosecution disclaimer argument because the argument was "omitted from the joint claim chart."  (Doc. 175 at 7.)  The Court is perplexed by this argument, as Firman listed the following items as "Firman's Support" for the claim term "valve assembly" in the parties' Joint Claim Construction Statement:

> The '101 Patent's Prosecution: Application (Feb. 4, 2016) at 14-17; Preliminary Amendment (July 22, 2016) at 6-7 (claims); Non-Final Rejection (Jan. 5, 2018) at 2-10 (detailed action); Response (Apr. 5, 2018) at 6-16 (remarks); Final Rejection (Aug. 9, 2018) at 2-13 (detailed action); Appeal Brief (Mar. 8, 2019) at 1-21 (arguments); Non-Final Rejection (June 25, 2019) at 2-10 (detailed action); Interview Summary (Oct. 1, 2019) at 1; Amendment/Response (Oct. 25, 2019) at 2-6 (claims), 7-13 (remarks); Terminal Disclaimer (Dec. 16, 2019) at 1; Interview Summary (Dec. 27, 2019) at 1; Notice of allowability (Dec. 27, 2019) at 2-4 (examiner amendments)

(Doc. 130 at 15-16.)[14]  The prosecution history cited in Firman's response brief appears to

---

[14]    The Court notes that Champion also disclosed as part of its support for its proposed construction "any materials referenced by Firman." (*Id.* at 14.)  Additionally, Champion's expert identified "the prosecution history of the '101 Patent" as an item he may use to support his opinions.  (Doc. 155-3 at 71 ¶ 141.)

be encompassed by the materials excerpted above.  In its briefing, Champion argued that Firman's intent to rely on the prosecution history was a "bur[ied] needle" in a "deliberately obtuse haystack of prosecution history citations."  (Doc. 175 at 7.)  During the *Markman* hearing and in response to questioning, Champion confirmed that its argument was premised on the fact that Firman had "buried" this argument by disclosing the whole '101 Patent prosecution history.  (Doc. 278 at 81-82.)  As discussed in the tentative order, Champion provides no support or explanation how the CMO (or any other authority) undermines Firman's approach to disclosure.  Indeed, the CMO *requires* each party to include in the Joint Claim Construction Statement "an identification of *all* references from the specification or prosecution history that support" that party's proposed construction.  (Doc. 33 at 7, emphasis added.)  Accordingly, the Court rejects Champion's disclosure argument.

ii.    Plain And Ordinary Meaning

Champion is correct that the term "valve assembly" has a plain and ordinary meaning.  Although, as with the term "selector switch," Champion has again failed to specify what that plain and ordinary meaning is,[15] "valve assembly" is one of those terms that has a plain meaning that is readily apparent even to judges: an assembly of one or more valves.  *See, e.g.*, *Malvern*, 85 F.4th at 1372 ("[W]e conclude that 'pipette guiding mechanism' has a plain and ordinary meaning—a mechanism that guides the pipette assembly.  It is appropriate to construe this term by looking to the words 'pipette,' 'guiding,' and 'mechanism' individually. . . .  Looking at the individual words in the claim, the immediately apparent meaning is that a 'pipette guiding mechanism' is a mechanism that guides the pipette.").

During the *Markman* hearing, it was unclear whether Champion was suggesting that once a court determines a term has a plain and ordinary meaning, the question of disclaimer is of no moment.  (Doc. 278 at 75-76.)  To the extent that was Champion's argument, it is

---

[15]    Champion's expert's report states that this "plain and ordinary meaning . . . includes one or more valves arranged to work together."  (Doc. 155-3 at 69 ¶ 136.)

unavailing. The Federal Circuit has made clear that "[t]he words of a claim are *generally* given their ordinary and customary meaning," although there are "two exceptions to this general rule," including "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365 (emphasis added). Thus, the question is whether the "disclaimer" exception should be applied to give the term "valve assembly" a meaning other than its plain and ordinary meaning. *Id.*

### iii. Handle Limitation

After hearing from both parties at the *Markman* hearing, the Court maintains its agreement with Champion that a valve assembly need not include a fuel valve handle.

First, the language of the claims themselves counsels against Firman's proposed construction requiring a "valve assembly" to include a valve handle. "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms. . . . [T]he context in which a term is used in the asserted claim can be highly instructive. . . . Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314 (cleaned up). In the '101 Patent, both Claims 17 and 18 use the term "valve assembly" but make no mention of handles. (Doc. 155-2 at 52 ['101 Patent at 10:24-65].) Looking at other claims in the patent, however, Claim 10 of the '101 Patent claims:

> A fuel selector for use with a dual fuel generator, the fuel selector comprising:
>
>> a valve assembly fluidly connected to each of a first fuel source and a second fuel source, the valve assembly being operable to selectively control a first fuel flow and a second fuel flow from the first fuel source and the second fuel source, respectively, to an engine of the dual fuel generator; and
>>
>> at least one valve handle positioned on and operably connected to the

> valve assembly to actuate the valve assembly to enable one of the first fuel flow and the second fuel flow to the engine;
>
> wherein the valve assembly comprises:
>
> > a first fuel valve having open and closed positions to selectively control the first fuel flow to the engine; and
> >
> > a second fuel valve having open and closed positions to selectively control the second fuel flow to the engine; and
>
> wherein the at least one valve handle is mechanically coupled to the first fuel valve and the second fuel valve to selectively open and close the first fuel valve and the second fuel valve responsive to actuation thereof.

(Doc. 155-2 at 52 ['101 Patent at 9:29-51].)

For three reasons, this language in Claim 10 suggests that the term "valve assembly" does not necessarily include valve handles. First, the "valve assembly" is listed as a *separate component* of the fuel selector than "at least one valve handle." Second, Claim 10 lists what the "valve assembly comprises," and the ensuing description does not include valve handles. *Cf. AFG Indus.,* 239 F.3d at 1245 ("Closed transition phrases such as 'consisting of' are understood to exclude any elements, steps, or ingredients not specified in the claim.") (cleaned up). Third, the "at least one valve handle" is described as being "positioned on and operably connected to the valve assembly." Put differently, this language suggests that the valve handle (where called for) is something "on and operably connected to" the valve assembly but is not a necessary part of the valve assembly. (*See also* Doc. 171-1 at 106 [emphasizing that the at least one valve handle must be "*on*" the valve assembly].)

Application of the doctrine of claim differentiation also suggests that valve handles are not necessary components of a valve assembly. Independent Claim 1 of the '101 Patent claims a "fuel selector comprising," among other things, "a valve assembly" but does not mention handles. (Doc. 155-2 at 51 ['101 Patent at 10:24-43].) Claim 3, which depends on Claim 2 and in turn on Claim 1, claims a "fuel selector" comprising "a first valve handle" and "a second valve handle." (*Id.* ['101 Patent at 10:47-59].) That Claim 3, a

dependent claim, adds the limitation of handles suggests that the valve assembly as described in Claim 1 does not necessarily include handles. *Cf. Seachange*, 413 F.3d at 1368-69 (doctrine of claim differentiation "is at its strongest where the limitation sought to be 'read into' an independent claim already appears in a dependent claim") (cleaned up).

As yet another example, in the '896 Patent, Claim 29 claims "[t]he fuel selector of claim **28** further comprising: a first valve handle . . . and a second valve handle." (Doc. 155-2 at 246 ['896 Patent at 12:5-16].) Claim 29 depends on Claim 28, which in turn, depends on Claims 26 and 21. (*Id.* ['896 Patent at 11:19-37, 11:52-60, 11:66-12:4].) Claims 28, 26, and 21 each claim a fuel selector with a valve assembly, but they make no mention of a valve handle as a necessary part of that valve assembly. (*Id.*) Thus, under the doctrine of claim differentiation, the presumption is raised that a valve assembly need not include a valve handle.

To be clear, the doctrine of claim differentiation "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Seachange*, 413 F.3d at 1369 (cleaned up). "[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence. . . . [C]laims that are written in different words may ultimately cover substantially the same subject matter." *Id.* (citation omitted).[16]

It's not clear that the specification rebuts the presumption here. True, the "Brief Description of the Invention" of the '101 Patent provides:

> In accordance with another aspect of the invention, a method of controlling
> fuel flow in a dual fuel general includes providing a first fuel valve assembly

---

[16] Firman argued during the *Markman* hearing that claim differentiation cannot overcome a disavowal made by the patentee during prosecution. Put differently, Firman argued that claim differentiation is a presumption that will be rebutted by an patentee's disavowal. The Court does not disagree. Federal Circuit caselaw "make[s] clear . . . that where found, prosecution history disclaimer can overcome the presumption of claim differentiation." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013). But that prosecution history disclaimer must be "clear and unmistakable" to rebut that presumption. *Id.* at 1096-97. As discussed throughout, the Court does not agree that the patentee's disclaimer as it relates to "handles" was clear and unmistakable; thus, the disclaimer does not operate to rebut the claim-differentiation presumption.

> . . . the first fuel valve assembly including a first fuel valve handle . . . [and] a second fuel valve assembly . . . including a second fuel valve handle.

(Doc. 155-2 at 48 ['101 Patent at 2:12-25].)  In the next paragraph, it also provides:

> In accordance with yet another aspect of the invention, a dual fuel generator includes . . . [a] fuel selector comprising a first fuel valve assembly including a first fuel valve and a first fuel valve handle . . . [and] a second fuel valve assembly including a second fuel valve and a second fuel valve handle . . . .

(*Id.* ['101 Patent at 2:34-46].)  The use of the word "including" in each of these paragraphs suggests, at least at first blush, that the valve assembly includes handles—i.e., that the valve handles are a component part of the valve assembly.  However, other language in the "Brief Description" supports a broader interpretation, where the valve assemblies are simply actuatable between ON and OFF positions without any reference to handles:

> In accordance with one aspect of the invention, a fuel selector for use with a dual fuel generator includes . . . a first fuel valve assembly . . . actuatable between an ON position and an OFF position to selectively control a first fuel flow to an engine of the dual fuel generator, and a second fuel valve assembly . . . actuatable between an ON position and an OFF position to selectively control a second fuel flow to the engine of the dual generator.

(*Id.* ['101 Patent at 1:61-2:3].)  As yet another example, later in the '101 Patent, the specification describes "one embodiment of the invention" as "a fuel selector" that includes "a first fuel valve assembly" and "a second fuel valve assembly," both of which are "actuatable between an ON position and an OFF position to selectively control" fuel flow to the generator, but once again, the description of this embodiment makes no mention of handles being necessary to actuate the valve assemblies between ON and OFF.  (*Id.* at 51 ['101 Patent at 7:8-25].)  Thus, even if the specification does consistently refer to the valve assembly as including valve handles, "it is unclear whether these references . . . are simply the consistent description of one possible embodiment or the description of the invention itself." *Seachange*, 413 F.3d at 1370.  Moreover, and as discussed, "[t]he claim language is broad" because "[t]he claim[s] [themselves] do[] not refer specifically to" valve assemblies actuated by valve handles. *Cf. Hubbell Inc. v. Watt Stopper, Inc.*, 2010 WL 11519467, *18 (W.D. Tex. 2010).  Thus, the specification alone does not rebut the

- 47 -

presumption.

Whether the prosecution history supports Firman's construction that a valve assembly must necessarily include valve handles presents a closer call. On the one hand, in Champion's Appeal Brief in response to the Examiner's rejection of the '101 Patent application, Champion disagreed with the Examiner's interpretation of the term "valve assembly" as used in Claim 1. (Doc. 171-1 at 97-100.) "[I]n rejecting [C]laim 1, the Examiner ha[d] asserted that the claimed 'valve assembly' is disclosed in Poehlman," a prior art invention. (*Id.*at 97.) In arguing against the Examiner's interpretation, Champion stated:

> In the present case, the Specification of the present application clearly illustrates and describes that *the claimed "valve assembly" is comprised of one or more first valve assembly 24 and second valve assembly 26 – with the first valve assembly 24 including a first fuel valve handle 34* that is operatively connected to a first fuel valve 36 to control an opening and closing of the first fuel valve and *the second valve assembly 26 including a second fuel valve handle 38* that is operatively connected to a second fuel valve 40 to control an opening and closing of the second fuel valve.

(*Id.* at 98-99, emphases added.) Because Claim 1 mentions "valve assembly" but does not mention "handles," this prosecution-history disclaimer argument—at least at first blush—appears to support that Champion viewed the term "valve assemblies" as necessarily including valve handles. Notwithstanding this, Champion argues that the prosecution "history does not make any particular emphasis on the 'handle' itself, and it is not clear whether the inclusion or omission of the 'handle' was important to the argument or to the examiner's determination." (Doc. 175 at 5.) However, "[a]n applicant's argument made during prosecution may lead to a disavowal of claim scope even if the Examiner did not rely on the argument." *Seachange*, 413 F.3d at 1374. *See also Multi-Tech Sys.*, 357 F.3d at 1350 ("We have stated on numerous occasions that a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation."); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998) ("The fact that an examiner placed no reliance on an applicant's statement

distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction."); *E.I. du Pont de Nemours  Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1438 (Fed. Cir. 1988) ("Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms.").

On the other hand, it does not appear that Champion was actually arguing that the presence of the fuel valve handles as part of the valve assembly was something that distinguished its invention as claimed in Claim 1 from the prior art (i.e., Poehlman), or even that the fuel valve handles were a required or necessary component of the Claim 1 "valve assembly."  Indeed, Champion's disagreement with the Examiner's interpretation of the term "valve assembly" in Claim 1 was based on the fact that the Examiner included the "electrical switching members" in Poehlman as part of Poehlman's alleged "valve assembly," which in turn "allow[ed] for an interpretation of the reference of the [Poehlman] fuel selector switch . . . being positioned *on* the valve assembly."  (Doc. 171-1 at 99.) Champion argued that the Examiner's "categorization" of the Poehlman fuel selector switch "as being both a 'selector switch' and part of a 'valve assembly'" was distinguishable because Champion's "claim 1 distinctly calls for *a valve assembly* and *a selector switch* as two separate and distinct elements/structures."  (*Id.* at 99-100.)  True, "[w]here an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Seachange*, 413 F.3d at 1373-74. "[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997).  But here, Champion was not arguing that its "valve assembly" in Claim 1 was distinguishable from the prior art (i.e., Poehlman) because Champion's valve assembly has handles but Poehlman's does not.  Instead, Champion was arguing that its "valve assembly" did not include a selector switch because its selector switch was a separate element from its valve assembly.  Put simply, Champion did not attempt to overcome a prior art rejection based on Poehlman for Claim 1 by arguing

- 49 -

that its valve assembly had handles.

For those same reasons, Firman's argument that "Champion . . . argued that including 'electrical switching members . . . in an alleged 'valve assembly' [would be] wholly inconsistent with a broadest reasonable interpretation of the claimed valve assembly" (Doc. 171 at 10, footnote omitted) is misleading because it suggests that Champion was arguing that its valve assembly was necessarily "mechanical" in an effort to overcome the prior art. But in that sentence of its appeal brief, Champion argued that the Examiner's inclusion of electrical switching members as part of the *Poehlman* valve assembly was inconsistent with "a 'broadest reasonable interpretation'" of the claimed valve assembly because including the electrical switching members of *Poehlman* as part of the *Poehlman* valve assembly allowed the Examiner "to identify components in Poehlman" that are in proximity to the *Poehlman* selector switch "so as to allow for an interpretation of the reference of the [*Poehlman* selector switch] being positioned *on* the valve assembly." (Doc. 171-1 at 99.) Champion was not arguing that inclusion of electrical switching members in its own valve assembly was inconsistent with what was being claimed. Thus, to the extent Firman contends that the valves in the valve assembly must be mechanical valves, that argument is not supported by this portion of the prosecution history.

During the *Markman* hearing, Firman argued that *Seachange* does not stand for the proposition that statements made during prosecution history are *only* relevant when made to distinguish prior-art references. Firman cited *Fenner Invs.* for the proposition that "[a]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant." 778 F.3d at 1323. The Court agrees that statements made during prosecution history that do not relate to distinguishing the claimed invention over the prior art are *relevant*. Thus, the Court agrees with Firman that the statement made by the patentee about handles being included in the valve assembly is certainly *relevant*. Indeed, it is the statement's relevance that caused the Court to acknowledge in its tentative order that the question of whether that statement constitutes a disclaimer is a "close[] call." (Doc. 267 at 35.) The problem for Firman is that it bears the burden of showing that the

- 50 -

disclaimer was "clear and unmistakable." When determining whether a prosecution history disclaimer was "clear and unmistakable," the Court must "examine the entire prosecution history, which includes amendments to claims and all arguments to overcome and distinguish references." *Seachange*, 413 F.3d at 1372. As discussed above, examination of the *context* in which the "handles" statement was made leads the Court to conclude that the patentee's statement was not a "clear and unmistakable" disavowal. *Cf. buySAFE, Inc. v. Google Inc.*, 2013 WL 3936906, *3 (D. Del. 2013) ("The prosecution history cannot be viewed in the abstract, context is important."). The patentee did not say its valve assemblies "must include" or "only include" handles. Nor did the patentee argue that its valve assemblies were distinguishable from the prior art because its valve assemblies had handles while the prior art's does not.

Nor does the *entire* prosecution history provided by the parties lead the Court to conclude that the patentee's statement about valve assemblies including handles was a "clear and unmistakable" disclaimer of any valve assemblies which do not include handles. *Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, 133 F.4th 1359, 1366 (Fed. Cir. 2025) ("Courts must take care, however, to interpret purported disavowals in the context of the prosecution history as a whole. The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art.") (cleaned up). For example, in rejecting Claim 10 based on Poehlman, the Examiner referred to the "rejections of claims 1-2 for further details since the limitations are similar" and stated that "[t]he *only difference*" between Poehlman and Claim 10 "is the fuel valve handle which Examiner interprets as reference number 51 of Poehlman." (Doc 171-1 at 84.) That the Examiner addressed the handles as part of Claim 10 but not as part of Claim 1 supports that "valve assembly" as used in Claim 1 does not necessarily include handles. Moreover, in its appeal brief, Champion disagreed with the Examiner's rejection of Claim 10, arguing that Poehlman does not teach "a valve handle that is positioned on and operably connected to the valve assembly" and thus "the feature of a 'valve handle' is wholly absent from the teachings of Poehlman." (*Id.* at 104.)

For Claim 10, unlike its arguments for Claim 1, Champion distinguished the prior art on the basis of the valve handle claimed in Claim 10—which makes sense because Claim 1 does not expressly call for handles whereas Claim 10 does. Similarly, Champion argued that Claim 4, which expressly calls for valve handles, is distinguishable from the prior art because "the feature of a 'valve handle' is wholly absent from the teachings of Poehlman." (*Id.* at 111.) If Champion believed that valve handles were a necessary component of all valve assemblies, it would have sought to distinguish the term "valve assembly" in Claim 1 from Poehlman on the ground that the valve assembly in Claim 1 includes handles but Poehlman's does not. That Champion declined to do so, and only argued valve handles as a distinguishing factor from Poehlman for claims that expressly called for valve handles, suggests that Champion did not understand the term "valve assembly" to necessarily include handles.

Additionally, the Examiner thereafter issued another office action with new grounds for rejection based on other prior art (i.e., Sugimoto) "in response to" Champion's "appeal brief filed on 3/8/2019." (Doc. 175-2 at 4.) As part of its response to that second rejection, Champion amended Claim 1 to provide for first and second fuel valves as part of the valve assembly and for those fuel valves to be "mechanical valves." (Doc. 175-3 at 3.) But the amendments made no mention of handles. (*Id.*) And as Champion notes, "the examiner [also] allowed two other independent claims (now issued claims 17 and 18) to issue with amendments. The claims were amended to include a valve assembly, but neither include a mechanical fuel valve or a valve handle, despite their appearance in claims 1 and 10." (Doc. 175 at 6. *Compare* Doc. 175-3 at 7 [independent Claim 22 calling for a valve assembly, dependent Claim 23 calling for first and second fuel valves as part of the valve assembly, and dependent Claim 24 calling for those fuel valves to be non-solenoid, mechanical valves], *with* Doc. 155-2 at 52 ['101 Patent at 10:45-65: Claim 18 (as issued) calling for valve assembly comprising first and second fuel valves, and dependent Claim 19 (as issued) calling for those fuel valves to be non-solenoid, mechanical valves].) These amendments suggest that the term "valve assembly"—unless qualified with a description

that it includes mechanical fuel valves or handles—does not necessarily include either mechanical fuel valves or handles.

The Court is also unpersuaded by Firman's argument during the *Markman* hearing that the purported "handles" disclaimer here is similar to the disclaimer made in *Multi-Tech Sys.* There, the Federal Circuit held that certain limitations in the patent required "the claimed data packets travel directly from a local site to a remote site(and vice versa) over a telephone line and not a packet-switched network." 357 F.3d at 1348-49. There, "[i]n response to the examiner's first office action," Multi-Tech "took the opportunity to provide a 'summary of the invention' before addressing the § 103 rejection." *Id.* at 1349. In that summary, Multi-Tech stated: "In their specification, Applicants disclose a communications system which operates over a standard telephone line. Such a telephone line is commonly referred to in the art as a 'plain old telephone service' (POTS) line and establishes a point-to-point connection between telephone equipment on each end of the line. Applicants' invention . . . transmits the packets across a POTS line to a remote site . . . ." *Id.* The Court views *Multi-Tech Sys.* as distinguishable for at least two reasons. First, as noted, Multi-Tech's disavowal statement was made in a "summary of the invention" section, which came *before* the patentee addressed the examiner's § 103 rejection. The statement made by the patentee here was made as *part* of responding to the Examiner's rejection and was not made as part of a "summary of the invention" section. (Doc. 171-1 at 93-94 [the patentee's "Summary of Claimed Subject Matter" is a separate section that precedes the statement at issue here].) Second, the court in *Multi-Tech Sys.* relied on the patentee's prosecution-history disclaimer as "confirm[ation] that Multi-Tech viewed its inventions as being limited to communications over a telephone line." 357 F.3d at 1349. The *Multi-Tech Sys.* court had already held that the patent specification "repeatedly and consistently describe[d] the local and remote systems of the claimed inventions as communicating directly over a telephone line," that the specification "then describe[d] various preferred embodiments of the invention, *in all of which the hardware components of the local system*" operate over a telephone line, and that some of these statements were found in the

"Summary of the Invention," which was "not limited to describing a preferred embodiment, but more broadly describe the overall inventions." *Id.* at 1348 (emphasis added). Here, in contrast, not every embodiment in the patent specification, and not every description of the valve assembly in the Brief Description, describes the valve assemblies as having handles.

To reiterate, "[t]he party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063-64 (Fed. Cir. 2016) (citation omitted). For the reasons stated above, the language that Firman points to in the prosecution history for Claim 1, when viewed in context and in light of the prosecution history as a whole, does not show that Champion *clearly and unmistakably* limited the term "valve assemblies" to requiring valve handles.

As for extrinsic evidence, only Champion's expert provides an opinion regarding the term "valve assembly." (Doc. 155-3 at 69-71.) He opines that a "POSITA would not understand the claims to require" the fuel valves in the valve assemblies to have handles. (*Id.* at 70 ¶ 138.) He explains that even where fuel valves are controlled by "mechanical means"—e.g., as is called for in Claim 1 of the '101 Patent (Doc. 155-2 at 51 ['101 Patent at 8:42-43: "wherein the first fuel valve and the second fuel valve are mechanical valves"])—those mechanical valves may be controlled by handles, *or* by levers, knobs, and buttons. (Doc. 155-3 at 70 ¶ 139.) Thus, the extrinsic evidence also supports that valve assemblies need not have handles.[17]

---

[17] There is no merit to Firman's argument during the *Markman* hearing that extrinsic evidence, including expert testimony, cannot be considered under *Vitronics*. In a later case, the Federal Circuit, addressing *Vitronics*, stated that "there is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. . . . In *Vitronics*, we did not attempt to provide a rigid algorithm for claim construction, but simply attempted to explain why, in general, certain types of evidence are more valuable than others." *Phillips*, 415 F.3d at 1324. *See also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) ("Despite the district court's statements to the contrary, *Vitronics* does not prohibit courts from examining extrinsic evidence, even when the patent document is itself clear."). Here, the the extrinsic evidence supports, and does not contradict, the intrinsic evidence.

- 54 -

### iv.    Separate And Distinct

Firman contends that Champion's arguments to the Patent Office with respect to Claim 1 "represented an express disavowal of any claim scope in which the valve assembly . . . is not 'separate and distinct' from the selector switch." (Doc. 171 at 10.)  As discussed above, in its appeal brief, Champion rejected the Examiner's interpretation of the term "valve assembly" in Claim 1.  Specifically, Champion distinguished itself from Poehlman, the prior art, on the ground that Champion's valve assembly and selector switch were separate structures.  Because the Examiner interpreted the Poehlman selector switch as both forming part of the Poehlman valve assembly *and* acting as the Poehlman fuel selector, Champion argued:

> This is not what is called for in claim 1.  Instead, claim 1 distinctly calls for *a valve assembly* and *a selector switch* as two separate and distinct elements/structures – with claim 1 clearly and separately defining each of these elements and setting forth a relationship therebetween.  These elements should not be confused with one another, as the Examiner has attempted to do.  The Examiner has stretched and distorted the teachings of Poehlman in an attempt to satisfy the elements called for in claim 1 by asserting that an individual structure disclosed in Poehlman (i.e., fuel selector switch 51) discloses different, distinct elements of claim 1.  Such a categorization of the electrical fuel selector 51 as being both a "selector switch" and part of a "valve assembly" distorts the teachings of Poehlman . . . .

(Doc. 171-1 at 99-100.)  Because Champion unambiguously "argue[d] that [Claim 1] possesses a feature that the prior art does not possess"—i.e., the selector switch being a separate element/structure from the valve assembly—"in order to overcome a prior art rejection, the argument may serve to narrow the scope" of the term "valve assembly" in Claim 1.  *Seachange*, 413 F.3d at 1372-73.

Champion argues that the describing the valve assembly and the selector switch as "separate and distinct" "adds confusion" because "[g]iven that there can be 'corresponding operation' and that the 'selector switch' can be 'on the valve assembly,' it would confuse a jury to instruct them that these are 'separate' and 'distinct.'"  (Doc. 175 at 6.)  This argument is unavailing—two things can easily be distinct/separate elements of something

while also being connected.[18]

During the *Markman* hearing, Champion also argued that importing "separate and distinct" contradicts the claims, improperly imports limitations, and violates claim differentiation. These arguments are unavailing. As discussed above, claim differentiation is only a presumption that can be rebutted by a clear and unmistakable disclaimer, which is what is present here.

Champion alternatively argues that "even if a disclaimer might hypothetically apply to a single patent claim" (here, Claim 1), "Firman (who has the burden) has made no argument supporting why it would apply to other claims with different formats and limitations." (Doc. 175 at 7.) Thus, the question becomes whether the patentee's disavowal as to the "valve assembly" in Claim 1 applies to other claims.

"The prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in suit." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001). A disclaimer may be carried forward "if there are only immaterial differences" between the relevant portions of the claims. *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 944 (Fed. Cir. 2013). In the tentative order, the Court stated that Firman bears the burden on the disclaimer issue but had provided no argument whatsoever as to whether each time "valve assembly" is used in the '101, '667, '390, and '896 Patents, it is used in claims with the same or similar limitation. (Doc. 267 at 41.) The Court expressed that it was not convinced that the term is used in the same way in each of the claims. (*Id.*) During the *Markman* hearing, Firman argued that (1) it only bears the burden of proving a "clear and unmistakable disclaimer" and does not also bear the burden of showing that such disclaimer applies to other claims; and (2) at any rate, the "separate and distinct" disclaimer here should apply to the other claims. Because the Court now concludes, on further reflection, that the caselaw supports

---

[18]    Champion draws the analogy of ears on a rabbit head, arguing that it wouldn't make sense to call ears on a rabbit's head "separate and distinct" from the rabbit's head. (Doc. 155 at 9; Doc. 175 at 6.) This analogy fails because ears on a rabbit head are, at least arguably, part of the rabbit's head, whereas Champion argued that the selector switch is *not* a part of the valve assembly.

applying the "separate and distinct" disclaimer here to those claims in the '101, '667, '390, and '896 Patents that include the disputed term "valve assembly," it need not decide if that is Firman's burden to prove.

In *Multi-Tech Sys.*, the Federal Circuit held that "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." 357 F.3d at 1349. The court further held "that Multi-Tech's statement made during the prosecution of the '627 patent is relevant to an understanding of the common disclosure in the sibling '649 and '532 patents" because, among other things, "the specification is identical for all three patents." *Id.* at 1349-50. Similarly, in *Isola USA Corp. v. Taiwan Union Tech. Corp.*, 2014 WL 11292316 (D. Ariz. 2014), the court held:

> In [*Multi-Tech Sys.*], a district court constructed claims in three patents, which derived from a single "parent application," "share[d] a common specification," and were issued within a period of about 18 months. The district court constructed a term in one patent based on statements made during prosecution, and applied the same construction to a second patent that had already been issued when the statements were made. In affirming the district court, the Federal Circuit held that under those circumstances the prosecution history of the later patent could be used to limit the scope of the earlier-issued patent because the statement "was a representation of [the applicant's] own understanding of the inventions disclosed in all three patents."
>
> Applying the [*Multi-Tech Sys.*] analysis to the Patents–in–Suit, the Court finds that the '140 Patent's disclaimer should be applied to the '258 Patent, but not to the '414 Patent. The Isola Patents did not stem from one parent application, but *they have largely identical specifications and shared claims terms that demonstrate that they are closely intertwined.* However, the '414 Patent issued more than eight years prior to the disclaiming statements in the '140 prosecution, and includes in its embodiments examples of BPADGE that are not monomers. The Court finds the disclaimer should not apply to contradict a preferred embodiment when so large a time gap exists between the previously issued patent and the later disclaimer. In contrast, the '258 Patent was issued on March 1, 2011–approximately two months prior to the disclaiming statement and approximately seven months prior to the issuance of the '140 Patent. Under the [*Multi-Tech Sys.*] approach, the Court finds that the monomer disclaimer made in the '140 Patent's prosecution applies retroactively to the '258 Patent.

*Id.* at *17. Here, the '101, '667, '390, and '896 Patents all have identical specifications. (Doc. 171 at 2.) They also share claim terms—most notably, they share the term "valve assembly" and are thus closely intertwined. (Doc. 130 at 13 [the parties' Joint Claim Construction Statement, identifying that the term "valve assembly" appears in Claims 17-18 of the '101 Patent; Claims 1-3, 10, and 12-15 of the '667 Patent; Claims 3-7 of the '390 Patent; and Claims 21, 25-28, and 30-32 of the '896 Patent].) The patents were all issued within four years of one another, with the '101 Patent (for which the prosecution history disclaimer was made) having been issued first.[19] Accordingly, the Court agrees with Firman that, under the *Micro-Tech Sys.* analysis, the "separate and distinct" limitation should apply to the other claims at issue.

c. **The Court's Construction**

Accordingly, the Court construes the term "valve assembly" as follows: "an assembly of one or more valves that is separate and distinct from the selector switch."

B.    **Second And Third Patent Family Disputed Terms**

1.    <u>Fuel Lockout Apparatus[20]</u>

| Champion's Briefed Proposal | Firman's Briefed Proposal |
| --- | --- |
| Plain and ordinary meaning | A moveable barrier whose positioning prohibits a subsequent user action necessary to enable a different fuel source |

a.    **The Parties' Briefed Arguments**

Champion argues that "[t]here is no need to construe the term 'fuel lockout

---

[19]    The '101 Patent was issued on March 24, 2020. (Doc. 155-2 at 39.) The '667 Patent was issued on April 19, 2022. (*Id.* at 130.) The '390 Patent was issued on September 19, 2023. (*Id.* at 180.) The '896 Patent was issued on February 20, 2024. (*Id.* at 232.)

[20]    Champion argues that this term appears in the '780 Patent Claims 1-2, 6, 8-9, and 15; and the '985 Patent Claim 6. (Doc. 155 at 19.) Firman argues that this term appears in the '780 Patent Claims 1-2, 6, and 8-9, and 15; the '986 Patent Claim 6; the '654 Patent Claims 1 and 6-7; the '970 Patent Claims 4-5, 26-27, and 50-51; and the '895 Patent Claims 1-2, 6, 8, 12, and 14-15. (Doc. 171 at 13 n.16.) Other than an apparent typo which the Court assumes was a reference to the '985 Patent (as there is no '986 Patent in the record), Firman's additions are consistent with the parties' Joint Claim Construction Statement. (Doc. 130 at 26-27.)

- 58 -

apparatus' because it has a well-understood plain and ordinary meaning." (Doc. 155 at 19.) Champion also argues that "Firman's construction does not merely commit the cardinal sin of claim construction by attempting to rewrite the claim to import limitations from the specification, *the phrases in Firman's proposed construction do not even appear in the specification*." (*Id.*) Champion argues there is an absence of lexicography or disavowal, and thus "it would be improper to adopt Firman's proposed construction that improperly imports extraneous limitations into the claims." (*Id.*at 20.)

In response, Firman argues that the parties' dispute centers on "whether the term 'fuel lockout apparatus' refers to any apparatus that performs a particular function, regardless of structure, or whether it refers to the apparatus disclosed in the specification." (Doc. 171 at 14.) Specifically, Firman argues that "[t]he parties agree that, outside the context of Champion's patents, the term 'fuel lockout apparatus' does not have a well-understood meaning" and is a term "coined by the inventor." (*Id.*, citation omitted.) Accordingly, Firman argues the term should be understood by reference to the specification. (*Id.*) Firman argues that "[t]he specification exclusively uses the term 'fuel lockout apparatus' to refer to a mechanical device that, depending on its position, 'block[s] [the] fuel inlet 59 to prevent coupling' the second fuel source and 'prevents the fuel valve handle 56 [for the first fuel source] . . . from moving.'" (*Id.*) Put differently, Firman argues that "when the fuel lockout apparatus is in the first position, it prevents the user from connecting the hose needed to supply the second fuel," and "[c]onversely, when the fuel lockout apparatus is in the second position, it prevents the user from rotating the first fuel source's fuel valve handle to the ON position." (*Id.*) Firman argues that "[t]his moveable barrier therefore creates a two-step process to select which fuel to feed the engine. The user must either: (1) first close the mechanical fuel valve and then connect a second fuel source, or (2) first disconnect the second fuel source then open the mechanical fuel valve." (*Id.*) Next, Firman argues that its construction "does not import limitations." (*Id.* at 15.) Moreover, Firman argues that "Champion attempts to broaden this term to the point that it completely divorces it from what the '780 patent discloses" because Champion's

- 59 -

construction "could cover any means for performing the function of prohibiting more than one fuel from being selected." (*Id.*)  Specifically, Firman argues that Champion's construction (1) is restricted by 35 U.S.C. § 112(f); (2) fails to meet the requirements of § 112(f); and (3) should be rejected because "the specification uses the coined phrase to refer to one and only one structure: a movable barrier whose positioning prohibits a subsequent user action necessary to enable a different fuel source." (*Id.*)

In reply, Champion argues that Firman misstates its proposal. (Doc. 175 at 7.)  First, Champion argues that "subsequent user action" and "moveable barrier" are not phrases that come from the specifications. (*Id.*)  Second, Champion argues that it "never 'agreed' that this term 'does not have a well-understood meaning'" and that "[t]here is no evidence, much less 'agreement,' that it is a 'coined term.'" (*Id.* at 7-8.)  Third, Champion argues that it "never suggested the term is subject to 35 U.S.C. § 112(f), nor did [it] argue this term is not structural." (*Id.*)

b. **The Court's Tentative Construction And The Parties'**
***Markman* Hearing Arguments**

The Court tentatively construed "fuel lockout apparatus" as "a barrier that prevents connection of the second fuel source when the first fuel source is in use and prevents communication of the first fuel source to the engine when the second fuel source is connected." (Doc. 267 at 47.)

During the *Markman* hearing, Champion reiterated that the term "fuel lockout apparatus" has a plain and ordinary meaning but was "endeavoring to work with the Court's tentative construction together with the plain meaning that [its] expert has presented in order to propose an alternative construction here." (Doc. 278 at 89.)  First, Champion argued that "barrier" does not appear in the patents and so it should not appear in the construction. (*Id.* at 91-92.)[21]  Next, Champion took issue with the second half of

---

[21]    During the *Markman* hearing, Champion provided an extensive discussion of the claims, how the claims use different terms to describe the fuel lockout apparatus including "flange," and why requiring a fuel lockout apparatus to have a "barrier" or "flange" violates claim differentiation. (Doc. 278 at 93-95.)  Because, as discussed below, the Court agrees that "barrier" should be replaced with "apparatus" in the construction of the term "fuel lockout apparatus," a detailed description of Champion's arguments on this point is

the tentative construction—i.e., "prevents communication of the first fuel source to the engine when the second fuel source is connected"—arguing that this definition applies to what the *mechanical fuel valve* does, not what the fuel lockout apparatus does. (*Id.* at 90-91.) Champion proposed an alternative construction: "an apparatus that ensures individual communication of the fuel sources to the engine." (*Id.* at 92.) In support of that proposal, Champion cited the "Brief Description of the Invention," which provides:

> The mechanical fuel lockout switch includes a mechanical fuel valve and a fuel lockout apparatus. . . . *The fuel lockout apparatus* couples to the mechanical fuel valve *ensuring individual communication* of the fuel sources to the engine.
>
> . . .
>
> When the mechanical fuel valve is in the first position, the fuel lockout apparatus communicates the first fuel source to the internal combustion engine and prevents the second fuel source from coupling to the internal combustion engine, and actuation of the mechanical fuel valve to the second position causes the fuel lockout apparatus to permit the second fuel source to couple to the internal combustion engine, and interrupts the first fuel source communication with the internal combustion engine.

(Doc. 155-2 at 10, emphasis added ['780 Patent at 1:66-67, 2:4-7, 2:51-59].)

Firman argued that Champion raised two issues: (1) whether the fuel lockout apparatus is a "barrier"; and (2) whether the tentative construction of fuel lockout apparatus usurps the role of the mechanical fuel valve. (Doc. 278 at 96.) As for the second issue, Firman argued that the fuel lockout apparatus prevents movement of the mechanical fuel valve, thereby preventing communication of the fuel source to the engine. (*Id.* at 102, 104.) As for the first issue, Firman argued that the fuel lockout apparatus is a "barrier." (*Id.* at 96-100.) The Court questioned Firman's counsel as to whether the word "barrier" was redundant in light of the tentative construction's use of the word "prevent," and Firman at least tacitly agreed it was redundant. (*Id.* at 106.)

In reply, Champion reiterated why "barrier" should be replaced with "apparatus" in light of certain claims' use of the term "flange." (*Id.* at 108-09.) Champion also argued at

unnecessary.

length why there are multiple things that must happen to prevent communication of the first fuel source.  (Doc. 109-10.)

c.    <strong>Analysis</strong>

As an initial matter, the parties appear to dispute whether the term "fuel lockout apparatus" has a plain and ordinary meaning or whether the inventor has acted as lexicographer and coined the term.  The Court agrees with Champion that "fuel lockout apparatus" has a plain and ordinary meaning, particularly when viewed in light of the specification.  The Court is not persuaded by Firman's unsupported assertion that the parties "agree" that the term "fuel lockout apparatus is a coined" term.  (Doc. 171 at 14.) This is something Champion disputes.  (Doc. 175 at 7.)  The parties' experts also provide competing opinions on whether this term has a plain and ordinary meaning.  Firman's expert opines that a "POSITA generally understands the term 'lockout' to refer broadly to a device that prevents user access," but "the phrase 'fuel lockout apparatus' is not a known term in the field of engine or generator design (or even mechanical engineering more broadly).  A POSITA would therefore rely solely on its context within the claims and specification to understand what the term fuel lockout apparatus refers to."  (Doc. 171-1 at 27 ¶ 72.)  Champion's expert opines that "a POSITA would accord this term its plain and ordinary meaning consistent with and understood in light of the specification and claim language, which includes an apparatus that prevents selection of more than one fuel source."  (Doc. 155-3 at 73-74 ¶ 155.)  As discussed, "[a] district court . . . has the discretion to take expert testimony into account in determining the ordinary meaning of a claim term to one skilled in the art."  *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1331 (Fed. Cir. 2012).  Having considered both the intrinsic and extrinsic evidence, the Court concludes that "fuel lockout apparatus" has a plain and ordinary meaning.  *Cf. IQASR*, 825 F. App'x at 902-03.

As discussed in the tentative order, Champion's presentation failed to specify what that plain and ordinary meaning is.  Champion's expert opines that this disputed term's plain and ordinary meaning "includes an apparatus that prevents selection of more than one

- 62 -

fuel source." (Doc. 155-3 at 40-41 ¶ 155, emphasis added.)  However, Firman argues that this interpretation "broaden[s] this term to the point that completely divorces it from what the '780 patent discloses." (Doc. 171 at 15.)  During the *Markman* hearing, Champion argued that the Court need not construe the term "fuel lockout apparatus" if it rejects Firman's proposal; however, the Court finds that there is at least partial merit to Firman's proposed construction and finds that simply concluding that the term "fuel lockout apparatus" should be given its plain and ordinary meaning does not resolve the parties' dispute, such that the Court must go further and construe the term.  *O2 Micro*, 521 F.3d at 1361.

Following the *Markman* hearing, two disputes remain with respect to the tentative construction: (1) whether the fuel lockout apparatus is an "apparatus" or "barrier"; and (2) whether the fuel lockout apparatus "prevents communication of the first fuel source to the engine when the second fuel source is connected."

i.      "Apparatus" Or "Barrier"

The tentative order agreed with Firman that the "lockout" part of the disputed term requires that the fuel lockout apparatus act as a "barrier." (Doc. 267 at 46.)  The tentative order noted that "[b]arrier" is defined by Merriam Webster as "something material that blocks or is intended to block passage."  Barrier, *Merriam-Webster* (last visited Mar. 30, 2026), *available at* https://www.merriam-webster.com/dictionary/barrier [https://perma.cc/M5S6-6U5M].   The tentative order concluded that because the specification consistently refers to the fuel lockout apparatus as performing blocking and unblocking actions, it can appropriately be understood as a "barrier" as that word is commonly understood. (Doc. 267 at 47.)

Nevertheless, as discussed above, the Court asked Firman during the *Markman* hearing whether the term "barrier" is redundant and confusing in light of the fact that the fuel lockout apparatus is described as "preventing" connection/communication of the fuel sources.  Although Firman maintained its position that the fuel lockout apparatus acts as a barrier, it seemed to agree that the term is redundant in light of the use of the word

- 63 -

"prevent" in the tentative construction.  Moreover, the term "barrier" is not used anywhere in the patent specification.  Accordingly, the Court will revise its construction to replace the word "barrier" with "apparatus."

> ii.    <u>"Prevents Communication Of The First Fuel Source To The Engine When The Second Fuel Source Is Connected"</u>

The Court is persuaded by Champion's argument during the *Markman* hearing that the language "prevents communication of the first fuel source to the engine when the second fuel source is connected" should be removed from the construction.  Champion argued at length that by defining the fuel lockout apparatus as "prevent[ing] communication of the first fuel source to the engine when the second fuel source is connected," the tentative construction was usurping the definition of, or the role played by, the mechanical fuel valve.  Although, as discussed earlier in this order, Champion has not provided, and the Court has not located, a case holding that a construction is legally improper if it overlaps with the way another term would be construed, there is nevertheless merit to Champion's argument for this particular term.  Upon further reflection and the Court's re-review of the patent specification, it does not appear that the "fuel lockout switch" is always described as preventing communication of the first fuel source.

The tentative order cited the "Brief Description of the Invention," which defines the fuel lockout apparatus as follows:

> The mechanical fuel lockout switch includes a mechanical fuel valve and a fuel lockout apparatus. . . .  The fuel lockout apparatus couples to the mechanical fuel valve ensuring individual communication of the fuel sources to the engine.
>
> . . .
>
> When the mechanical fuel valve is in the first position, *the fuel lockout apparatus communicates the first fuel source to the internal combustion engine and prevents the second fuel source from coupling to the internal combustion engine*, and actuation of the mechanical fuel valve to the second position causes *the fuel lockout apparatus to permit the second fuel source to couple to the internal combustion engine*, and interrupts the first fuel source communication with the internal combustion engine.

(Doc. 155-2 at 10 ['780 Patent at 1:66-67, 2:4-7, 2:51-59].)[22]  In this description, the "fuel lockout apparatus" is unquestionably described as "communicat[ing] the first fuel source to the internal combustion engine and prevent[ing] the second fuel source from coupling to the internal combustion engine."  (*Id.*)  This language supports the first half of the tentative construction—which neither party appeared to object to at the *Markman* hearing—which is that the fuel lockout apparatus "prevents connection of the second fuel source when the first fuel source is in use."  This language in the '780 Patent specification also unequivocally describes the fuel lockout apparatus as "permit[ting] the second fuel source to couple to the internal combustion engine" when the mechanical fuel valve is actuated to the second (closed) position.  (*Id.*)  Once again, that supports the first half of the tentative construction.  Initially, the Court read the phrase "interrupts the first fuel source communication with the internal combustion engine" in the above-quoted specification language as referring to the fuel lockout apparatus.  That was, at least in part, the basis for tentatively concluding that the fuel lockout apparatus "prevents communication of the first fuel source to the engine when the second fuel source is connected."  However, on reflection, the comma that comes before "interrupts" suggests that what is doing the interrupting of the first fuel source's communication to the engine is the mechanical fuel valve and its actuation to second (closed) position—*not necessarily* the fuel lockout apparatus.  Accordingly, Champion is correct that (at least based on this

---

[22]    Champion argued during the *Markman* hearing that the language in this excerpt—"The fuel lockout apparatus couples to the mechanical fuel valve ensuring individual communication of the fuel sources to the engine"—supports its revised proposed construction of "an apparatus that ensures individual communication of the fuel sources to the engine."  (Doc. 278 at 91-92.)  The Court rejects this revised proposed construction for two reasons.  First, that sentence is not describing the fuel lockout apparatus itself, but is instead describing the result of coupling the fuel lockout apparatus to the mechanical fuel valve and how those two components work together.  Thus, Champion's reliance on this language is a curious position for it to take, especially in light of Champion's arguments throughout the *Markman* hearing that a court's construction of one term cannot usurp the construction of another and/or the definition of how several component parts work together.  Second, Champion's revised proposal, like Champion's proposed construction from its briefing—"an apparatus that prevents selection of more than one fuel source" (Doc. 155-3 at 73 ¶ 155)—is too broad.  Both definitions would appear to also apply to the mechanical lockout switch generally, of which the fuel lockout apparatus is just one component.

language from the specification) it would be confusing, and in fact incorrect, to tell the jury that the fuel lockout apparatus is itself what does the interrupting/preventing of the first fuel source's communication with the engine.

Upon further review of the specification, the Court also notes that the "Brief Description of the Invention" describes the "*mechanical fuel lockout switch*" as "communicat[ing] the second fuel source to the dual fuel engine and interrupt[ing] the first fuel source communication with the dual fuel engine when in second position." (*Id.* at 10 ['780 Patent at 2:7-11].) This language further supports that it is not always the fuel lockout apparatus itself that is preventing or interrupting communication of the first fuel source when the second fuel source is in use.

The tentative order also cited the '780 Patent's description of the fuel lockout apparatus as depicted in FIG. 2 and as appearing in one embodiment of the invention:

> Mechanical fuel lockout switch **38** may also include fuel lockout apparatus **58** coupled to mechanical fuel valve **54** to communicate fuel sources individually to generator **20**. In one embodiment of the invention, fuel lockout apparatus **58** communicates first fuel source **28** to the engine by actuating mechanical fuel valve **54** to first position **38***(a)* to open the first fuel line as shown in FIG. **2**, and communicates second fuel source **30** to the engine by actuating mechanical fuel valve **54** to second position **38***(b)* to open communication of the second fuel source **30** to the engine as shown in FIG. **3**. Referring back to FIG. **2**, when mechanical fuel valve **54** is in first position **38***(a)*, fuel lockout apparatus **58** communicates first fuel source **28** to the dual fuel engine and *prevents communication between the second fuel source and the dual fuel engine.*

(*Id.* at 12 ['780 Patent at 5:37-51].) Again, however, this language only supports the first half of the tentative construction—i.e., that the fuel lockout apparatus prevents the second fuel source from connecting.    A review of the claims themselves—as well as the doctrine of claim differentiation—compels the conclusion that the latter half of the tentative construction should be removed. For example, Claim 1 of the '780 Patent claims:

> a fuel lockout apparatus coupled to the mechanical fuel valve;
>
> . . .
>
> wherein the fuel lockout apparatus is configured to:

- 66 -

> prevent the second fuel source from coupling to the second fuel line while the mechanical fuel valve is in the first position; and
>
> permit the second fuel source to couple to the second fuel line while the mechanical fuel valve is in the second position.

(*Id.* at 15 ['780 Patent at 11:61-62, 12:5-11].)  This language, in an independent claim, only describes the fuel lockout apparatus with reference to the second fuel source—i.e., the fuel lockout apparatus prevents/permits[23] coupling of the second fuel source.  In other words, it supports the first half of the tentative construction.  However, Claim 1 makes no mention of the fuel lockout apparatus conversely preventing the first fuel source from communicating with the engine when the second fuel source is in use.  Indeed, Claim 1 states that the *mechanical fuel lockout switch* (not the fuel lockout apparatus itself) is what "communicates the second fuel source to the dual fuel engine and interrupts the first fuel source communication with the dual fuel engine when in the second position."  (*Id.* ['780 Patent at 11:63-12:4].).  Thus, this independent claim does not support the second half of the tentative construction.

> Importantly, Claim 2, which depends on Claim 1, claims:
>
> The mechanical fuel lockout switch for a dual fuel engine of claim **1**, wherein *the fuel lockout apparatus prevents actuation of the mechanical fuel valve to the first position when the second fuel source communicates with the dual fuel engine.*

(*Id.*, emphasis added ['780 Patent at 12:12-16].)  In other words, this dependent claim describes the fuel lockout apparatus as preventing the mechanical fuel valve from actuating to the first position (i.e., opening)—which would in turn allow communication of the first fuel source to the engine—when the second fuel source is communicating with the engine.  This dependent claim thus addresses the second half of the tentative construction.  But this is a *dependent* claim, and as such, the doctrine of claim differentiation raises the presumption that the fuel lockout apparatus in Claim 1 need not necessarily prevent communication of the first fuel source to the engine by *itself* preventing the mechanical

---

[23]    In light of this language, the Court will add the term "permit" to its construction.

fuel valve from actuating to first position.

As yet another example, Claim 14 of the '895 Patent claims "a fuel lockout apparatus coupled to the mechanical fuel valve and configured to: prevent the pressurized fuel source from coupling to the gaseous fuel line while the liquid fuel line is open, and permit the pressurized fuel source to couple to the gaseous fuel line while the liquid fuel line is closed by the mechanical fuel valve." (*Id.* at 229 ['780 Patent at 14:17-24].)  Claim 15, which depends on Claim 14, claims a "fuel lockout apparatus [] further configured to prevent the mechanical fuel valve from opening the liquid fuel line while the fuel regulator system is coupled to the gaseous fuel line." (*Id.* ['780 Patent at 14:25-29].)  The Court has not located anything in the specification that would rebut this presumption.  Accordingly, the tentative construction impermissibly imported a limitation when construing the term "fuel lockout apparatus" by requiring the fuel lockout apparatus to itself prevent communication of the first fuel source when the second fuel source is in use.

### d.   The Court's Construction

Accordingly, the Court construes "fuel lockout apparatus" as follows: "an apparatus that prevents connection of the second fuel source when the first fuel source is in use and permits connection of the second fuel source when the mechanical fuel valve is closed."

### 2.   Prevents/Permits The Fuel Source From Coupling/To Couple[24]

| Champion's Briefed Proposal | Firman's Briefed Proposal |
| --- | --- |
| Plain and ordinary meaning | Prevent[s] . . . the fuel source from attaching . . . and allow[s] the . . . fuel source to attach |

### a.   The Parties' Briefed Arguments

Champion argues that "this phrase does not require Court intervention" because "[t]he phrase uses commonly used, simple words," and a "POSITA would accord this term its plain and ordinary meaning consistent with, and understood in light of, the specification

---

[24]   This term appears in the '780 Patent Claims 1 and 8; the '985 Patent Claim 6; the '654 Patent Claims 1 and 6; the '970 Patent Claims 4, 26, and 50; and the '895 Patent Claims 1 and 14. (Doc. 130 at 78.)

and claim language, which includes to prevent fuel flow and permit fuel flow." (Doc. 155 at 17.) Champion rejects Firman's proposed construction, arguing it "is confusing and overly restricts the meaning of 'coupled.'" (*Id.*) Specifically, Champion argues that "Firman changes the word 'couple' to 'attach'" and "[g]iven that 'coupled' is a term the parties have agreed should be accorded its plain and ordinary meaning, creating specialized definitions for the coupling of the fuel source is confusing." (*Id.* at 17-18, footnote omitted.) Champion emphasizes that its expert opines that the plain and ordinary meaning of "coupled" "includes two or more components directly or indirectly interacting with each other, for example, physically, electrically, and/or fluidly" and that "Firman's proposed construction would completely eliminate fluid coupling" even though "the specifications clearly teach that fluid coupling could be included in the term 'coupled.'" (*Id.* at 18.)

In response, Firman concedes that "[t]he parties agree that the plain meaning of the term 'coupling' and 'to couple' refers to multiple ways of connecting two items, including placing those items in communication and physically attaching items together." (Doc. 171 at 16.) Firman argues that the parties' dispute concerns "what it means to 'prevent' (or 'permit') coupling." (*Id.*) Firman argues that "Champion's construction prevents only one form of coupling (i.e., fuel flow), while still allowing another form (i.e., attachment)," whereas "Firman's construction requires preventing both forms of coupling." (*Id.*) Referring to the claims themselves, Firman argues that "the phrase 'prevent coupling' solely refer[s] to the fuel lockout apparatus that prevents the second fuel source from coupling to the fuel line." (*Id.*) Firman argues that "[t]he specification discloses only one way in which the fuel lockout apparatus does so: a flange that blocks an inlet to prevent the hose from attaching; i.e., it prevents all forms of coupling." (*Id.*) Firman notes that "the specification uses the phrase 'prevent coupling' just one time, and it does so by explaining that blocking the connection port is what prevents the coupling." (*Id.*) Firman further points to Champion's argument that the "prior art RD9000E generator does not 'prevent coupling' because the alleged fuel lockout apparatus 'is separate and distinct from the LPG inlet coupling' and therefore does not prevent coupling." (*Id.* at 17.) Turning to

Champion's proposed construction, Firman argues that it "takes the broader position that preventing coupling need merely prevent 'fuel flow'" and that "[t]his construction would allow the fuel line to remain attached to the fuel inlet—which directly contradicts its above contentions and the heart of the '780 patent." (*Id.*)  In summary, Firman argues that "the phrase 'prevent coupling' solely refers to the action of the lockout apparatus, [and] a POSITA reading the patent would understand the phrase to mean preventing all forms of coupling, including attachment." (*Id.*)

In reply, Champion first argues that "Firman's arguments about certain Champion products practicing a single embodiment of the claims is not dispositive of the entirety of the claim scope." (Doc. 175 at 8.)  Second, Champion argues that the case cited by Firman is "not authoritative or analogous." (*Id.*)  Third, Champion argues that "both parties agree 'couple' can include (among other things) the concept of 'fuel flow,' thus, it is inappropriate to limit this term to other kinds of interactions ('attach[ing]'), as Firman proposes." (*Id.*)  Champion argues that "coupling" "may include attaching or other means of connection (*e.g.*, electrically or fluidly)" and that "Firman's only evidence—'to block fuel inlet 59 to prevent coupling'—is not inconsistent with the concept of fluid coupling or fuel flow because blocking the fuel inlet is an example where the structure could prevent the fluid coupling or fuel flow." (*Id.*)

### b.    The Court's Tentative Construction And The Parties' *Markman* Hearing Arguments

The Court tentatively construed "prevents/permits the fuel source from coupling/to couple" as "to prevent the fuel source from connecting directly or indirectly" and "to permit the fuel source to connect directly or indirectly." (Doc. 267 at 52.)

During the *Markman* hearing, Firman argued that the term "coupling" is not in dispute, and only what it means to "prevent coupling" is in dispute. (Doc. 278 at 113.)[25] Firman explained that there are different forms of coupling and that physical attachment is

---

[25]    Firman stated during the *Markman* hearing that it was not disputing the tentative construction of "permit coupling" and was only disputing the tentative construction of "prevent coupling." (Doc. 278 at 113.)

just one form of coupling. (*Id.*) Firman argued that "preventing coupling" is satisfied only if *all* forms of coupling are prevented. (*Id.*) Firman analogized that if software was said to "prevent cyberattacks," that would mean that the software prevents *all forms* of cyberattacks (e.g., phishing, malware, ransomware, etc.). (*Id.* at 114.) Firman distilled its argument as follows: "to prevent X means that you have to prevent all forms and types of X, whether that's X type 1 or X type 2." (*Id.*) Firman proposed revising the tentative construction to replace "directly or indirectly" with "directly and indirectly" to clarify that all forms of coupling must be prevented. (*Id.* at 115.)

During the *Markman* hearing, Champion argued at length that the tentative order erred by using the term "connecting" as opposed to "coupling." (*Id.* at 119.) Champion also took issue with Firman's prior proposal of using the term "attaching," appearing to suggest that "connecting" and "attaching" are synonymous. (*Id.*) And Champion argued that defining "coupling" to mean "connecting directly and indirectly" "would explicitly read out of the claim language the embodiments that are disclosed in the specifications." (*Id.* at 120.) Champion also argued that "[c]onnecting is a subset . . . of coupling." (*Id.* at 121.) In response to questioning, Champion then agreed that "if connect means coupled, if it has the same definition as coupled" then "it would mean the same thing," but argued that "if all we're doing is substituting two words that mean the same thing, then . . . why not use the language that was disclosed in the specification, the language that is actually in the claims?" (*Id.*) And Champion clarified that there is only an issue "if 'connecting' means something else, something other than what the plain and ordinary meaning of 'coupling' is." (*Id.* at 122.) As for Firman's proposal to replace "or" with "and," Champion argued that this was not "supported by the specification or the claim language themselves" and Champion "would agree with the Court's tentative, subject to" "connecting" meaning the same thing as "coupling." (*Id.* at 122-23.)

Following these arguments, the Court suggested adding commas to offset the language "directly or indirectly" in the Court's tentative construction. (*Id.* at 123.) Champion stated that it "would be fine with that" (*id.*), and Firman clarified that although

it believes its proposed use of "and" is "perhaps clearer," "as long as the order that issues is clear that what that means is preventing all forms of connection, whether it's direct or indirect, that's okay" (*id.* at 123-24). Champion also argued that "if there's no direct connection, then there would also be no indirect connection, so it just makes that language superfluous." (*Id.* at 123.)

c.    **Analysis**

As an initial matter, to the extent Champion's argument during the *Markman* hearing was that the Court erred by using "connecting directly or indirectly" in its construction as opposed to "coupling," that argument is without merit. As both parties agree, "to couple" or "coupling" has a plain and ordinary meaning. Each party articulates that plain and ordinary meaning slightly differently. (*Compare* Doc. 155 at 18 [Champion, arguing "coupled" "includes two or more components directly or indirectly interacting with each other"]; *with* Doc. 171 at 16 [Firman, arguing "coupling" or "to couple" "refers to multiple ways of connecting two items, including placing those items in communication and physically attaching items together"].) But in substance, both parties agree that "coupling" or "to couple" has a plain and ordinary meaning, which includes "connecting directly or indirectly." This definition is consistent with decisions of other district courts that have found the common term "coupled" to mean "directly or indirectly connected." *Parthenon Unified Memory Architecture LLC v. ZTE Corp.*, 2016 WL 310174, *20 (E.D. Tex. 2016). At the hearing, Champion conceded that there was only an issue "if 'connecting' means something else, something other than what the plain and ordinary meaning of 'coupling' is." (Doc. 278 at 122.) The Court fails to see how defining "coupling" as "connecting directly or indirectly" is contrary to the term's plain and ordinary meaning or the parties' own definitions of the term. To the extent there is a need for clarification, the Court takes this opportunity to clarify that it views the plain and ordinary meaning of "coupling" as synonymous with "direct or indirect connection." That connection could be direct or indirect. That connection could also refer to physical

connection, electrical connection, or fluid connection.[26]

In the tentative order, the Court rejected Firman's proposal to construe "prevent coupling" to mean "prevent attaching." (Doc. 267 at 50-52.) Based on Firman's arguments during the *Markman* hearing, it is now clear that what Firman wanted to accomplish through its redefinition of "coupling" as "attaching" was to have the construction of "prevent coupling" mean preventing *all forms* of coupling. Put differently, Firman was attempting to argue that by preventing physical attachment, that would, in effect, prevent all other forms of coupling. That is a point with which Champion agreed at the hearing. (Doc. 268 at 123 [Champion arguing that "if there's no direct connection, then there would also be no indirect connection"].) Although, as discussed below, the Court agrees with the substance of Firman's argument that "preventing coupling" means preventing all forms of coupling, both direct and indirect, re-defining "coupling" to mean "attaching" would still be inconsistent with caselaw and the plain and ordinary meaning of "to couple." As discussed in the tentative order, "[t]he Federal Circuit has held that the unmodified term 'coupled' does not automatically imply a physical connection and has counseled courts against reading such a limitation into the term absent contrary evidence in the intrinsic record." *CardioFocus, Inc. v. Cardiogenesis Corp.*, 827 F. Supp. 2d 36, 45-46 (D. Mass. 2011) (citing *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 992 (Fed. Cir. 1999)). Although the Court now understands that redefining "coupling" to mean "attaching" when followed by "prevent" would have the same substantive result as defining "prevent coupling" to mean "prevent all forms of coupling," the Court finds that redefining "coupling" to "attaching" only when it follows the word "prevent" would be confusing to the jury and therefore still rejects that approach.

Nevertheless, as stated, the Court agrees with Firman that to "prevent coupling"

---

[26] Although the parties do not dispute that the term "coupling," *in a vacuum*, should be given its plain and ordinary meaning, the parties' briefing initially disputed whether "coupling" should be redefined to "attaching" when "coupling" is followed by the word "prevents." To avoid ambiguity and to adequately address the parties' dispute, the Court finds it necessary to spell out what that plain and ordinary meaning of "coupling" is when that word is followed by the word "prevents."

means to prevent all forms of coupling for several reasons. First, the plain and ordinary meaning of "prevent" suggests that when something is said to "prevent X" it is preventing *all forms* of X. The Court was persuaded by Firman's analogy that if a company said its software "prevents cyberattacks," the company means that its software prevents all forms of cyberattacks (and not just phishing or malware attacks).

The claims themselves also support this understanding. For example, Claim 1 of the '780 Patent claims a mechanical fuel lockout switch:

> wherein the fuel lockout apparatus is configured to:
>
> prevent the second fuel source from coupling to the second fuel line while the mechanical fuel valve is in the first position; and
>
> permit the second fuel source to couple to the second fuel line while the mechanical fuel valve is in the second position.

(Doc. 155-2 at 15 ['780 Patent at 12:5-11].) By defining "prevent coupling" to mean preventing all forms of coupling, such a definition encompasses Champion's concern that preventing coupling must include preventing fluid coupling.

The specification also supports this understanding. The specification provides:

> Actuation of mechanical fuel valve **54** to first position **38***(a)* causes fuel lockout apparatus **58** to block fuel inlet **59** to prevent coupling the first end **50***a* and second end **50***b* of the quick-disconnect hose coupling together, and actuation of mechanical fuel valve **54** to another position causes fuel lockout apparatus **58** to unblock fuel inlet **59** to permit attaching first end **50***a* and second end **50***b* together.

(*Id.* at 13 ['780 Patent at 7:60-67].) By physically blocking the fuel inlet, the fuel lockout apparatus prevents all types of coupling, including fuel-flow coupling (as Champion's construction proposes), but also physical-attachment coupling (as Firman initially proposed), as well as any other type of coupling (as Firman now proposes). Thus, the specification supports Firman's understanding that "prevent coupling" refers to stopping all forms of coupling. *Cf. Cloud Farm*, 674 F. App'x at 1007 (holding that "[t]he district court rightly determined that the plain and ordinary meaning" of "prevent" is "to stop," particularly "after considering the claim language in light of the specification").

Champion's own expert appears to agree that "coupling" refers to all forms of coupling when used in the '780 Patent. Although Champion's expert proposes that "prevents coupling" be construed as "prevent(s) fuel flow" (Doc. 155-3 at 57 ¶ 90), that construction runs afoul of Champion's expert's own explanation that "coupled" includes not just fluid-coupling but also physical- and electrical-coupling. (*Id.* at 58 ¶ 93). Indeed, Champion's expert explains that "the '780 Patent uses 'coupled' to describe *both a physical and fluid connection* between the generator and the fuel delivery system." (*Id.* ¶ 92, emphasis added.) Thus, the opinions of Champion's own expert support that the '780 Patent uses the term "coupled" to refer to all forms of coupling—including physical attachment and fluid coupling.

Critically, during the *Markman* hearing, the Court asked both parties whether adding commas around "directly or indirectly" in the tentative construction would be sufficient. Both parties agreed so long as the order made clear that this revision means "prevents coupling" refers to preventing all forms of coupling. (Doc. 278 at 123 [Champion: "We would be fine with that."]; *id.* at 124 [Firman: "That actually occurred to me yesterday as I was preparing. I think that our proposed change is perhaps clearer, but if Your Honor changes it to what you're proposing now, as long as the order that issues is clear that what that means is preventing all forms of connection, whether it's direct or indirect, that's okay."].) Accordingly, the Court will revise its tentative ruling to add those commas, and the Court will take the opportunity to clarify that this revision is being made to explain that "prevent coupling" means to prevent all forms of coupling.

c.     **The Court's Construction**

Accordingly, the Court construes the term "prevents/permit the fuel source from coupling/to couple" to mean "to prevent the fuel source from connecting, directly or indirectly," and "to permit the fuel source to connect, directly or indirectly."

…

…

…

- 75 -

### 3. Prevent The Mechanical Fuel Valve From Opening/Prevent Actuation Of The Mechanical Fuel Valve To The First Position[27]

| Champion's Proposal | Firman's Proposal |
|---|---|
| Plain and ordinary meaning | Prevent[s] the mechanical fuel valve from moving |

#### a. The Parties' Arguments

Champion argues that "[t]he main flaw in Firman's position for these two separate claim terms is that these are two clearly different phrases and Firman wants them to have an identical meaning." (Doc. 155 at 13.)  Relying on the doctrine of claim differentiation, Champion argues these terms must have different meanings.  (*Id.* at 13-14.)  Next, Champion argues that "[a]lso implicit in Firman's position is that 'actuat[ing]' and 'opening' are both identical to the word 'moving,'" and Champion argues "that is facially false, and Firman gives no support for this construction." (*Id.* at 14.)  Last, Champion argues that Firman's proposed inclusion of the term "moving" "presents even more confusion"—for example, a valve could "move" to the closed position.  (*Id.*)  Thus, Champion asks the Court to adopt the plain and ordinary meaning of these terms and reject Firman's proposal.  (*Id.*)

In response, Firman focuses on the word "prevent" in the phrases, arguing that "[b]oth forms refer to the same thing: restricting the mechanical fuel valve from moving to the open position." (Doc. 171 at 18.)  Next, Firman disputes that "moving" is unclear, arguing that the "sole form of valve movement the patent refers to is the opening and closing of the valve's mechanism." (*Id.*)  Firman also argues that "under Champion's apparent claim interpretation, the mechanical valve's movement need not *ever* be prevented so long as simultaneous fuel flow does not occur." (*Id.*)  Firman argues that "[t]his makes the term 'prevent' superfluous." (*Id.*)  Last, Firman disputes Champion's

---

[27]    The term "prevent the mechanical fuel valve from opening the liquid fuel line" appears in the '654 Patent Claim 7; the '970 Patent Claims 5, 27, 51; and the '895 Patent Claim 15. (Doc. 130 at 47.)  The term "prevent[s] actuation of the mechanical fuel valve" appears in the '780 Patent Claims 2, 8, and 15 and the '895 Patent Claims 2 and 8. (*Id.* at 41.)

reliance on the doctrine of claim differentiation, arguing that "the only 'actuation' at issue is actuation into the open position" and "although 'actuation' may theoretically refer to either opening or closing the valve, that has no relevance here because additional claim limitation language restricts this term to actuation to open position." (*Id.* at 19.)

In reply, Champion argues that "Firman's approach takes two distinct claim phrases and morphs them together—using words not present in either version or the specification." (Doc. 175 at 8.) Champion again argues that Firman's proposed use of the term "moving" is confusing: "As a simple example, the valve could 'move' slightly without opening the liquid fuel line or actuating the valve to the first position, as claimed. But because the structure did not prevent that immaterial movement, Firman's position would be that it does not infringe . . . ." (*Id.*) Last, Champion argues that "prevent" is not superfluous because what is "prevented" is "actuation . . . to the first position." (*Id.* at 9.)

b.    **Analysis**

Although Champion has again failed to specify what its proposed plain and ordinary meanings are, the Court agrees that these terms have plain and ordinary meanings, supported by the claims themselves as well as the specification, and that Firman's proposal deviates from those plain and ordinary meanings.

As an initial matter, the term "moving"—which Firman seeks to include—is too broad and is not what is claimed. The claims do not cover fuel lockout apparatuses that prevent the mechanical fuel valve from *moving*—they cover fuel lockout apparatuses that prevent the mechanical fuel valve from actuating to the first position and opening the liquid fuel line. Firman's briefing lacks any persuasive explanation why these phrases should be broadened to say anything other than what their plain meaning provides. Indeed, Firman implicitly acknowledges that these phrases don't just refer to the mechanical fuel valve "moving," but rather refer to the mechanical fuel valve "moving *to the open position*." (Doc. 171 at 18, emphasis added.) Neither the claims themselves, nor the specification, support changing the plain meaning of these words to the broader term "moving."

The extrinsic evidence further supports the conclusion that preventing "movement"

is not what is claimed. As Champion's expert explains, a mechanical fuel valve could "rotate" (i.e., move) so long as the mechanical fuel valve is not actuated to the first position. (Doc. 155-3 at 103 ¶ 79.) As Champion's expert further explains, a POSITA would understand that the mechanical fuel valve could rotate (i.e., move) so long as "the mechanical fuel valve **54** is not able to rotate far enough to open the liquid fuel line." (*Id.* at 105 ¶ 85.)

Firman also argues that under Champion's proposed construction, movement need not be prevented so long as simultaneous fuel flow doesn't occur. This argument is without merit. The language of the claims does not call for a fuel lockout apparatus that generally prevents simultaneous fuel flow—they call for a fuel lockout apparatus that prevents the mechanical fuel valve from actuating to first position and opening the first fuel line.

Last, "practice has long recognized that claims may be multiplied to define the metes and bounds of the invention in a variety of ways." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (cleaned up). "Thus two claims which read differently can cover the same subject matter." *Id.* Here, adopting the plain and ordinary meaning does not "interpret [the claims] to be broader than what is contained in the specification and claims as filed." *Id.* at 1024.

c. **The Court's Construction**

Accordingly, the Court construes "prevent the mechanical fuel valve from opening the liquid fuel line" to mean "restrict the movement of the mechanical fuel valve such that the liquid fuel line is not opened, but without necessarily restricting other movement of the mechanical fuel valve." The Court construes "prevents actuation of the mechanical fuel valve to the first position" to mean "restricts the movement of the mechanical fuel valve such that the mechanical fuel valve cannot move into the first position, but without necessarily restricting other movement of the mechanical fuel valve."

…

…

…

4.      Selectively Control[28]

| Champion's Briefed Proposal | Firman's Briefed Proposal |
|---|---|
| Plain and ordinary meaning | A portion of the mechanical fuel valve mechanically blocks fuel flow from one fuel source while unblocking fuel flow from a second fuel source |

a.      **The Parties' Briefed Arguments**

Champion argues that "the patentee *never* used either 'block' or 'unblock' in any of the claims," and "[t]o read such limitations into the claims for these simple phrases that contain no complex words violates the well-settled rule that 'while the claims are read in view of the specification, importing a limitation from the specification into the claims has been deemed one of the "cardinal sins of patent law.""" (Doc. 155 at 16, citation omitted.) Champion also argues that "Firman's proposed construction converts a requirement of 'selectively control' to a meaning indicating 'blocking or unblocking,'" but "'[b]locking' is not equivalent to 'selectively controlling' because the term 'blocking' can mean completely stopping," whereas "'controlling' can certainly include blocking but also includes increasing and decreasing by various desired amounts." (*Id.*) In sum, Champion argues that by "[b]y importing words like 'mechanical' and 'unblocking' into the claims without any support, Firman violates basic claim construction principles." (*Id.*)

In response, Firman argues that "[t]his term is found solely within claims that require 'a mechanical fuel valve . . . to selectively control' the two different fuel flows such that only one enter the engine at a time." (Doc. 171 at 19.) Firman argues that "[t]he parties appear to dispute what the article 'to' means when referring to the mechanical fuel valve 'to' conduct the selective control"—"Champion argues that the mechanical fuel valve need not control the fuel flows, whereas Firman proposes that the mechanical fuel

---

[28]    This term appears in the '780 Patent Claims 1 and 15; the '985 Patent Claims 5 and 15; the '654 Patent Claims 1 and 6; the '970 Patent Claims 1, 12, 20, and 44; and the '895 Patent Claims 1, 8 and 14.  (Doc. 130 at 62-63.)  Firman asserts, but Champion disputes, that the term also appears in the '780 Patent Claim 8.  (*Id.* at 62 n.51; Doc. 155 at 15 n.9.)

- 79 -

valve controls the flows." (*Id.* at 19-20, footnote omitted.).  Next, Firman argues that the "patent exclusively refers to selectively controlling fuel flow by blocking and unblocking of the fuel lines" and that blocking/unblocking is done exclusively by "a portion of the mechanical fuel valve." (*Id.* at 20.)  And Firman argues that the "plain language makes clear that the mechanical fuel valve performs the selective control." (*Id.*)

In reply, Champion argues that Firman "*unilaterally chang[ed] the claim language to be construed.*" (Doc. 175 at 9.)  Specifically, Champion argues that "[f]or the first time, Firman now argues that 'a mechanical fuel valve . . .' needs construction," and further argues that the "Court should reject Firman's unilateral change, made long after the joint statement deadline, expert reports and depositions, and Champion's Brief because of the unfair prejudice to Champion." (*Id.*)  Next, Champion characterizes Firman's proposed construction as "extreme" because it "requires 100% stoppage by adding 'blocking,' which is not generally understood to be 'control[ling] fuel flow' because fuel control can be done by degree." (*Id.*)  Last, Champion argues that Firman's proposed "construction also introduces a new requirement that the same 'portion' of the valve perform both the blocking and unblocking, which is nowhere found in the specification." (*Id.*)

b.       **The Court's Tentative Construction And The Parties'** ***Markman* Hearing Arguments**

The Court tentatively construed the term "selectively control" as "a mechanical fuel valve either permits or prevents fuel flow from a fuel source based on its positioning in either the first (open) or second (closed) position." (Doc. 267 at 60.)

During the *Markman* hearing, Champion argued that the tentative order construed more than what the Court was asked to construe. (Doc. 278 at 125.)  Champion took the tentative construction of the term and substituted that construction for the disputed language in the asserted claims, illustrating that it would be confusing to a jury, and would make crafting a jury instruction difficult, because the tentative construction does not fit grammatically into the surrounding claim language. (*See, e.g.*, *id.* at 128-29.)  Moreover, Champion appeared to abandon its argument from its briefing that "selectively control"

includes controlling fuel flow by degree. (*Id.* at 129 [agreeing with the tentative order that "selectively control means to permit or prevent fuel flow"].)  Instead, Champion argued that the asserted claims contain five different variations of the term "selectively control" and that each variation should be given a different construction (*id.* at 126); however, in advocating for this new position, all Champion proposed was replacing the words "selectively control" in each of the asserted claims with "permit or prevent."  (*Id.* at 130 "[W]e've really only substituted the 'selectively control' for 'permit or prevent.'"].  *See also id.* at 141 ["THE COURT: If I understood your position earlier, it's essentially that for the disputed claims, all you want me to do is take the term "selectively control' and construe that two-word phrase as --.  [CHAMPION'S COUNSEL]: Permits or prevents. . . .  That's correct, Your Honor."].)  Champion also argued that the second use of "selectively control" in Claim 5 of the '985 patent was not something the Court was asked to construe.  (*Id.* at 127-28.)[29]

In response, Firman first argued that Champion's arguments at the *Markman* hearing took a different approach than Champion took previously, and that Champion's proposal of five different constructions "were never actually identified by Champion under the Court's case management order."  (*Id.* at 131.)  Thus, Firman argued that Champion's attempt to argue "for the first time proposed constructions about five claim variations" is "procedurally improper."  (*Id.* at 132.)  Next, Firman argued that Champion failed to explain why the tentative construction would be confusing to a jury.  (*Id.*)  Firman then argued that "on the substance" Champion is "also just wrong" because Champion's newly proposed construction "fails to answer the two questions that the Court's tentative order

---

[29]     The Court is confused by this argument.  In the slides provided during the *Markman* hearing, Champion quoted the following language from Claim 5 of the '985 Patent, arguing that the italicized portion of the quote was not something the Court was asked to construe: "985 Cl. 5: selectively control fuel flow to the dual fuel generator from the liquid fuel source through the liquid fuel line and the pressurized fuel source through the gaseous fuel line, the mechanical fuel valve configured to open and close the liquid fuel line to *selectively control fuel flow from the liquid fuel source to the dual fuel generator.*"  The Court's confusion stems from the fact that the language "the mechanical fuel valve configured to open and close the liquid fuel line to selectively control fuel flow from the liquid fuel source to the dual fuel generator" doesn't appear in Claim 5 of the '985 Patent. (Doc. 155-2 at 157 ['985 Patent at 12:32-38].)

astutely identified"—i.e., (1) *what* selectively controls fuel flow; and (2) *how* does it selectively control fuel flow. (*Id.*)  Firman agreed with the tentative construction to the extent it concluded that *what* performs the selective controlling of fuel flow is the mechanical fuel valve. (*Id.* at 133-34.)  But Firman argued that the tentative construction was "correct but in Firman's view incomplete" as to *how* the mechanical fuel valve performs the selective controlling of fuel flow. (*Id.* at 134.)  Firman argued that the final construction should make clear that the mechanical fuel valve selectively controls fuel flow via "a mechanical form of control." (*Id.*)  Firman expressed that it was concerned that Champion intends to argue "that the tentative construction would cover situations where the mechanical fuel valve indirectly impacts fuel flow that is controlled by an electrical fuel valve." (*Id.*)  Ultimately, Firman took no issue with Champion's revised proposal of construing "selectively control" to mean "permit or prevent" fuel flow but argued that the word "mechanically" should precede "permit or prevent" to resolve the dispute between the parties over whether the mechanical fuel valve can trigger an electrical valve which itself does the selective controlling of fuel flow. (*Id.* at 134, 137-39.)  In support of that argument, Firman argued that if the patentee had intended to cover such a situation where the mechanical fuel valve triggered an electrical valve which itself performed the selective controlling of fuel flow, then the patentee would have used the word "impact" or "influence" to describe the mechanical fuel valves actions, as opposed to "control." (*Id.* at 139.)

In reply, Champion argued that "after receiving the Court's tentative order, both parties have proposed constructions to or minor alterations to the Court's tentative, none of which have been briefed" and so "Champion's doing nothing more on this term than what both parties have done for the other terms." (*Id.* at 140.)  Next, Champion reiterated its argument that Firman is trying to improperly have the Court construe "mechanical fuel valve," arguing that Champion has not had the chance to brief "the mechanical fuel valve issue." (*Id.* at 141.)  In sum, Champion argued that "conceptually, the Court's construction is correct" and Champion "believe[s] that the Court understands what the claim language

is trying to do, but the way that the Court has crafted the tentative . . . brings in a potential for juror confusion." (*Id.* at 142.)  And Champion reiterated its new proposal that the term "selectively control" simply be replaced with "permit or prevent."  (*Id.* at 142-43.)

In surreply, Firman argued that "the joint claim chart proposed something broader for construction" than just "selectively control" "and so it's not correct to say that the Court can just construe 'selectively control' because the parties jointly proposed something longer and broader." (*Id.* at 143.)  Next, Firman argued that "Champion says that Firman's asking the Court to construe mechanical fuel valve" but "that's [not] quite right.  What Firman is arguing and in agreement with the Court on is the fact that mechanical fuel valve is the answer to what does the selective controlling in the Court's construction of the phrase 'selectively control.'" (*Id.* at 143-44.)  Put differently, Firman argued that it's "not asking the Court to construe what is the mechanical fuel valve." (*Id.* at 144.)  Last, Firman clarified that it would be fine with Champion's proposal of simply replacing "selectively control" with "permit or prevent" "as long as the word 'mechanically' is added." (*Id.*)

c.    <strong>Analysis</strong>

The parties first appear to dispute *what* is doing the "selective controlling."  The parties' arguments during the *Markman* hearing underscored that this remains a live dispute, so the Court must address it.  Firman argues that every time "selectively control" is used in the claims, the "mechanical fuel valve" is described as "selectively controlling." Champion does not appear to dispute this, except to say that Firman has changed the term to be construed from "selectively control" to "mechanical fuel valve."  Champion essentially reiterated this argument at the *Markman* hearing.  (Doc. 278 at 125.)  As discussed in the tentative order, nearly every time the phrase "selectively control" is used in the claims, it appears in the following language:

> a mechanical fuel valve actuatable between a first position and a second position to selectively control fuel flow

(Doc. 155-2 at 15-16 ['780 Patent at 11:56-58, 12:53-55, 14:11-13]; *id.* at 157-58 ['985 Patent at 12:34-36, 13:45-14:2]; *id.* at 176-77 ['654 Patent at 12:13-14, 13:4-5]; *id.* at 210-

- 83 -

13 ['970 Patent at 13:47-48, 15:9-10, 16:4-6, 19:1-2]; *id.* at 228-29 ['895 Patent at 12:14-15, 13:6-7, 14:9-10].)  The phrase "selectively control" also appears in the following claim language:

> wherein mechanical fuel valve opens and closes the liquid fuel line to selectively control fuel flow from the liquid fuel source to the dual fuel generator

(*Id.* at 177 ['654 Patent at 13:9-11]. *See also id.* at 229 ['895 Patent at 14:13-15: "the mechanical fuel valve configured to open and close the liquid fuel line to selectively control fuel flow from the liquid fuel source to the dual fuel generator"].)[30]  Based on the language of the claims themselves, it seems obvious that the mechanical fuel valve's positioning is what causes the "selective control" of fuel flow.

This understanding is supported by the specification.  As just one example, the specification provides that the "[m]echanical fuel lockout switch **38** includes mechanical fuel valve **54** that selectively controls fuel flow through first fuel line **66** by closing the line when mechanical fuel lockout switch **38** actuates to second position **38***(b)*."  (*Id.* at 13 ['780 Patent at 8:49-52].)  Based on the phrase "mechanical fuel valve that selectively controls," it is clear that *what* "selectively controls fuel flow" is the "mechanical fuel valve."

That being said, the Court rejects Firman's inclusion of the phrase "a portion of" the mechanical fuel valve in its proposed construction from its briefing.  The addition of "a portion of" is confusing.  It is the positioning of the mechanical fuel valve in either the first or second position that selectively controls the fuel flow.  Additionally, Champion is correct that the addition of the phrase "a portion of" introduces confusion over whether the

---

[30]   To the extent Champion's argument during the *Markman* hearing was that it is improper for the Court to rely on this claim language because "neither party has asked the Court to construe this use of selectively control," the Court is unpersuaded.  Although the Court was only asked to construe what it means to "selectively control fuel flow . . ." (Doc. 130 at 62-63), "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.  Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314 (citations omitted).  Thus, the Court sees nothing inherently incorrect with relying on this alternative claim language to "enlighten" or "illuminate" the meaning of the disputed claim term.

same portion of the mechanical fuel valve does the blocking and unblocking of the fuel sources.

As discussed, the tentative order construed "selectively control" as "a mechanical fuel valve either permits or prevents fuel flow from a fuel source based on its positioning in either the first (open) or second (closed) position." (Doc. 267 at 60.) During the *Markman* hearing, Champion persuasively argued that the tentative construction would create confusion for jurors and difficulty in crafting jury instructions because it did not fit neatly into the claim language as a grammatical matter. Thus, Champion proposed replacing "selectively control" throughout the disputed claims with "permits or prevents."[31]

Firman did not object to Champion's proposal to remove the extraneous language from the tentative construction and to construe "selectively control" to mean "permit or prevent" fuel flow, so long as the word "mechanically" preceded "permit or prevent" to clarify that it is the mechanical fuel valve performing the selective control of fuel flow, and not the mechanical fuel valve indirectly impacting fuel flow by triggering an electrical valve which itself performs the selective controlling of fuel flow. As explained, the claims and specification are unequivocal that the mechanical fuel valve is what selectively controls fuel flow by itself actuating to either the first or second position. Although Champion argued at the *Markman* hearing that the Court was construing more than what it was asked to construe, if the Court were to simply ignore the issue of *what* is performing the selective control, this would not fully resolve the parties' dispute (as *O2 Micro* requires). Following the *Markman* hearing, the Court has re-reviewed the disputed claims as well as the specification for the second patent family and agrees with Firman that it is the mechanical fuel valve, and its mechanical actuation between first and second position, that selectively controls the fuel flow. Nowhere do the patents suggest that the mechanical

---

[31]    Champion actually proposed five different constructions for "selectively control" based on the five variations of claim language in which that term appears. However, in each of those variations, all Champion proposed was replacing the words "selectively control" with "permit or prevent," and otherwise adopted the remainder of the claim language verbatim. Accordingly, it is unnecessary to provide five separate constructions. As discussed later, the term "selectively control" is construed as "mechanically permit or prevent" fuel flow.

fuel valve triggers some other electrical valve which itself performs the selective control of fuel flow. Indeed, the claims themselves are unequivocal that the mechanical fuel valve is what performs the selective control. Accordingly, the Court agrees with Firman that adding the term "mechanically" to describe the selective control performed only by the *mechanical* fuel valve is appropriate.

The second dispute between the parties is *how* the mechanical fuel valve "selectively controls"—that is, does it do so by controlling the increase/decrease of fuel flow or does it do so by opening and closing fuel lines as it is actuated between first and second positions?[32] As discussed in the tentative order, the Court is unpersuaded by Champion's argument from its briefing that the term "selectively control" could refer to increasing and decreasing the fuel flow from a given fuel source by a certain amount. As an initial matter, nothing in the patent specification ever describes or suggests that the mechanical fuel valve is intended to control the *degree* of fuel flow from a particular fuel source—indeed, the whole point of the invention is to prevent fuel flow from one fuel source when the other fuel source is in use, and vice versa. If "selectively control" were read to mean increasing and decreasing fuel flow rather than permitting and preventing fuel flow, such a construction might encompass embodiments in which fuel flow from one source is permitted while fuel flow from the other fuel source is decreased but not prevented. That would result in simultaneous delivery of both fuel sources to the engine— precisely what the invention is designed to prevent. *Cf. Kaken Pharma. Co., Ltd. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020) ("A patent's statement of the described invention's purpose informs the proper construction of claim terms . . . .").

It's also clear that "selectively control" cannot refer to increasing and decreasing

---

[32] During the *Markman* hearing, Champion appeared to argue that it was improper for the Court to address "how" the selective controlling is done. (Doc. 278 at 129.) To the extent that is Champion's argument, it is without merit. The parties' briefing, at the very least, made clear that the parties were disputing whether "selective control" meant only permitting/preventing fuel flow or whether it more broadly allowed for controlling fuel flow "by degree." Thus, to resolve the parties dispute, the Court had to answer the question of *how* the mechanical fuel valve "selectively controls"—i.e., does it do so by permitting/preventing fuel flow or does it do so by controlling the degree of fuel flow.

fuel flow, as Champion's briefing suggests, because the "selective control" is only described as a result of the mechanical fuel valve being positioned in either the first (open) position or second (closed) position. In other words, the mechanical fuel valve is only ever described as selectively controlling fuel flow by actuating to either the first or second position. (Doc. 155-2 at 15-16 ['780 Patent at 11:56-58, 12:53-55, 14:11-13]; *id.* at 157-58 ['985 Patent at 12:34-36, 13:45-14:2]; *id.* at 176-77 ['654 Patent at 12:13-14, 13:4-5]; *id.* at 210-13 ['970 Patent at 13:47-48, 15:9-10, 16:4-6, 19:1-2]; *id.* at 228-29 ['895 Patent at 12:14-15, 13:6-7, 14:9-10].) There is no position of the mechanical fuel valve described in the patents other than first (open) position and second (closed) position. If the mechanical fuel valve were to control the increase and decrease of fuel flow from a particular fuel source, there would need to be other positions between first (open) and second (closed) positions to allow for increasing and decreasing fuel flow. Further support for this interpretation is found in the claims themselves. As discussed, the mechanical fuel valve is described in the claims as *opening* and *closing* the liquid fuel line—not increasing and decreasing liquid fuel flow. (*Id.* at 177 ['654 Patent at 13:9-11]. *See also id.* at 229 ['895 Patent at 14:13-15].)[33] At any rate, Champion appeared to abandon this argument during the *Markman* hearing, agreeing with the tentative construction that to "selectively control" fuel flow means to "permit or prevent" fuel flow.

### d.    The Court's Construction

Accordingly, the Court construes the term "selectively control fuel flow to the dual fuel engine from a first fuel source through a first fuel line and a second fuel source through a second fuel line" and "selectively control fuel flow to the . . . [generator/engine] from the liquid fuel source through the liquid fuel line and the pressurized fuel source through the gaseous fuel line" as follows: "mechanically permit or prevent fuel flow to the dual fuel

---

[33]    The Court stated in the tentative order that it was also unpersuaded by Firman's use of the terms "blocking" and "unblocking" in its proposed construction from its briefing. (Doc. 267 at 60.) Firman appeared to abandon this part of its proposed construction during the *Markman* hearing, and so the Court need not address it here.

engine from a first fuel source through a first fuel line and a second fuel source through a second fuel line" and "mechanically permit or prevent fuel flow to the . . . [generator/engine] from the liquid fuel source through the liquid fuel line and the pressurized fuel source through the gaseous fuel line."

5. A Switch To Change Operation[34]

| Champion's Proposal | Firman's Proposal |
|---|---|
| Plain and ordinary meaning | Non-limiting intended use |

a. **The Parties' Arguments**

Champion argues that "Firman's 'non-limiting intended use' position is frivolous because this doctrine is applied only (if at all) to claim preamble language; the at-issue language is not in the claims' preambles." (Doc. 155 at 12.)  Champion argues that where, as here, the language "is not in a preamble, there is no valid argument that the claimed structure would be 'non-limiting'" and thus "there is no legal support for Firman's position and the inquiry can stop here." (*Id.*)  Champion argues that "[s]tated differently, Firman asks the Court to excise this element from the claims, which is improper." (*Id.*)  Champion also contends that there are "other flaws in [Firman's] approach," including that "Firman wrongly reads 'switch' as a verb (an action) as opposed to a noun (a thing)" and "[s]ince the claim calls for 'a' switch, it is clearly a 'thing'—a noun—and therefore is a structural limitation to the claim." (*Id.* at 13.)  And Champion argues that interpreting "switch" as a noun is further supported by the final clause of Claim 1 of the '398 Patent which refers to "actuation of *the switch*." (*Id.*)  Champion also argues that example embodiments in the patent refer to the switch with reference numeral **38**, and that the switch **38** is "referenced more than 30 times throughout the specifications of the '398 and '145 Patents and has two figures dedicated to its placement according to certain embodiments – FIG. 2 and FIG. 3." (*Id.*)  Last, Champion argues that its expert "opines that a POSITA would accord these terms their plain and ordinary meaning consistent with and understood in light of the

---

[34]    This term appears in the '398 Patent Claims 1 and 57 and the '145 Patent Claim 1. (Doc. 130 at 37.)

specification and claim language, which includes a physical structure arranged to allow a fuel selection." (*Id.*)

In response, Firman argues that "[w]hether a 'switch' limits the claims is not in dispute." (Doc. 171 at 21.) "Rather, Firman contends that the phrase 'to change operation of the engine between gaseous fuel and liquid fuel' is a non-limiting statement of intended use" for two reasons. (*Id.*) First, Firman argues that "the phrase does not add any material limitations and duplicates what is already present in the clam." (*Id.*) Second, Firman argues the "the phrase does not call for any manipulative difference in the structure of the claimed device or process, because the claimed invention performs the same way regardless of whether this language exists." (*Id.*) Firman argues that "[t]he phrase in dispute (even if located in the claim body rather than preamble) describes only the purpose of use and not any unique aspects of the claimed invention." (*Id.*)

In reply, Champion argues that "Firman mis-states Champion's proposal." (Doc. 175 at 9.) First, Champion argues that "Firman concedes the language has a structure: a switch," and thus "[t]he inquiry ends." (*Id.*) Second, Champion argues that "Firman misstates and misquotes the law" because the cases cited by Firman "involve *method* claims, unlike the *system* claims here." (*Id.*) Champion argues that "Firman has not cited (because there are none) *any* case holding that a structural element in non-preamble language of a *system* claim could be held to be a 'non-limiting intended use.'" (*Id.* at 10.)

b.      **Analysis**

The parties agree that the term "switch" is a structural limitation; however, they dispute whether the language that follows—i.e., "to change operation of the engine between gaseous fuel and liquid fuel"—is an intended use or a limitation.

"Whether to treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (cleaned up). "In general, a preamble limits the invention if it recites essential structure or steps, or if it is necessary to give life, meaning,

and vitality to the claim. Conversely, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Id.* (cleaned up). "No litmus test defines when a preamble limits claim scope," although several "guideposts . . . have emerged from various cases discussing the preamble's effect on claim scope." *Id.*

As an initial matter, the language that Firman argues is a non-limiting intended use is found in the body and not the preamble of the claims. Champion argues that the doctrine of non-limiting intended use applies only when the disputed language is found in the preamble; however, the Court is not persuaded that such a blanket rule exists. *In re Stencel*, 828 F.2d 751, 754 (Fed. Cir. 1987) ("There is an extensive body of precedent on the question of whether a statement in a claim of purpose or intended use constitutes a limitation for purposes of patentability. Such statements often, *although not necessarily*, appear in the claim's preamble . . . .") (citations omitted, emphasis added).

Champion also argues that "Firman misstates and misquotes the law" because the cases Firman relies upon "involve *method* claims, unlike the *system* claims here." (Doc. 175 at 9.) The Court agrees that Claim 1 of the '398 Patent and Claim 1 of the '145 Patent appear to be system claims. However, Claim 57 of the '398 Patent appears to be a method claim. Because Champion's arguments presuppose that all of the at-issue claims are system claims, the Court will address the parties' arguments as to these two categories of claims separately.

### i.    Non-Method Claims

As for Claim 1 of the '398 Patent and Claim 1 of the '145 Patent, Firman's request that the Court construe the disputed language here as a non-limiting intended use appears to be a novel one. *Cf. CommScope Techs. LLC v. Dali Wireless, Inc.*, 2017 WL 6549933, *13 (N.D. Tex. 2017) ("CommScope's argument regarding 'intended use' is novel. 'Intended use' analysis has been applied by federal courts to the *preamble of a method claim*. . . . CommScope argues that the same analysis applies to terms in the body of non-method claims."). Neither party has identified a case that specifically supports what

Firman is asking for here—i.e., to find that language that describes a specific structural component of a system (i.e., non-method) claim, found within the body of the claim, is a non-limiting intended use. The Court located two decisions which it views as bearing on the issue.

The first case is *Secor View Techs. LLC v. Nissan N. Am., Inc.*, 2013 WL 6147788 (D.N.J. 2013). At issue in *Secor View* was the '321 Patent that "describe[d] a rear view camera system that seeks to improve upon the existing rear view mirror system." *Id.* at *1. Claim 1 of the '321 patent claimed:

> Rear view arrangement for a motor vehicle . . . , comprising:
>
> left and right video camera arrangements respectively mounted on the left and right sides of the motor vehicle at a position at or forward of the said driver's position; and each said arrangement including a miniature video camera having a viewing angle directed generally rearwards, and a housing that is formed of a fairing disposed over the associated camera *to protect same and minimize lateral protuberance from the side of the vehicle while avoiding unnecessary air flow turbulence . . . .*

*Id.* (emphases altered). "Plaintiff argue[d] that the phrase 'to protect same and minimize lateral protuberance from the side of the vehicle while avoiding unnecessary air flow turbulence,'" found in the body of the claim, was "not limiting because it is merely 'aspirational.'" *Id.* at *5. The court acknowledged that "[t]he typical rule is that a preamble that simply states the intended use or purpose of an invention will usually not limit the claims" but noted that the "the phrase Plaintiff argues is non-limiting is in the body of the claim, not in the preamble." *Id.* at *5 n.11. The court nevertheless proceeded to apply the doctrine, holding that the patentee of the '321 patent "claimed a fairing with certain attributes, and those attributes are limiting." *Id.* In holding that the phrase "to protect same and minimize lateral protuberance from the side of the vehicle while avoiding unnecessary air flow turbulence" was limiting, the court explained that the phrase "provides the criteria by which the fairings are analyzed: the fairing must protect the camera, must 'minimize lateral protuberance' from the side of the vehicle, and it must avoid 'unnecessary' air flow turbulence." *Id.* at *5. So too here, the patentee claimed "a switch," and the phrase "to

- 91 -

change operation of the engine between gaseous fuel and liquid fuel" provides the criteria by which the switch is analyzed: the switch must change operation of the engine between fuel sources.

The second case is *CommScope*, 2017 WL 6549933. At issue in *CommScope*, among other things, was the '473 patent that "relate[d] to distributed antenna systems ('DAS')," which, in a nutshell, "allows for increased signal coverage" for cellphones. *Id.* at *1. "DAS typically consists of three components: a remote unit, host unit, and base station." *Id.* Claims 6 and 11 of the '473 patent contained the following language: "wherein the host unit is configurable to transmit a digital representation of a first subset of the plurality of downlink signals to the first remote unit and a digital representation of a second subset of the plurality of downlink signals to the second remote unit, the second subset being different than the first subset." *Id.* at *12. CommScope argued that this language stated a non-limiting intended use. *Id.* The court noted that "CommScope's argument regarding 'intended use' is novel" because "'[i]ntended use' analysis has been applied by federal courts to the *preamble of a method claim*," yet "CommScope argue[d] that the same analysis applies to terms in the body of non-method claims." *Id.* at *13. Like the court in *Secor*, however, the *CommScope* court proceeded to apply the doctrine, holding that the language was limiting: "Regardless of whether 'intended use' analysis is applicable outside the context of the preamble and method claims, the Court finds that the disputed claim term does not state an intended use." *Id.* The court's conclusion was supported by two reasons. First, the court held that the disputed "term does not describe an intended use or purpose of the invention" (i.e., DAS); rather, "[i]t describes a feature of the invention" (i.e., the host unit). *Id.* The same is true here. The phrase "to change operation of the engine between gaseous fuel and liquid fuel" does not describe an intended use or purpose of the invention (i.e., the dual fuel engine/generator); rather, it describes a feature of that invention (i.e., the switch). Second, the *CommScope* court held that "the disputed claim term is related to the 'essence of the invention.'" *Id.* at *14. *Cf. Catalina*, 289 F.3d at 808 ("In general, a preamble limits the invention if it recites essential structure or steps, or if it

is 'necessary to give life, meaning, and vitality' to the claim.") (citation omitted).  It is clear that the disputed phrase here is "necessary to give life, meaning, and vitality" to the non-method claims.  For example, after "the switch" is first referenced, qualified by the phrase "to change operation of the engine between gaseous fuel and liquid fuel," "the switch" is again referred to in describing the liquid fuel cut-off solenoid.  Claim 1 of the '398 Patent claims:

> A dual fuel engine comprising:
>
> . . .
>
> a switch to change operation of the engine between gaseous fuel and liquid fuel; . . . and
>
> a liquid fuel cut-off incorporated into the carburetor to interrupt liquid fuel upon actuation of the switch from liquid fuel to gaseous fuel.

(Doc. 155-2 at 79 ['398 Patent at 21:36-50].)  Claim 1 of the '145 Patent similarly claims:

> A dual fuel generator comprising:
>
> . . .
>
> a switch to change operation of the engine between gaseous fuel and liquid fuel; . . . [and]
>
> a liquid fuel cut-off solenoid to interrupt liquid fuel flow to the engine upon actuation of the switch from liquid fuel to gaseous fuel.

(*Id.* at 125 ['145 Patent at 21:36-51].)  Use of "the switch" in the later clauses of the body of these claims "can only be understood in the context of the" preceding language describing that switch as one that can "change operation of the engine between gaseous fuel and liquid fuel."  *Pitney Bowes*, 182 F.3d at 1306.  For that reason, the Court is unpersuaded by Firman's argument that the phrase "to change operation of the engine between gaseous fuel and liquid fuel" "does not add any material limitations and duplicates what is already in the claim."  (Doc. 171 at 21.)  If the phrase "to change operation of the engine between gaseous fuel and liquid fuel" were excised from the claims (as Firman requests), it's still not clear from the clause "actuation of the switch from liquid fuel to gaseous fuel" that the switch is what changes the *engine's* operation *between* (i.e., back-and-forth between) those two fuel sources.  All those clauses explain is that when the switch

is actuated from liquid fuel to gas fuel, the liquid fuel cut-off interrupts the liquid fuel flow. Put differently, the phrase "actuation of the switch from liquid fuel to gaseous fuel" does not render the phrase "to change operation of the engine between gaseous fuel and liquid fuel" superfluous because it (1) does not explain that the switch is what changes the operation of the *engine*, all it explains is that the switch causes the liquid fuel flow to the engine to be interrupted; and (2) does not explain that the switch changes operation of the engine *between* fuel sources, and not just from liquid to gas fuel.

That the disputed claim term is essential to the invention is also supported by the specification. *Cf. CommScope*, 2017 WL 6549933 at \*14. For example, the specification states: "Beneficially, embodiments of the invention provide for a fuel lockout switch to ensure that two fuels are not simultaneously delivered to a dual fuel internal combustion engine and to efficiently convert operation of the engine between the fuel sources." (Doc. 155-2 at 78 ['398 Patent at 20:42-46]. *See also id.* at 124 ['145 Patent at 20:42-46].) The switch, and its capability to switch between two fuel sources without simultaneously delivering both fuels to the engine, is also what distinguishes the claimed invention over the prior art. *Cf. CommScope*, 2017 WL 6549933 at \*14 ("The specification praises how configurability (or flexibility) is the feature of the invention that improves upon the prior art. . . . This indicates that the patentee envisioned the configurability claim to be a limitation of the invention, not a statement of intended use."). The specification states that "a common problem with [prior art configurations] that couple two fuel sources to a single engine is the engine can experience overly rich air-fuel ratio when both fuels are simultaneously engaged during cross-over switching between the fuel sources." (Doc. 155-2 at 69 ['398 Patent at 1:57-62]; *id.* at 115 ['145 Patent at 1:60-65].) In light of these considerations, the disputed phrase is limiting in the non-method claims.

ii.    <u>Method Claim</u>

Claim 57 of the '398 Patent claims:

A method for assembling a dual fuel engine comprising . . .

coupling a switch to the engine to change operation of the engine between gaseous fuel and liquid fuel; and

- 94 -

> attaching a liquid fuel cut-off to the carburetor to close the fuel passage upon actuation of the switch from liquid fuel to gaseous fuel.

(Doc. 155-2 at 81 ['398 Patent at 25:47-26:13].)  For the same reasons as identified for the non-method claims, the Court concludes that the phrase "to change operation of the engine between gaseous fuel and liquid fuel" is limiting even in the method claim.  The cases cited by Firman—all of which address method claims—do not alter this result.  Firman argues that "the phrase does not call for any manipulative difference in the structure of the claimed device or process, because the claimed invention performs the same way regardless of whether this language exists" (Doc. 171 at 21), but the cases cited by Firman in support of this proposition are all distinguishable.

For example, in *L'Oreal USA, Inc. v. Olaplex, Inc.*, 844 F. App'x 308 (Fed. Cir. 2021), the Federal Circuit noted that "[i]n several cases, we have determined that certain claim language was properly understood as 'only a statement of purpose and intended result' and not calling for 'a manipulative difference in the steps of the claim.'" *Id.* at 324.  But the court further explained that "[i]n each case, the court made a claim-specific judgment of the intended effect of the language; and in each case, the language at issue identified a property in only very general terms and appeared in the very same claim that stated the other more concrete requirements." *Id.*  As one example, the *L'Oreal* court cited *Bristol-Meyers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001), which Firman also cites (Doc. 171 at 21).[35]  In *Bristol-Meyers Squibb*, claim 1 of the '803 patent claimed: "A method for reducing hematologic toxicity in a cancer patient undergoing [t]axol treatment comprising parenterally administering to said patient *an antineoplastically effective amount* of *about 135-175 mg/m2 taxol over a period of about three hours.*"  246 F.3d at 1371 (emphases altered).  The court held that the phrase "an

---

[35]    *L'Oreal* itself found that claim limitations "requiring specific decreases . . . in hair breakage" *were* limiting because they "state[d] specific requirements rather than a general purpose or aspirational result for the claimed method."  844 F. App'x at 324.  So too here, the limitation that the switch operate "to change operation of the engine between gaseous fuel and liquid fuel" states a specific requirement of the switch and not an aspirational result of the claimed invention.

antineoplastically effective amount" was an "expression of intended result" that "essentially duplicates the dosage amounts recited in the claims that are also described in the specification as 'antineoplastically effective.'" *Id.* at 1375. In other words, because specific dosage amounts were already provided in the claims and described as "antineoplastically effective" in the specification, it was duplicative to describe those specific dosage amounts in the claims as "antineoplastically effective." Similarly, in *In re: Copaxone Consol. Cases*, 906 F.3d 1013 (Fed. Cir. 2018), the court concluded that the phrase "the regimen being sufficient to reduce the frequency of relapses in the patient" was non-limiting because "[t]he claims are clear that the dosing has to be [a] 'therapeutically effective regimen," and so, "the addition of 'the regimen being sufficient to' be therapeutically effective is superfluous, does not change the claimed method or require any additional required structure or condition for the claims." *Id.* at 1023.

Here, unlike in *Bristol-Meyers Squibb* or *Copaxone*, there is no language in the claims that renders the phrase "to change operation of the engine between gaseous fuel and liquid fuel" duplicative or superfluous. As explained above, Firman's argument that the later language in the claim—"actuation of the switch from liquid fuel to gaseous fuel"— renders the disputed language duplicative or redundant is without merit.

Finally, Firman relies on *Mainland Lab., Ltd. v. Headwaters Res., Inc.*, 638 F. Supp. 2d 749 (S.D. Tex. 2009), but that case is also distinguishable. There, claim 1 of the '111 patent claimed: "a method for pretreating a non-aqueous flyash for use in a cementitious composition comprising the steps of: obtaining said non-aqueous flyash; treating said flyash with an effective amount of a treatment agent selected from the group consisting of an ethoxylate, sodium lauryl sulfate, and tall oil to lower said adsorption potential of said cementitious composition . . . ." *Id.* at 752. The court found that the phrase "to lower said adsorption potential of said cementitious composition" was "a statement of purpose that does not result in any manipulative difference in the steps of the claim." *Id.* In a nutshell, the court reasoned that if that language were excised from the claim, an individual would still perform all of the steps of the patent—and lowering the adsorption potential of the

cementitious composition would simply be an intended result of following all of those steps. The same cannot be said here. The intended result of "coupling the switch to the engine" is not "chang[ing] operation of the engine between gaseous fuel and liquid fuel." Instead, the disputed phrase describes limiting *attributes* of the switch that gets coupled to the engine.

### c.   The Court's Construction

The Court concludes that the phrase "to change operation of the engine between gaseous fuel and liquid fuel" is limiting. It describes the attributes of the switch and not the intended result of the invention. Because Firman's only argument on this disputed term is that it is non-limiting, the Court agrees with Champion that the term should be given its plain and ordinary meaning, and no further construction is required. *O2 Micro*, 521 F.3d at 1360-61.

### C.   Remaining Disputed Terms

#### 1.   Simultaneously[36]

| Champion's Proposal | Firman's Proposal |
|---|---|
| Plain and ordinary meaning, which includes two or more acts occurring over an overlapping time period; alternatively, two or more acts occurring over an overlapping time period | Concurrently |

### a.   The Parties' Arguments

Champion argues that "Firman's proposal to redefine 'simultaneously' to 'concurrently' only creates more confusion and yet another term to define (*i.e.*, what does 'concurrently' mean?)." (Doc. 155 at 14.) Champion points out that "[i]n the first three of the four cited instances of the term, the patentee used the term in the negative—that is, to

---

[36]   This Joint Claim Construction Statement, as well as Champion's brief, identify this term as appearing in the '780 Patent Claim 6; the '895 Patent Claims 6 and 12; and the '034 Patent Claim 6. (Doc. 130 at 54; Doc. 155 at 14.) Firman's brief omits Claim 6 of the '895 Patent. (Doc. 171 at 22 n. 32.)

'prevent simultaneous' fuel delivery or to 'not simultaneously' deliver fuel.  In the last, Claim 6 of the '034 Patent, it is used to call for the timing of the liquid cutoff solenoid— 'wherein activating the gaseous cutoff simultaneously activates the liquid cutoff solenoid.'"  (*Id.* at 14-15.)  Champion argues that a "POSITA knows that mechanical components such as valves cannot be instantly moved at an exact instant in time" and that "Newton's laws of motion dictate that such motions require time" and "the motions of all matter are subject to 'time constant' limitations."  (*Id.* at 15.)  "Given this knowledge," Champion argues that "a POSITA would view the use of 'simultaneously' as indicating that two or more acts are occurring over or during an overlapping time period, but not at any exact moment in time."  (*Id.*)  And Champion argues that "Firman's proposal violates the laws of physics in requiring two events to occur 'concurrently'—over any exact moment in time."  (*Id.*)

In response, Firman argues that "[t]he parties dispute whether this term defines the amount of overlap two events must have to be considered 'simultaneous.'"  (Doc. 171 at 22.)  "Firman proposes that they be concurrent, whereas Champion proposes that any infinitesimally small overlap be sufficient."  (*Id.*)  Firman argues that "Champion's proposal conflicts common usage, which does not treat two time periods as 'simultaneous' merely because some small fraction overlap exists."  (*Id.*)  Firman also argues that Champion's proposal "conflicts with the heart of the invention"—"[n]amely, avoiding simultaneous flow of multiple fuels"—because "Champion would have a definition that allows for both fuels to be supplied to the engine at the same time, the very thing its invention is designed to prevent."  (*Id.* at 22-23.)

In reply, Champion argues that "Firman's argument that 'Champion would have a definition that allows for both fuels to be supplied to the engine at the same time' is misleading" because "[i]t is possible that—as an illustrative example—at some time over the period during which one valve finishes opening and one valve finishes closing, there is small but non-zero amount of time where some insignificantly trivial amount of the 'other' fuel source is still available, while not impacting the claimed invention's ability to reduce

the problems caused by supplying an excess amount of two different fuel types to an engine at the same time." (Doc. 175 at 10.) Thus, Champion argues that its "plain meaning proposal does not 'eviscerate the stated purpose of the claimed invention.'" (*Id.*) Last, Champion argues that "Firman fails to elaborate on how its 'concurrently' construction should be viewed, adding only confusion." (*Id.*)

b.    **Analysis**

As an initial matter, it is unclear what exactly Firman means when it uses the term "concurrently." To the extent Firman is arguing that "concurrently" requires two events to occur at the exact same moment in time, such an argument appears to run counter to the common usage of "concurrently." For example, if a judge were to sentence a defendant to a prison term set to run concurrently with a previously imposed prison term, those two terms would occur during overlapping periods of time. Thus, if anything, use of the word "concurrently" would support *Champion's* proposed construction, highlighting the confusion that Firman's proposed construction raises.

At any rate, the term "simultaneous" is used in the asserted claims in two ways: (1) in the negative, i.e., to prevent simultaneous fuel delivery, and (2) to call for two cutoffs being activated simultaneously. The parties' briefing largely focuses on the second of these uses, so the Court begins there.

To the extent Firman is arguing that the two cutoffs must be activated at the exact same moment in time, the Court agrees with Champion that such a proposed definition runs counter to the common usage and plain and ordinary meaning of "simultaneously" (or, indeed, even the common usage of "concurrently"). The Federal Circuit addressed a similar issue in *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004). There, "[t]he parties dispute[d] whether the 'simultaneously off' sleep mode limitations" of various claims in a patent "were correctly construed." *Id.* at 1322. "Linear argue[d] that the district court misconstrued these limitations and erred in not giving the claim term 'simultaneously off' the full range of its ordinary and customary meaning by requiring that the transistors be switched off *at the same moment*." *Id.* at 1323 (emphasis added). The

Federal Circuit held that the district court had construed the limitation "too narrowly" by "requir[ing] the switching transistors to be turned off or disabled *at the same instant*." *Id.* at 1324 (emphasis added). Relying on the Webster's dictionary definition of "simultaneously," the Federal Circuit held that "[t]he plain meaning of the word simultaneously is 'in a simultaneous manner: at the same time: CONCURRENTLY" or "*existing or occurring* at the same time: COINCIDENT: CONCURRENT." *Id.* In other words, the court held that the plain and ordinary meaning of "simultaneously merely requires a condition to exist at the same time or concurrently," and not necessarily "at the same instant." *Id.* The Court finds this analysis persuasive and similarly concludes that the plain and ordinary meaning here would merely require the two cutoffs to be activated at the same time but not necessarily at the exact same instant.

Nor is there any merit to Firman's argument that if "simultaneously" were construed to merely mean overlapping time periods as opposed to exact moment in time, such a definition would run counter to the "heart of the invention" because it would allow for simultaneous fuel delivery to the engine. As Champion explains, even if "there is [a] small but non-zero amount of time where some insignificantly trivial amount of the 'other' fuel source is still available," that would not "impact[] the claimed invention's ability to reduce the problems caused by supplying an excess amount of two different fuel types to an engine at the same time." (Doc. 175 at 10.) Indeed, the patent specification explains that the goal is not to prevent *any and all* simultaneous fuel delivery, but rather "to prevent, *or substantially prevent*, simultaneous fuel delivery of the liquid fuel and the gaseous fuel to the engine"; the specification of the '034 Patent explains, for example:

> [G]asoline cutoff solenoid **96** and LPG cutoff solenoid **98** can be precisely timed to *limit or prevent fuel overlap* during changeover without interrupting engine performance. For instance, gasoline cutoff solenoid **96** may be opened prior to closing LPG cutoff solenoid **98** to ensure adequate fuel in float bowl **88** for on-the-fly changeover. Also, gasoline cutoff solenoid **98** is opened to reduce fuel in float bowl **88** and *limit fuel overlap* during on-the-fly changeover. Accordingly, switch **54** may be precisely timed to operate gasoline cutoff solenoid **96** and LG cutoff solenoid **98** *to prevent, or substantially prevent, simultaneous fuel delivery* of the liquid fuel and the

gaseous fuel to the engine.

(Doc. 155-2 at 31-32, emphasis added ['034 Patent at 8:65-9:10].)  Put differently, to the extent that the two cutoffs are not activated at the exact same moment in time, and to the extent that results in some small but insignificant amount of both fuels delivered to the engine, that does not necessarily defeat the claimed purpose of the invention.

As for the use of "simultaneously" in the negative—i.e., to prevent simultaneous fuel delivery—the Court construes the term to have the same plain and ordinary meaning. In other words, the Court construes this term to mean preventing delivery of both fuel sources at the same time but not necessarily at the exact same moment in time.  In *Linear Tech.*, the Federal Circuit found that "simultaneously off" in the patent claims did not require the transistors to be turned off at the exact same moment in time but rather required the transistors to be in a "simultaneous state of . . . being disabled or held off."  379 F.3d at 1324.  The Federal Circuit found support for this construction in the fact that the claims called for the transistors "to be simultaneously OFF for a *period of time*."  *Id.*  The court stated: "To construe the term in that way overlooks the phrase 'period of time,' which refers to a span of time more consistent with the recitation of a state of operation of the transistors rather than an act of transition between states.  Thus, we conclude that the ordinary and customary meaning of 'simultaneously off,' in contextual relation to the 'period of time' language of the claims, encompasses the simultaneous state of both switching transistors being disabled or held off."  *Id.*  Similarly, here, language in the patent specification supports that when the term "prevent simultaneous delivery of fuel" is used in the patents, it is referring to preventing delivery of both fuels to the engine during overlapping *periods of time* and not just preventing the two fuels from being delivered to the engine at the exact same moment.  For example, the "Background of the Invention" of the '034 Patent provides as follows:

> [A] common problem with [the prior art] configurations that couple two fuel
> sources to a single fuel inlet, such as a carburetor, of an engine is that during
> cross-over switching between the fuel sources the engine can experience
> overly rich air fuel ratio.  This is particularly problematic when switching

> from a liquid fuel to a gaseous fuel because carburetors have a fuel bowl containing fuel that is drawn into the engine even after the liquid fuel source is cut-off.  Therefore, *for a period of time*, the engine is running on both liquid and gaseous fuels causing an overly rich fuel mixture.  Further, *such simultaneous delivery* of fuel from the first fuel line and the second fuel line, *even if for a brief time*, may make the engine hard to start and lead to unstable operating conditions.

(Doc. 155-2 at 28, emphasis added ['034 Patent at 1:60-2:6].)  This language makes clear that the term "simultaneous delivery of fuel" refers to a "period of time"—not an exact moment in time—where both fuels are delivered to the engine.  Thus, this specification language supports Champion's proposed construction of "simultaneous."

Last, Champion's proposal—particularly where "simultaneous" is used in the negative (i.e., to *prevent* simultaneous fuel delivery)—makes most sense when viewed in light of the overall purpose of the invention.  As discussed, the purpose of the invention is to prevent, or at least substantially prevent, the delivery of both fuel types to the engine at the same time.  Under Firman's proposed definition, the claims would only prevent delivery of both fuel sources at the exact same moment in time, but would not cover, or prevent, the delivery of both fuel sources during overlapping periods of time.  In other words, Firman's definition—at least when applied to "simultaneously" as used in the negative—would go against the heart of the invention because it would allow both fuel sources to overlappingly be delivered to the engine so long as the delivery itself did not occur at the exact same moment in time.  To the extent this is Firman's proposal, it is incongruent with the heart of the invention.

In light of the above, the Court will adopt Champion's proposed construction.

### c.    The Court's Construction

Accordingly, the Court construes "simultaneously" to mean "two or more acts occurring over an overlapping time period."

…

…

…

2.    Desired Pressure[37]

| Champion's Proposal | Firman's Proposal |
| --- | --- |
| Plain and ordinary meaning, including any pressure enabling engine operation; alternatively, any pressure enabling engine operation | Pressure at which the engine operates |

a.    **The Parties' Arguments**

Champion argues that a "POSITA reading this claim term in light of the relevant specifications would understand that operating an engine (or generator) is a desirable outcome of the claimed inventions" and that "the plain and ordinary meaning of 'desired pressure' would contemplate a pressure for the fuel that, when presented in the context of the remaining limitations of the claim . . . *would enable engine operation*." (Doc. 155 at 16-17.)   Thus, Champion argues that "Firman's proposal . . . is confusing because it erroneously suggests that there is one such pressure, or worse, that the pressure is in reference to the *engine* as opposed to the *fuel* being delivered to the engine." (*Id.* at 17.)

In response, Firman argues that "[t]his term describes the pressure at which gaseous fuel is supplied to the engine." (Doc. 171 at 23.)   Firman explains that "[g]aseous fuel is stored in a pressurized vessel at a higher pressure than an engine can tolerate, so the pressure must be reduced before it is supplied to the engine." (*Id.*)   Firman argues that the "parties agree the claims require a 'desired pressure . . . to operate the engine,' but disagree what 'to operate the engine' means." (*Id.*)   "Firman contends it refers to the pressure at which the engine operates, i.e., the pressure at which it enters the carburetor." (*Id.*)   Firman clarifies that "[t]here remains a dispute only if Champion contends the term includes pressures higher than that which the carburetor can receive," which Firman argues "would contradict the patents' sole use of 'desired' pressure to refer to the pressure after all stages

---

[37]    This term appears in the '985 Patent Claim 1; the '654 Patent Claims 1, 6, and 10; the '970 Patent Claims 1, 12, 14, and 20; the '895 Patent Claim 14; the '034 Patent Claims 11 and 24; and the '120 Patent Claim 12. (Doc. 130 at 69-70.)   The parties' stipulation (Doc. 265) moots the parties' dispute as to this term in Claim 11 of the '034 Patent.

of regulation." (*Id.*)

In reply, Champion argues that "Firman concedes to Champion's construction without saying so many words" and that "Firman changed its proposed construction and argues there is no dispute if Champion agrees the pressure cannot be higher than what the carburetor can receive." (Doc. 175 at 10-11.)  Champion argues that "if the pressure is greater than what the carburetor can receive, it seems apparent that the pressure would be too great to enable engine operation." (*Id.* at 11.)  But Champion argues that "because pressure in the carburetor can vary widely . . . it would be confusing to define this claim by reference to pressures at the carburetor." (*Id.*)

### b.    **Analysis**

The Court fails to see any meaningful dispute between the parties.  The parties seem to agree that there is not a single, exact pressure that enables engine operation.  The parties also seem to agree that if the pressure is higher than what the carburetor can receive, that pressure cannot enable engine operation.  In light of the parties' apparent agreement, and because the claims and specification support the parties' understanding, the Court construes the term in accordance with those understandings.

### c.    **The Court's Construction**

Accordingly, the Court construes the term "desired pressure" as follows "any pressure enabling engine operation, such pressure not being higher than that which the carburetor can receive."

### 3.    Coupled To [Verb][38]

| Champion's Proposal | Firman's Proposal |
| --- | --- |
| Plain and ordinary meaning; alternatively, arranged in a way to perform a desired action, e.g., to "open and close a gaseous fuel source to the engine" | Indefinite |

---

[38]    This term appears in the '034 Patent Claims 1 and 18 and the '970 Patent Claim 44. (Doc. 130 at 84.)

- 104 -

a.      **The Parties' Arguments**

Champion argues that "Firman's only position here is apparently that 'coupled to [verb]' is indefinite under 35 U.S.C. § 112." (Doc. 155 at 21.) Champion argues in response that "[i]ssued patents are presumed to be valid, which includes a presumption that they are not indefinite," and "[i]ndefiniteness must be proven by clear and convincing evidence." (*Id.* at 21-22, citation omitted.) Champion argues that "coupled to [verb]" is not indefinite. (*Id.* at 22.) Specifically, Champion first argues that "there is no requirement in patent law that a part cannot be coupled to, or connect to, perform a given action." (*Id.*) Champion next argues that "Firman's entire position wrongly supposes that the English language does not allow for—and a POSITA would not understand—using a verb after 'coupled' because there is supposedly no way to know which structures are coupled." (*Id.*) Champion argues that "Firman's argument fails because this is an ordinary usage of the English language and because, regardless, the specification clearly shows examples of structures that can be coupled consistent with this claim language, such that a POSITA is reasonably informed about the scope of the claims." (*Id.*) Champion argues that a "POSITA would easily understand that 'coupled to' in these instances plainly and ordinarily would mean the same thing as 'arranged in a way to . . . [perform the action that follows].'" (*Id.* at 23.) Champion also argues that "the specifications also show that 'coupled to' is not indefinite" and that "[t]he definiteness inquiry focuses on whether those skilled in the art would understand the scope of the claim when the claim is read *in light of the rest of the specification*." (*Id.*, citation omitted.) Champion points to several sections of the '034 Patent specifications and argues that those sections make clear *what* is coupled to *what*. (*Id.* at 23-24.) Last, Champion relies on the opinion of its expert, who argues that a POSITA would understand "coupled to [verb]" to mean "arranged in a way to perform a desired function." (*Id.* at 24.)

In response, Firman argues that "[t]he parties dispute whether a POSITA would understand the scope of claims that require a part 'coupled to [verb]'" but that the parties "do not dispute that the plain and ordinary meaning of 'coupled' applies." (Doc. 171 at

- 105 -

24.)   Firman argues that "the plain and ordinary meaning of 'coupled' refers to two components being connected together in some way," "[b]ut when claiming something is 'coupled to' a verb, the claims become irreconcilably vague because it fails to identify what is coupled to what, and a POSITA would have no way to resolve this ambiguity other than to guess." (*Id.*)  Firman also argues that "[t]he Court should not rewrite 'coupled to' to mean 'configured to' because preserving invalidity through rewriting claims is expressly forbidden." (*Id.*)  Moreover, Firman argues that "the patentee knew how to use the phrase 'configured to' when it wanted to refer to something 'arranged in a way to perform a desired function.'"   (*Id.*)   Next, Firman argues that "Champion's own cites to the specification further support Firman" because "the specification expressly identifie[s] what *two* components are coupled together and thus provided exactly what is missing from the claims at issue." (*Id.* at 24-25.)  Last, Firman argues that *North Star Innovations, Inc. v. Hirschfield*, 2021 WL 5121180 (Fed. Cir. 2021), is distinguishable because "[t]he parties in *Hirschfield* did not dispute that the claims identified the two items coupled together." (*Id.* at 25.)  In sum, Firman asks the Court to find Claims 1 and 18 of the '034 Patent and Claim 44 of the '970 Patent invalid.  (*Id.*)

In reply, Champion reiterates that "issued claims are presumed valid" and argues that "Firman has not met its burden to show that this language is indefinite." (Doc. 175 at 11.)  Champion also argues that "it is common for courts to use synonymous language, consistent with and supported by the claim language and specification in construing contested claims" and that "[c]laim construction by its very nature is the rewriting of claim terms using different words," which "is all Champion has proposed here." (*Id.*)  Last, Champion argues that "Firman's argument that the 'claims at issue here fail to identify the elements coupled together' has no legal support" because "claim language must be interpreted with the specification in mind" and "Firman does not contend the specification fails to identify examples of structures that can be coupled together consistent with the claimed language at issue." (*Id.*)[39]

---

[39]    The parties dispute whether certain exhibits attached to Champion's opening brief are undisclosed extrinsic evidence in violation of the CMO.  (Doc. 171 at 25 n.35; Doc.

b.      **Analysis**

"Section 112 requires that a patent specification 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech.*, 844 F.3d at 1377.  The "party challenging patent validity on indefiniteness grounds carries the burden of proof." *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018).

As an initial matter, the Court rejects Champion's seeming attempt to redefine "coupled to [verb]" to mean "arranged in a way to . . . [perform the action that follows]." (Doc. 155 at 23.)  "A word or phrase *used consistently* throughout a claim should be *interpreted consistently*," but if the same term is used "in two contexts with a subtle but significant difference" then the term "should not necessarily be interpreted to have the same meaning in both phrases." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (citation omitted).  One of Champion's arguments appears to be that "coupled" is used in two different ways—followed by a noun or followed by a verb—and that where it is followed by a verb, it has a different meaning (i.e., "arranged in a way to").  But the Court is not convinced that the use of the term "coupled" necessarily means something different when it is followed by a noun versus followed by a verb. Instead, it appears that when "coupled" is followed by a verb as opposed to a noun, it is given its same plain and ordinary meaning, and contextual clues are simply required to understand *what* is coupled to *what*.  Champion appears to take this position in the

175 at 11 n.9.)  Because the Court's construction of "coupled to [verb]" does not depend on, or even rely upon, those exhibits, the Court need not resolve this dispute.

- 107 -

alternative—i.e., that the claims and the specification read together explain *what* is coupled to *what* (Doc. 155 at 23-24)—and the Court agrees with this alternative argument.

Consider, for example, the following language from the '034 Patent specification:

> In an exemplary embodiment of the invention, electro-mechanical valve system **76** includes a carburetor shutoff solenoid **94** coupled to carburetor **86** to control liquid fuel flow to the engine.

(Doc. 155-2 at 30 ['034 Patent at 5:62-65].)  In this format where "coupled to" is followed by a noun, it is clear that the carburetor shutoff solenoid is coupled—or connected directly or indirectly—to the carburetor, without any contextual clues required.

Now consider, as a separate example, the following language from the '034 Patent specification:

> Hose coupling **74** has a first end **74***a* mounted on the external surface of generator **30** and coupled to supply the second fuel to the engine.

(*Id.* ['034 Patent at 5:16-19].)  Here, unlike in the prior example, "coupled to" is followed by a verb (i.e., "supply").  Nevertheless, it is clear from the context of this sentence that the first end of the hose coupling is coupled—or connected directly or indirectly—to the generator to supply the second fuel to the engine.

Also consider, as another example, the following language from the '034 Patent specification:

> The multi-fuel engine also includes a liquid cutoff solenoid coupled to open and close a liquid fuel path to the engine, and a gaseous cutoff solenoid coupled to open and close a gaseous fuel source to the engine.

(*Id.* at 33 ['034 Patent at 12:47-51].)  Again, context indicates that the liquid cutoff solenoid and gaseous cutoff solenoid are coupled to the engine.  The multi-fuel engine *includes* these cutoffs, which are connected directly or indirectly to (i.e., coupled to) the engine, in order to open and close the fuel path/source to the engine.  The same can be said for the disputed language in the claims.

…

…

- 108 -

i.      Claim 1 of the '034 Patent

Claim 1 of the '034 Patent claims:

> A multi-fuel engine comprising . . . a gaseous cutoff coupled to open and close a gaseous fuel source to the engine.

(*Id.* at 34 ['034 Patent at 13:35-44].)   Context indicates that the multi-fuel engine comprises, among other things, a gaseous cutoff, which is connected directly or indirectly to (i.e., coupled to) the engine in order to open and close the gaseous fuel source to the engine.   This is also supported by the above-discussed specification language.   (*Id.* at 33 ['034 Patent at 12:47-51].)

Other language in the specification also states that the electromechanical valve system may include "generally a gaseous fuel cutoff solenoid, to couple the engine intake to second gaseous fuel source **118** and to control flow of the second gaseous fuel to the engine." (*Id.* at 32 ['034 Patent at 9:33-37].)   This language clarifies that the engine intake is coupled to the second gaseous fuel source via the gaseous fuel cutoff solenoid.   By implication, then, a POSITA would be informed with reasonable certainty that the gaseous fuel cutoff solenoid would be connected to both the engine via the engine intake as well as the second gaseous fuel source.   Given that the indefiniteness inquiry is determined in light of the specification, it cannot be said that Claim 1, in combination with the specification, "fail[s] to inform" with at least "reasonable certainty" a POSITA about the scope of the invention.   *Nautilus*, 572 U.S. at 901.   *See also Freeny v. Apple Inc.*, 2014 WL 4294505, *4 (E.D. Tex. 2014) ("Indefiniteness is a legal determination; if the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite.").

ii.      Claim 18 of the '034 Patent

Claim 18 of the '034 Patent claims:

> A multi-fuel internal combustion engine comprising . . . a carburetor cutoff solenoid coupled to control fuel flow within the carburetor from the liquid fuel line and selectively engage engine operation on liquid fuel; and a gaseous fuel valve coupled to control fuel flow through the gaseous fuel line and selectively engage engine operation on gaseous fuel.

(Doc. 155-2 at 35 ['034 Patent at 15:5-19].)  Once again, the multi-fuel internal combustion engine comprises, among other things, a carburetor cutoff solenoid, which is connected directly or indirectly to (i.e., coupled to) the engine in order to open and close the gaseous fuel source to the engine.

Even in the absence of those contextual clues in the claims themselves, the specification explains to a POSITA what the carburetor cutoff solenoid is coupled to or connected (directly or indirectly) to.  For example, in one embodiment, the "electromechanical valve system **76** includes a *carburetor cutoff solenoid* **94** *coupled to carburetor* **86** to control liquid fuel flow to the engine," and the "[c]arburetor cutoff solenoid **94** operates to open close a liquid fuel path to the engine downstream from float bowl **88** in carburetor **86**." (*Id.* at 30, emphasis added ['034 Patent at 5:62-67].)  As another example, referring to FIG. 5 of the '034 Patent, the specification states that the "*[c]arburetor shutoff solenoid* **94** *couples to float bowl* **88** to selectively control liquid fuel flow through main fuel circuit **152**," and "[c]arburetor cutoff solenoid **94** actuates to quickly start and stop liquid fuel flow from float bowl **88** to the engine through main fuel circuit **152** to provide precisely timed engine changeover between liquid and gaseous fuel sources." (*Id.* at 33, emphasis added ['034 Patent at 12:24-34].)  That the carburetor cutoff solenoid is coupled to, or connected directly or indirectly to, the carburetor, the float bowl, and engine also makes sense when looking at FIG. 2—which shows that the carburetor **86**, float bowl **88**, and carburetor cutoff solenoid **94** are all connected, directly or indirectly, to one another.  (*Id.* at 25 ['034 Patent FIG. 2].)  Thus, the claim language, in light of the specification, informs a POSITA, with at least reasonable certainty, as to what is being claimed.

As noted, Claim 18 also claims "a gaseous fuel valve coupled to control fuel flow." Once again, it is clear from contextual clues in the claim itself that the gaseous fuel valve is coupled to, or connected directly or indirectly to, the engine.  Moreover, the specification further explains that the gaseous fuel valve is "coupled along" the gaseous fuel line.  (*See, e.g.*, *id.* at 30 ['034 Patent at 6:30-33: "LPG cutoff solenoid **98** provides a gaseous fuel

valve coupled along gaseous fuel line **84** to open and close gaseous fuel source **82** to engine."]; *id.* at 32 ['034 Patent a 9:67-10:1: "Each fuel line has a gaseous fuel valve to open and close the line."].) Once again, because the phrase "coupled to" means connected directly or indirectly, it makes sense that the gaseous fuel valve would be "coupled to" multiple things, including the engine and the gaseous fuel line. As before, the claim language, in light of the specification, informs a POSITA, with at least reasonable certainty, as to what is being claimed.

iii.     <u>Claim 44 of the '970 Patent</u>

Claim 44 of the '970 Patent claims:

> A dual fuel generator comprising: an alternator; a dual fuel engine coupled to drive the alternator . . . .

(*Id.* at 212 ['970 Patent at 18:57-59].) Once again, context indicates that the dual fuel engine is coupled to the dual fuel generator. This understanding is supported by reference to the specification. The specification provides that, in one embodiment of the invention, the "dual fuel generator includ[es] a generator housing, an alternator mounted within the generator housing, and an engine driving the alternator and mounted within the generator housing, the engine configured to operate on a liquid fuel supplied from a liquid fuel source through a liquid fuel line and a gaseous fuel supplied from a pressurized fuel source through a gaseous fuel line." (*Id.* at 209 ['970 Patent at 11:62-12:2].) This language explains that the dual fuel generator includes a generator housing and that the engine is mounted within that generator housing—in other words, the engine is coupled to the generator.

This understanding is also supported by the description of another embodiment of the invention: "a dual fuel generator includes an alternator and a dual fuel engine coupled to drive the alternator." (*Id.* ['970 Patent at 12:63-65].) This language makes clear that the alternator and dual fuel engine are included in the dual fuel generator, and that the dual fuel engine and alternator are coupled to one another. Read in light of the specification, a POSITA would be informed, with at least reasonable certainty, as to what is being claimed.

…

iv.    Summary

In sum, having balanced the concerns of "the inherent limitations of language and the modicum of uncertainty which is the price of ensuring the appropriate incentives for innovation, on the one hand, and, on the other, enough precision to afford clear notice of what is claimed," the Court concludes that these claims, read in light of the specification, "inform those skilled in the art with reasonable certainty about the scope of the invention." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382 (Fed. Cir. 2015) (cleaned up).  Thus, Firman has not met its burden of showing, by clear and convincing evidence, that the claims are indefinite.

c.    **The Court's Construction**

"Coupled to [verb]" should be given its plain and ordinary meaning—i.e., "connected directly or indirectly to."  Even where "coupled to" is followed by a verb, a POSITA would be informed with reasonable certainty as to what is claimed—including *what* is coupled to *what*—by reference to the specification.

Accordingly,

**IT IS ORDERED** that the disputed claim terms are construed in accordance with the above order.

Dated this 10th day of June, 2026.

_____
Dominic W. Lanza
United States District Judge

- 112 -