WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Champion Power Equipment Incorporated, | No. CV-23-02371-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Firman Power Equipment Incorporated, | |
| Defendant. | |

This is a patent infringement dispute between two direct competitors, Plaintiff Champion Power Equipment Incorporated ("Champion") and Defendant Firman Power Equipment Incorporated ("Firman"). During the early stages of the case, the Court issued a stipulated protective order that, among other things, enabled the parties (and third parties) to designate certain materials as "CONFIDENTIAL – FOR COUNSEL ONLY" and placed significant restrictions on the dissemination and use of materials so designated. (Doc. 95.)

Firman and specially appearing nonparty Generac Power Systems, Inc. ("Generac") (together, "Movants") contend that Champion repeatedly violated these restrictions and seek an order to show cause why Rule 37 sanctions should not be issued against Champion. (Doc. 250.) The motion is fully briefed (Docs. 254, 263) and nobody requested oral argument. Because Champion had the opportunity to respond, the Court construes Movants' motion as one for sanctions under Rule 37. For the reasons that follow, the motion is granted in part and denied in part.

…

…

## BACKGROUND

I.    <u>Relevant Factual Background</u>

A.    **The Protective Order**

On November 4, 2024, the Court issued the parties' stipulated protective order. (Doc. 95.)

As relevant here, paragraph 1 of the protective order allows the parties, and certain third parties, to designate materials as either "CONFIDENTIAL" or 'CONFIDENTIAL — FOR COUNSEL ONLY." (*Id.* ¶ 1 ["Each party to this litigation that produces or discloses any Materials, answers to interrogatories, responses to requests for admission, trial testimony, deposition testimony, and/or transcripts of trial testimony and depositions that the producing party believes should be subject to this Protective Order may designate the same as 'CONFIDENTIAL' or 'CONFIDENTIAL — FOR COUNSEL ONLY.'  Third parties who produce Materials or provide testimony in this litigation may also designate Confidential Information subject to the terms of this Order."].)  For purposes of brevity, the term "CONFIDENTIAL — FOR COUNSEL ONLY" will be referred to by the shorthand "AEO," i.e., attorneys' eyes only.

The next relevant paragraph of the protective order is paragraph 4, which explains that materials designated as AEO are subject to limitations on disclosure and use.  (*Id.* ¶ 4 ["All Confidential Information designated as [AEO] must not be disclosed by the receiving party to anyone other than those persons designated within this Order, must be handled in the manner set forth below, and must not be used for any purpose other than in connection with this litigation, unless and until such designation is removed either by agreement of the parties or by order of the Court."].)

Paragraph 5, in turn, identifies the five categories of individuals with whom AEO materials may be shared.  (*Id.* ¶ 5 ["Information designated [AEO] may be viewed only by: (a) Counsel . . . of the receiving party; (b) Independent experts and stenographic and clerical employees associated with such experts . . . ; (c) The Court and any Court staff and administrative personnel; (d) Any court reporter employed in this litigation and acting in

that capacity; and (e) Any person indicated on the face of the document to be its author or co-author, or any person identified on the face of the document as one to whom a copy of such document was sent before its production in this action."].)

Paragraph 12 further elaborates on the use restrictions applicable to AEO materials. (*Id.* ¶ 12 ["Confidential Information designated . . . [AEO] shall be used solely for the prosecution or defense of this action."].)

Paragraph 15 reiterates that "[t]o the extent [AEO material] has not been disclosed prior to and apart from this litigation, it must be used only for purposes of this action" and also creates a duty to "immediately" notify affected parties of any violation of the protective order's disclosure restrictions and to make "every effort" to prevent future violations. (*Id.* ¶ 15 ["If Confidential Information[1] is disclosed to any person other than a person authorized by this Order, the party responsible for the unauthorized disclosure must immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties and, without prejudice to any rights and remedies of the other parties, make every effort to prevent further disclosure by the party and by the person(s) receiving the unauthorized disclosure."].)

Finally, paragraph 21 provides a mechanism for producing, outside of this litigation, AEO materials obtained during this litigation. (*Id.* ¶ 21 ["Materials designated [AEO] pursuant to this Order . . . may be disclosed if . . . the party to whom [AEO material] has been produced thereafter becomes obligated to disclose the information in response to a lawful subpoena, provided that the subpoenaed party gives prompt notice to Counsel for the party which made the designation, and permits Counsel for that party sufficient time to intervene and seek judicial protection from the enforcement of this subpoena and/or entry of an appropriate protective order in the action in which the subpoena was issued."].)

B.    **First Alleged Violation**

On October 16, 2024, Firman produced to Champion a document that Firman had

---

[1]    The term "Confidential Information" is defined elsewhere in the protective order as encompassing materials designated as AEO. (*Id.* ¶ A.)

- 3 -

designated AEO pursuant to the protective order.  (Doc. 255 at 1 ¶ 2.)

On October 31, 2024, Champion's now-former lead counsel, Tim Ziolkowski ("Ziolkowski") of Ziolkowski Patent Solutions Group, SC ("ZPS"), sent Champion's CEO Dennis Trine ("Trine") an email that summarized information from that Firman-produced AEO document. (Doc. 251 at 6; Doc. 254 at 4; Doc. 258 at 1 ¶ 2.)  The specific information communicated to Trine was: "Firman claims they sold four RD9000E generators to D&H Distributing in the week of June 5, 2015." (Doc. 251 at 5.)

On November 2, 2024, Ziolkowski instructed Trine to delete the email, and Trine avows that he did so "immediately." (Doc. 251 at 6; Doc. 254 at 4; Doc. 258 at 1 ¶ 2.) Trine further avows that he "did not share the email or its contents with anyone." (Doc. 258 at 1 ¶ 2.)

On November 5, 2024, Ziolkowski notified Firman of the disclosure. (Doc. 250 at 3; Doc. 254 at 4; Doc. 251 at 6.)  The notification email provided: "We inadvertently provided that information to Champion (without any pricing), then after realizing it was labelled AEO within 2 days we told Champion to delete that information.  They confirmed that they had done so." (Doc. 251 at 6.)  Firman assumed, based on the last sentence's use of the plural pronoun "they," that Ziolkowski had shared this information with several "unidentified individuals at Champion." (Doc. 263 at 5 n.3.)  However, Champion asserts in its briefing that "the only recipient at Champion of the pertinent email was [Trine]." (Doc. 254 at 4.)

Champion's counsel, Zachary Schroeder ("Schroeder") of Snell & Wilmer L.L.P. ("Snell"), states in a declaration that on June 2, 2025, Firman produced a document that "contained the same pertinent information" as what was in the AEO document disclosed to Trine in October 2024 and that this later-produced document was not designated AEO. (Doc. 255 at 1 ¶ 3.)

C.     **Second Alleged Violation**

On April 23, 2025, Firman produced to Champion another document that Firman designated as AEO per the protective prder.  (*Id.* at 1-2 ¶ 4.)

On April 24, 2025, Ziolkowski emailed Trine a summary of this Firman-produced AEO document. (Doc. 254 at 4; Doc. 258 at 2 ¶ 3.) Champion states in its briefing that Trine was the only Champion recipient of the email. (Doc. 254 at 5.)

On November 19, 2025, Schroeder learned that Ziolkowski had sent the April 24, 2025 email to Trine. (Doc. 254 at 4; Doc. 255 at 2 ¶ 6.) That same day, Ziolkowski and David Barker of Snell instructed Trine to delete the email, and Trine stated that he did so that same day. (Doc. 254 at 4; Doc. 255 at 2 ¶¶ 7-8; Doc. 258 at 2 ¶ 3.) Trine avows that he "did not share the emails or their contents with anyone." (Doc. 258 at 2 ¶ 3.)

On December 12, 2025, Schroeder notified Firman's counsel about the disclosure. (Doc. 250 at 3; Doc. 251 at 10; Doc. 254 at 5; Doc. 255 at 2 ¶ 9.)

Schroder's declaration states that on June 2, 2025, Firman produced documents that "contained the same pertinent information" as what was disclosed to Trine in Ziolkowski's April 24, 2025 email and that those later-produced documents were not designated as AEO. (Doc. 255 at 2 ¶ 5.) Moreover, when Firman's counsel responded to Schroeder's email about the April 24, 2025 disclosure, Firman's counsel "agree[d] the information disclosed . . . is confidential" (i.e., not AEO). (Doc. 251 at 9.)

D.    **Third Alleged Violation**

On December 18, 2024, Ziolkowski sent an email to Trine that included, as attachments, seven AEO documents. (Doc. 254 at 5; Doc. 258 at 2 ¶ 5.) Those AEO documents had been produced by Generac in response to subpoenas issued to Generac in this litigation. (Doc. 250 at 3; Doc. 258 at 2 ¶ 5.)

On December 4, 2025, Schroeder learned that Ziolkowski had sent this email to Trine. (Doc. 254 at 5; Doc. 255 at 2 ¶ 10.) The next day, Schroeder instructed Trine to delete the email. (Doc. 254 at 5; Doc. 255 at 2 ¶ 11.)

On December 11, 2025, Trine stated that he deleted the email. (Doc. 254 at 5; Doc. 255 at 2 ¶ 12.) Trine also avows in a declaration that he deleted the email on that date. (Doc. 258 at 2 ¶ 7.) Trine further avows that he "never opened, viewed, downloaded, or otherwise accessed these . . . documents, and [he] never forwarded or otherwise transmitted

the December 18 Email to anyone.  No one else at Champion was copied on the December 18 Email.  Only Mr. Ziolkowski's colleagues at ZPS, Jacob Fritz, an associate attorney, and Robyn Templin, a paralegal, were copied on the December 18 Email."  (*Id.* at 2 ¶ 6. *See also* Doc. 250 at 4 n.3.)

On December 19, 2025, Champion's counsel notified Generac's counsel of the disclosure.  (Doc. 250 at 3; Doc. 251 at 29; Doc. 254 at 5.)  That same day, Generac's counsel responded by requesting further information, including: when the disclosure was made, to whom it was made, when the disclosure was discovered, what counsel and Champion had done to ensure that the information was deleted and wouldn't be used by Champion, what counsel and Champion had done to ensure future disclosures wouldn't occur, and whether Ziolkowski continued to have access to Generac's documents.  (Doc. 251 at 28.)

On December 22, 2025, Champion's counsel responded:

> The inadvertent disclosure was made by . . . Ziolkowski prior to his withdrawal as counsel of record for Champion in this matter.  Mr. Ziolkowski is no longer involved with this matter and Champion's remaining counsel have removed [ZPS's] access to our repository of case documents, including documents Generac produced in response to the Champion and Firman subpoenas.  After discovery of the inadvertent disclosure, Champion was instructed to delete the email that contained the foregoing documents and has confirmed that it has done so.

(*Id.* at 27.)

On December 23, 2025, Generac's counsel responded that Generac was "not satisfied by [Champion's] response and apparent attempt to place all culpability on Mr. Ziolkowski now that he has exited the case."  (*Id.* at 26.)  Generac's counsel stated that Generac had "requested specific information such that Generac can understand the extent and nature of the breach of the Protective Order" and cited the provision of the protective order requiring "the party responsible for the unauthorized disclosure [to] immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties."  (*Id.*)  Generac's counsel argued that "Champion's vague, non-specific answers

do not provide Generac with the 'pertinent facts' to evaluate the breach." (*Id.* at 27.)

That same day, Champion's counsel responded with a "further response to [Generac's] email." (*Id.* at 25.) Champion's counsel explained:

> The email was from Mr. Ziolkowski at ZPS to Mr. Trine at Champion and the only other individuals on the email were an associate attorney and a paralegal at ZPS, Mr. Fritz and Ms. Templin. There were no other Champion recipients, and Mr. Trine did not open, access, forward, save, or otherwise access the Confidential Information in any way or manner before deleting the email and attachments. Thus, nothing was "disclosed" to Mr. Trine or anyone else at Champion.
>
> . . .
>
> [A]fter the transmission was discovered by Champion's counsel, counsel promptly instructed Champion to delete the email. Champion confirmed the email and attachments containing the AEO Confidential Information was deleted, and that neither Mr. Trine nor anyone else at Champion viewed, forwarded, or otherwise accessed any of the materials. Thus, the transmission of documents designated as AEO Confidential Information were discovered and corrective action was taken to assure Champion deleted the materials without accessing them.
>
> Because the materials were not accessed, no AEO Confidential Information was made known to Champion or any unauthorized person. Further, because the transmittal message with the materials attached was deleted by Mr. Trine and not retained, Champion cannot access it in the future and no future disclosure can occur from the prior transmission. Moreover, counsel have all been alerted to prevent any future transmissions of AEO Confidential Information.
>
> Nevertheless, although not technically a disclosure, counsel for Champion provided notice to you out of an abundance of caution to provide the pertinent facts related to the transmission and the efforts made to prevent disclosure and future disclosure. This complies with counsel for Champion's obligations under the operative Protective Order. Accordingly, we consider this matter closed.

(*Id.* at 25-26.)

Within the same hour, Generac's counsel responded that Champion's "refusal to answer basic questions about when the transmission was made and when the disclosure was discovered is a violation of Paragraph 5 of the Protective Order." (*Id.* at 25.)

On January 5, 2026, Generac's counsel followed up that Generac "under[stood]

Champion's continued failure to identify when the transmission was made and when the disclosure was discovered to mean that Champion is refusing to provide this information" and that Generac "believe[d] this is a violation of Paragraph 15 of the Protective Order, not to mention the violation of the Protective Order by the disclosure itself." (*Id.* at 24.)

That same day, Champion's counsel responded that Champion was "not refusing to answer basic questions about the inadvertent transmission of materials designated as Confidential Information" and that Champion "continue[d] to disagree with [Generac's] characterization of the situation." (*Id.* at 23.) Champion's counsel continued:

> [T]he transmission in question occurred on December 18, 2024. Champion's counsel at Snell . . . discovered the transmission on December 4, 2025, and instructed Champion to delete the email sent by Mr. Ziolkowski the following day, December 5, 2025. On December 11, 2025, Champion confirmed that the information was deleted. Neither Mr. Trine nor anyone else at Champion viewed, forwarded, or otherwise accessed any of the materials. Thus, there was no actual disclosure nor any breach of the protective order. Moreover, Champion and its counsel have complied with the notice requirements under Paragraph 15 of the Protective Order by promptly notifying you and taking corrective action even though there had not been an actual disclosure of any protected information.

(*Id.*)

On January 6, 2026, Generac's counsel questioned the plausibility of the assertion that Trine had received an email from Champion's lead counsel but did not open that email for approximately one year. (*Id.* at 22.) Generac's counsel also expressed "concern[] that Mr. Fritz was included on the December 18, 2024 communication and did not identify it as a potential breach of the Protective Order" and asked Champion to "describe the remedial measures taken to ensure that Mr. Fritz does not further participate in any breach of the Protective Orders" in the current matter and in the Champion-Generac litigation in the Eastern District of Wisconsin. (*Id.*) Generac's counsel also expressed "concern[] about compliance with Paragraph 15 of the Protective Order," arguing that "Champion's counsel became aware of the breach on December 4, 2025" but "did not notify Generac until December 19, 2025 and, even then, did not provide all pertinent facts." (*Id.*) Last,

Generac's counsel expressed that Generac was "additionally concerned about any breaches relating to productions in the Eastern District of Wisconsin case" and asked Champion to "confirm . . . that counsel has reviewed all communications to Champion to ensure no additional breaches have occurred." (*Id.*) It does not appear that Champion responded to that request. (Doc. 250 at 5.)

E.    **Fourth And Fifth Alleged Violations**

On July 8, 2025, "Ziolkowski's paralegal uploaded non-Champion AEO documents to . . . Trine's Microsoft OneDrive account." (Doc. 254 at 6. *See also* Doc. 257 at 3 ¶ 7; Doc. 258 at 2 ¶ 8.) "[T]hose documents were deleted from Mr. Trine's Microsoft OneDrive account approximately two hours after [Ziolkowski's paralegal] uploaded them." (Doc. 257 at 3 ¶ 7. *See also* Doc. 254 at 6; Doc. 258 at 2 ¶ 8.) Trine avows that he "was not aware that said documents were uploaded to [his] OneDrive account until after they were deleted by" Ziolkowski's paralegal and that he "never accessed said documents through [his] Microsoft OneDrive account or any other means." (Doc. 258 at 2 ¶ 8.) Vincent Bautista ("Bautista"), a support engineer for Consilien, LLC ("Consilien"), Champion's information technology vendor, avows that he "review[ed] . . . Microsoft's access logs" and "confirmed that those documents were never accessed by Mr. Trine nor anyone else at Champion." (Doc. 257 at 3 ¶ 7.)

Although the documents were deleted approximately two hours after being uploaded to Trine's OneDrive account, "[b]ecause of litigation-hold or retention settings within Champion's Microsoft environment, deleted files were nevertheless preserved in a retention or preservation location." (Doc. 254 at 6. *See also* Doc. 257 at 1-2 ¶¶ 3-4.) Deleted documents, including the documents temporarily uploaded to Trine's OneDrive account, are retained in what is known as a "Preservation Hold Library." (Doc. 257 at 1-2 ¶ 3.) "The Preservation Hold Library is a feature of Microsoft 365 that effectively acts as a backup folder that maintains a copy of all digital files that are edited or deleted by a custodian/user" and "has been enabled for several Champion employee Microsoft OneDrive accounts because Champion has actively been in litigation (i.e., litigation hold)."

- 9 -

(*Id.*)  Bautista avows that he "confirmed that neither Mr. Trine nor any other Champion employee had access to the Preservation Hold Library for Mr. Trine's Microsoft OneDrive account." (*Id.* at 2 ¶ 4.)  "Microsoft [also] maintains a log that shows who accessed Mr. Trine's Preservation Hold Library," and Bautista avows that he "reviewed the log and confirmed that neither Mr. Trine nor any other Champion employee accessed his Preservation Hold Library." (*Id.* at 2 ¶ 5.)

At some point after the upload-and-delete incident, Bautista "ran searches for terms at the request of Champion's legal counsel, [and] those searches captured files and documents retained in Mr. Trine's Preservation Hold Library"; thereafter, "[t]he resulting files and documents, including those retained in Mr. Trine's Preservation Hold Library, were sent to Champion's legal counsel" with "metadata . . . identify[ing] [Trine] as the custodian." (*Id.* at 2 ¶ 6.)[2]  Those documents captured from Trine's Preservation Hold Library were then produced by Champion in its lawsuit with Generac. (Doc. 254 at 6; Doc. 255 at 2-3 ¶¶ 13-17; Doc. 257 at 1-3 ¶¶ 3-7; Doc. 259 at 1-2 ¶¶ 2-3.)

Specifically, in the litigation between Champion and Generac in Wisconsin, "Champion produced . . . two documents . . . with metadata indicating they were collected from the custody of Champion CEO Mr. Trine." (Doc. 250 at 5. *See also* Doc. 251 at 31.) "[T]hese two documents were highly-confidential *Generac documents* that Generac had produced to Champion in . . . this [l]awsuit in response to Firman's subpoena." (Doc. 250 at 5. *See also* Doc. 251 at 31.)  When Generac produced these documents in response to Firman's subpoena in this case, the documents were designated AEO. (Doc. 250 at 5; Doc. 251 at 31.)  However, when Champion re-produced those documents back to Generac in the Wisconsin litigation, they no longer had their AEO designation. (Doc. 250 at 5; Doc. 251 at 32.)

Following Champion's re-production of these documents to Generac in the Wisconsin litigation, Generac's counsel sent a letter to Champion's counsel. (Doc. 251 at

---

[2]    Once the documents were collected by Consilien, Consilien then provided them to Snell, which "maintained the documents in a Relativity database for this matter." (Doc. 255 at 2 ¶ 13.)

31-33.) That letter requested that Champion respond to several detailed questions about how and when this alleged disclosure occurred. (*Id.* at 32-33.) Champion's counsel responded via email, explaining that the two documents "were not disclosed to Mr. Trine or anyone else at Champion," "[n]either Mr. Trine nor any other Champion employee accessed the documents," and "[t]he documents were erroneously produced . . . from counsel's e-discovery database, which is not accessible to Mr. Trine." (*Id.* at 21.) In response, Generac's counsel argued that Champion's counsel's "response fail[ed] to acknowledge or explain how or why Champion produced [the two documents] with . . . Trine as the custodian and without any confidentiality designation" and further requested a "sworn statement from Champion's e-discovery vendor identifying" several pieces of information about the alleged disclosure. (*Id.* at 20.) The parties continued to discuss the issue via email. (*Id.* at 18-19.) At some point, the two documents were clawed back by Champion's counsel in the Wisconsin litigation with Generac. (Doc. 251 at 19; Doc. 259 at 1-2 ¶ 2.)

On February 10, 2026, Generac's counsel emailed Firman's counsel that, in a recent production in the Wisconsin litigation, Generac "identified . . . [a] document that was produced by Champion to Generac but which may have originated with Firman." (Doc. 251 at 17.) Specifically, the document appeared to be a Firman AEO document that had been produced by Champion to Generac without any confidentiality designation, and the metadata for this document identified Trine as the custodian. (*Id.*) Firman asked Generac to temporarily treat the document as AEO while it investigated the issue, and Generac agreed. (*Id.* at 16-17.) Following its investigation, Firman "confirmed" that the document was produced by Firman to Champion "with an AEO designation in the Champion-Firman lawsuit" before this Court. (*Id.* at 15.) Specifically, Firman identified the document as a native Excel sheet that it had produced to Champion in this lawsuit. (Doc. 251 at 2 ¶ 4.) When it was originally produced in this litigation, the native Excel sheet was accompanied by a slipsheet designating the native file as AEO. (*Id.*) The parties dispute whether the filename of the native Excel sheet contained a separate identification of the document as

AEO. (*Compare* Doc. 250 at 6 n.4, citing Doc. 251 at 2 ¶ 4; *with* Doc. 254 at 7, citing Doc. 256 at 2 ¶¶ 7-8, *and* Doc. 259 at 2 ¶ 4.) On February 13, 2026, Firman asked Champion to claw back the document, and on February 19, 2026, Champion's counsel confirmed that it had done so. (Doc. 251 at 15-16; Doc. 259 at 2 ¶ 3.)

In its briefing, Champion explains that "[f]or the native files," like the Firman-produced native Excel file, "it appears that when former counsel downloaded the documents from the document repository, they only downloaded the native file and not the corresponding slip-sheet." (Doc. 254 at 7.) Subsequently, those documents were temporarily uploaded to Trine's OneDrive account, deleted shortly thereafter, and then stored in Trine's Preservation Hold Library. (Doc. 254 at 7; Doc. 257 at 3 ¶ 7.) When current counsel asked Consilien to run additional ESI searches, Consilien's search captured those documents stored in Trine's Preservation Hold Library—including native files without their accompanying slip-sheets. (Doc. 254 at 7; Doc. 255 at 3 ¶ 15; Doc. 256 at 2 ¶ 5; Doc. 257 at 3 ¶ 7.) Schroeder avows that when Snell received these documents from Consilien, he "had no knowledge of ZPS's upload of the July 8th Documents to Mr. Trine's account and no knowledge that the [Consilien-captured documents] contained the July 8th Documents" and thus he did not "know or suspect" that those Consilien-captured documents "contained anything other than Champion documents." (Doc. 255 at 3 ¶ 16.)

On or around November 12, 2025, "during [Schroeder's] review" of the Consilien-captured documents "in preparation for discovery in the ongoing litigation, [he] observed that some of the" Consilien-captured documents "appeared to contain non-Champion AEO documents," which "was inconsistent with [his] prior understanding that the [Consilien-captured documents] were from Champion." (*Id.* at 3 ¶ 17.) "Upon making this discovery, Snell . . . promptly conducted an investigation" and "learned of ZPS's upload of the July 8th Documents and that the July 8th Documents were part of the" documents "received from Consilien." (*Id.* at 3 ¶ 18.)

II.    Relevant Procedural History

On November 10, 2023, Champion initiated this action. (Doc. 1.)

- 12 -

During the course of this litigation, "Champion and Firman both served subpoenas to Generac." (Doc. 128 at 2.)

Approximately a year after initiating this action, Champion sued Generac in the Eastern District of Wisconsin, "asserting the same set of patents" as it asserts in this action. (*Id.* at 1.)

On March 6, 2026, Movants filed the pending motion for an order to show cause why sanctions should not issue for Champion's alleged violations of the protective order. (Doc. 250.) That motion is now fully briefed. (Docs. 254, 263.)

**DISCUSSION**

I.    Legal Standard

"The Court may impose sanctions for violations of a protective order[] under Federal Rule of Civil Procedure 37(b)(2)." *Finjan, Inc. v. Eset, LLC*, 2019 WL 1429596, *7 (S.D. Cal. 2019). *See also United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 911 (9th Cir. 1986) (affirming Rule 37 sanctions for protective order violation); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 784 (9th Cir. 1983) ("This failure to obey the protective discovery order exposed counsel *and Falstaff* to liability under Rule 37(b)(2) for the resulting costs and attorney's fees."); *Top Brand LLC v. Cozy Comfort Co. LLC*, 2023 WL 12197271, *4 (D. Ariz. 2023) (sanctioning plaintiffs for violations of protective order); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 12596470, *5 (N.D. Cal. 2014) ("[T]he Ninth Circuit has repeatedly held that Rule 37 provides comprehensively for enforcement of all discovery orders, including Rule 26(c) protective orders.") (cleaned up); 1 Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 37:21 (June 2026 update) ("The better view . . . is that Rule 37(b) applies to the violation of a protective order generally. As explained in the Committee Note to the 1970 amendments to Rule 37(b), the rulemakers intended the phrase 'to provide or permit discovery' to encompass protective orders under Rule 26(c) and further intended that Rule 37(b)(2) would 'provide comprehensively for enforcement of' all orders within its broad sweep. Together, the text of Rule 37(b)(2) and the 1970 Committee Note strongly support

the view that protective orders are 'discovery orders' fully enforceable through Rule 37(b)(2) regardless of the nature of the violation.") (footnotes omitted).

Rule 37(b)(2)(A) provides that "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." *Id. See also* Gensler, *supra*, § 37:22 ("The list of merits sanctions contained in Federal Rule of Civil Procedure 37(b)(2) is not exhaustive; the court may impose any other sanctions as are just under the circumstances."). "Rule 37(b) . . . authorizes the district court to impose a wide range of sanctions if a party fails to comply with a discovery order. The district court's authority to issue the sanctions is subject to certain limitations: (1) the sanction must be just; and (2) the sanction must specifically relate to the particular claim at issue in the order." *Nat'l Med. Enters.*, 792 F.2d at 910 (citations omitted).

Additionally, Rule 37(b)(2)(C) provides that "[i]nstead of or in addition to the orders above, the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Id.* (emphasis added). *See also* Gensler, *supra*, § 37:23 ("Whether or not the court chooses to impose any of the other sanctions available under Federal Rule of Civil Procedure 37(b), the court is presumptively required to order the party who violated the order to pay the reasonable expenses caused by the violation, including attorney's fees. . . .

[T]he court need not shift expenses if the court finds that the violation was substantially justified or that other circumstances make an award of expenses unjust. The expense award may run against the party, the party's counsel, or both. A fee award sanction must be limited to those attorney's fees caused by the misconduct at issue.") (footnotes omitted).

When determining whether sanctions should be imposed under Rule 37 based on the violation of a protective order, a court must first assess whether "its protective order [has] been violated." *Apple*, 2014 WL 12596470 at *4. *See also* Gensler, *supra*, § 37:19 ("Federal Rule of Civil Procedure 37(b) does not apply to discovery misconduct generally. Rather, it applies only when someone disobeys a discovery *order*."). "A district judge's determination that an order was not complied with is entitled to considerable weight because the district judge is best equipped to assess the circumstances of the noncompliance." *Nat'l Med. Enters.*, 792 F.2d at 911.

Assuming there has been a violation, the court must next assess whether sanctions are warranted. *Apple*, 2014 WL 12596470 at *4. "Authority . . . is not obligation" and "protective order violations may, but do not necessarily, constitute sanctionable conduct." *Id.* at 5. "[T]he court has the discretion to determine whether sanctions are appropriate." *Id.* "In determining whether to issue sanctions, or what forms the sanctions should take, a court must look to the totality of the circumstances surrounding each violation." *Id.* "Rule 37(b) sanctions may serve either remedial and compensatory purposes or punitive and deterrent purposes." *Id.* (quoting *Falstaff*, 702 F.2d at 783). "[T]he ideal remedy is one that advances both the remedial and deterrent goals of sanctions, as the need for one is not diminished by a need for the other. Thus, sanctions may be warranted where a relatively innocent violation leads [to] great harm, where there is strong evidence of bad faith or willful conduct (even if there is minimal evidence of harm), and certainly where both are present." *Id.* at 6. "In all circumstances, an appropriate sanction will stem from the balance of the two." *Id.*

II.     The Parties' Arguments

Movants argue that "[o]n multiple occasions, Champion has improperly disclosed

- 15 -

to Champion principals documents and information produced in this case as [AEO] by Champion competitors," Firman and Generac, and that "some of these breaches were not even self-identified by Champion but rather discovered by *Generac* in Champion's improper production of *Firman's* competitively sensitive materials in a lawsuit between Champion and Generac." (Doc 250 at 1.)  Movants also argue that "Champion's response to its breaches are even more problematic" because "Champion has taken a lackadaisical approach to each breach and repeatedly refused to investigate the full scope of the issue, suggesting that Firman and Generac have only seen the tip of the iceberg." (*Id.*)  Movants seek "an order to show cause requiring Champion to conduct a full audit and explain why sanctions should not issue to enforce the Protective Order." (*Id.*)  Movants emphasize that "[a] court's protective order plays a key role in facilitating discovery and assuaging fears of litigants that their competitors will wrongfully acquire their confidential information" and identify four reasons why an order to show cause should issue. (*Id.* at 7-8.)  First, Movants argue that "Champion repeatedly violated the Court's [protective order] by mishandling its competitors' AEO documents and information and providing those materials to Champion's CEO." (*Id.* at 8.)  Movants argue that "a violation is a violation, and even if Champion claims to have acted negligently, rather than intentionally, willfulness is not needed to establish a violation of the [protective order]." (*Id.*)  Movants also argue that Champion's conduct is not excused by claiming that the AEO information was improperly designated. (*Id.* at 9.)  Second, Movants argue that Champion further violated the protective order "by providing copies of Firman's AEO document to (a) Generac, *another direct competitor*, (b) in an *unrelated proceeding*, and (c) *without any confidentiality designations*." (*Id.*)  Movants argue that even if Trine never had the documents, "by producing [the documents] to Generac (a direct competitor) in an unrelated case and without any confidentiality designations," Champion still breached the protective order. (*Id.* at 9-10.)  Third, Movants argue that "Champion failed to recognize on its own and self-report" the fourth and fifth alleged violations and that "[t]his pattern of recurring breaches suggests a systemic failure in Champion's compliance." (*Id.* at 10.)  Movants

also argue that "Champion's pattern of 'breach, avoid accountability, breach again' suggests that additional breaches remain undiscovered and unremedied." (*Id.*) Movants assert that they "have no confidence that the same or similar breaches of Firman and Generac AEO documents have not been repeated in Champion's separate (and recently concluded) lawsuits against other competitors such as Westinghouse and Harbor Freight." (*Id.*, footnotes omitted.) Fourth, Movants argue that "when faced with the reality of the [protective order] violations, Champion did not react with the level of concern and promptness the violations warranted" and thus violated paragraph 15 of the protective order by failing to "immediately" disclose "all pertinent facts relating to the unauthorized disclosure." (*Id.* at 11, cleaned up.) For example, Movants argue that "Champion's counsel became aware of the first breach of Generac's AEO designation on December 4, 2025, but failed to notify Generac until December 19, 2025—more than two weeks later— and even then did not provide all pertinent facts," and that "[o]nly after being repeatedly pressed for those facts . . . did Champion disclose certain details." (*Id.*) As for the fourth and fifth alleged violations, Movants argue that Champion "still has not explained why it used Firman's produced documents in a different lawsuit, why the documents show Mr. Trine as the custodian, and why they were produced without any confidentiality designation despite having received them with AEO designations." (*Id.*) Movants argue that they "do not take this motion lightly" and emphasize that they waited until there were "five violations," which "violate[d] the [protective order] in four different ways," to seek judicial intervention, which is particularly necessary because "[s]ome of Champion's explanations appear implausible" and "Champion refuses to take the reasonable steps to assure Firman and Generac that future violations will not occur." (*Id.* at 12.) Movants seek three specific sanctions: (1) "[a]n audit of Champion's counsel's communications with Champion, including an audit of . . . Trine's email and custodial documents, and an audit of Champion's e-discovery databases, to identify and remedy, as needed, any additional [protective order] violations, along with a filing of the audit findings and results with the Court"; (2) "Champion's payment for Firman's and Generac's fees and costs

incurred in preparing this motion and reply, in an amount to be determined and submitted to the Court"; and (3) the "Court's warning that future Champion violations of the [protective order] will result in automatic monetary sanctions in the amount of $10,000 for each violation." (*Id.* at 13, cleaned up.)

In response, Champion argues that Movants' motion "mischaracterizes the facts," "presents a distorted picture," and "should be denied." (Doc. 254 at 2.) Champion argues that it "does not minimize the seriousness of compliance" with the protective order and does not "dispute that limited, inadvertent disclosure issues occurred on a few occasions at the hands of Champion's prior (and now terminated) counsel." (*Id.*) But Champion argues that "Movants' motion overstates the facts and seeks disproportionate, draconian remedies not warranted in these circumstances" because, "[a]t most, the record reflects a few limited and subsequently cured instances of remediated events where [AEO] information was transmitted by former counsel, but no disclosure of the AEO information actually occurred because (1) no one at Champion accessed the AEO document or information, and Champion has since deleted the non-accessed information; or (2) where limited information was disclosed, the disclosure was remedied, and the same information was subsequently produced by Firman without any AEO designation." (*Id.*) Champion argues that "[t]hese instances were almost exclusively attributable to former counsel's mishandling of materials and later-arising preservation artifacts in a Microsoft environment—not ongoing, willful misconduct by Champion or any of its current counsel." (*Id.*) Champion argues that "[t]his distinction matters" because "Rue 37 does not require punitive relief whenever a technical violation may have occurred." (*Id.*) Specifically, Champion argues that "[t]he first and second incidents described in the motion involved summary descriptions of information that later appeared in documents without an AEO designation, undercutting any claim of competitive harm"; that "[t]he third incident described in the motion involved email attachments that Champion's CEO did not open, review, download, or forward"; and that "[t]he fourth and fifth incidents did not involve any knowing review by, or disclosure to, Champion at all" and were simply attributable to

"Microsoft OneDrive litigation hold settings." (*Id.* at 3.) Champion also argues that "Movants identify no evidence of bad faith, no evidence that Champion actually used any competitor AEO material for any business purpose, and no concrete prejudice requiring court intervention" and "[t]heir speculation that there may be more 'violations' is not a sufficient basis for the sweeping sanctions requested." (*Id.*) Champion attributes "[t]hree of the five alleged incidents" to "former counsel's . . . emails to Champion" and attributes the other two "to a single July 8, 2025, upload-and-delete event later magnified by Microsoft preservation settings and associated metadata." (*Id.* at 9.) Champion argues that its "[c]urrent counsel did not create these issues" but instead "uncovered them, investigated them, instructed deletion, obtained confirmation, revoked former counsel's access, and disclosed them." (*Id.*) Champion argues that "especially in multi-jurisdictional complex patent cases with multiple parties represented by dozens of attorneys," "these issues are bound to arise and even expected." (*Id.*) Next, Champion argues that "[s]anctions are especially inappropriate because Movants cannot demonstrate meaningful harm," as they "have not identified, and cannot identify, any AEO information that Champion's CEO actually read, retained, or used": (1) "[f]or the first and second incidents, the allegedly sensitive information was later produced in other documents without an AEO designation"; (2) "[f]or the third incident, Champion's CEO did not open or review the attached AEO documents and he confirmed deletion"; and (3) "[f]or the fourth and fifth incidents, Mr. Trine never saw the documents at all." (*Id.* at 10.) Champion argues that Movants "never identify any actual competitive use, business decision, strategic advantage, dissemination, or downstream harm resulting from any incident" and "[t]he absence of any concrete prejudice strongly counsels against sanctions." (*Id.* at 11.) Next, Champion argues that "[o]nce current counsel discovered the issues, they investigated the disclosures, instructed deletion, obtained confirmation from Champion's CEO, removed former counsel's access to the case repository, and reported the inadvertent or improper disclosures" and that "[t]hat is remedial conduct, not disregard." (*Id.*) Champion argues that "Rule 37 does not require the Court to impose punitive relief whenever an opposing party is dissatisfied with the

speed or detail of a disclosure response." (*Id.*) And Champion argues that the protective order "does not require [it] to comply with the unilateral and arbitrary demands of Movants until they are satisfied." (*Id.* at 12.) Next, as for the fourth and fifth incidents, Champion argues that "the documents were uploaded by former counsel, deleted within approximately two hours, never seen by Mr. Trine, and later surfaced only because litigation-hold settings preserved deleted files in a retention location" and that "[a]t a minimum, these facts defeat Movants' effort to present the fourth and fifth incidents as knowing disclosures to Champion's CEO." (*Id.*) Next, Champion argues that the relief sought by Movants is "grossly disproportionate." (*Id.* at 13.) Champion argues that its "current counsel has already conducted a thorough internal investigation of Mr. Ziolkowski's handling of AEO materials and reported its findings to Movants," and "Ziolkowski has withdrawn and his firm's access to Champion's document repository has been revoked," so "[a]n intrusive audit is unnecessary where violations have been identified, explained, and remediated, and where the party responsible for the underlying conduct is no longer involved in the case." (*Id.*) Champion also argues that "[e]very violation was caused by former counsel acting without knowledge of current counsel or Champion's business personnel"; "the fourth and fifth incidents arose from the automated operation of a litigation hold, not from any deliberate decision by Champion or its current counsel"; "[t]here is no evidence of willfulness or bad faith"; "no AEO information was actually read or retained by Champion's CEO"; current counsel remediated the violations; "Movants have suffered no competitive harm"; and "[t]he response, while not instantaneous, has been thorough and transparent." (*Id.* at 14.) Champion argues that, "[a]t a minimum, the Court should reject the requested audit, fee award, and automatic future sanctions as unnecessary and disproportionate to the remediated conduct at issue." (*Id.* at 15.)

In reply, Movants argue that "Champion's resistance to an audit confirms the likelihood it will reveal still more problems." (Doc. 263 at 1.) Movants also argue that "[e]ven more troubling is the continued lack of accountability and refusal to recognize the

need for a change." (*Id.*) Specifically, Movants argue that "Champion's current counsel tries to blame former co-counsel, but this artificial distinction between 'former' and 'current' makes no difference" because "[a] party is responsible for the actions of its attorneys, even if those attorney have withdrawn," "[c]urrent counsel from Snell . . has been co-counsel throughout this case," and "current counsel also independently breached the Court's [protective order] multiple times." (*Id.*) Movants also argue that "Champion's claim that the breaches were inadvertent misses the point and confuses recklessness with mere inadvertence," and while "[p]erhaps the first and second breaches would be characterized as carelessness," "the record shows a pattern of willful blindness." (*Id.*) Next, Movants argue that "Firman, Generac, and the integrity of the judicial process have been damaged by Champion's repeated violations" and that "Champion's attempts to minimize its breaches only underscore its lack of remorse and reflection." (*Id.*) Movants argue that "Rule 37(b) does not require the Court wait until, as Champion urges, irreparable harm befalls Firman or Generac." (*Id.*)  Finally, Movants argue that "absent court intervention, there is no reason to expect that the future will hold anything different." (*Id.*)

III.    <u>Analysis</u>

    A.    **First Alleged Violation**

As an initial matter, it's unclear whether Champion disputes that the first alleged violation constitutes a "disclosure" prohibited by the protective order.  In the introductory section of its brief, Champion states that it does not "dispute that limited, inadvertent disclosure issues occurred on a few occasions at the hands of Champion's prior (and now terminated) counsel." (Doc. 254 at 2.)  But in the same breath, Champion argues that "no disclosure of the AEO information actually occurred because . . . where limited information was disclosed, the disclosure was remedied, and the same information was subsequently produced by Firman without any AEO designation." (*Id.*)

To the extent Champion's argument is that although the first alleged violation was a disclosure, it was not an "actual" disclosure because it was remedied, that argument is without merit.  Under the plain terms of paragraphs 4 and 5 of the protective order, if AEO

information is disclosed to or viewed by a party principal (who is not otherwise the author of the document), that is a violation.  (Doc. 95 at 4-5 ¶¶ 4-5.)  Such a violation occurred when Ziolkowski sent the October 31, 2024 email to Trine.

Having determined that the protective order was violated, the Court must next determine if sanctions are warranted.  "Although a finding of willfulness or bad faith is unnecessary to impose sanctions under Rule 37, their presence or absence may be considered when deciding whether to impose sanctions."  *Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 2021 WL 1324435, *2 (C.D. Cal. 2021).  Movants agree that Champion's first violation "could be blamed on pure sloppiness" (Doc. 263 at 5.  *See also id.* at 1 ["Perhaps the first and second breaches could be characterized as carelessness."]), and the record contains no evidence of willfulness or bad faith with respect to the first violation.

Additionally, the situation was promptly remedied by Ziolkowski, and there was no actual prejudice to Firman.  In *Global Master*, the court found "that imposition of sanctions . . . would be unjust" where "Plaintiffs' violation of the protective order was not willful or in bad faith," "Plaintiffs' counsel promptly remedied the situation as soon as he learned of the mistake," and "the documents were only available for public viewing for less than six days, so any prejudice to Defendants was minimal."  2021 WL 1324435 at *2.  Similarly, here, (1) the violation was not willful or in bad faith; (2) the situation was promptly remedied once Ziolkowski learned of it, because Ziolkowski instructed Trine to delete the email just two days after it was sent, and Trine avows that he did so; and (3) any prejudice to Firman was minimal because there is no evidence that Trine shared the contents of the email with anyone and the same information (at least in substance) was later produced by Firman without an AEO designation.  *Cf. Harmon v. City of Santa Clara*, 323 F.R.D. 617, 626-27 (N.D. Cal. 2018) (although it was "undisputed that Haddad and Sherwin disobeyed" the protective order after a video designated as "confidential" was disclosed publicly, "in light of the fact that [the court's order] de-classifies the video as confidential under the

protective order, a civil contempt finding no longer makes sense").[3]   Accordingly, the Court concludes that the only sanction potentially warranted as a result of the first violation is an award of attorneys' fees (the propriety of which is addressed in the final section of this order).  *See, e.g.*, *Sound View Innovations, LLC v. Hulu, LLC*, 2018 WL 6038288, *3 (C.D. Cal. 2018) (awarding only attorneys' fees as a Rule 37 sanction for violating a protective order where the disclosure was "inadvertent," "the resulting prejudice to defendant was minimal, if any" and "plaintiff's counsel acted promptly to remedy the error").

### B.     Second Alleged Violation

Once again, it's unclear whether Champion disputes that the second alleged violation qualifies as an "actual" disclosure prohibited by paragraphs 4 and 5 of the protective order.  (*Compare* Doc. 254 at 2 *with id.* at 4-5.)  To the extent that is Champion's argument, it is rejected for the same reasons as the first violation.  Nevertheless, this violation is subject to the same sanctions analysis as the first violation: (1) there is nothing in the record that suggests this disclosure was willful or in bad faith; (2) Schroeder promptly remedied the situation as soon as he learned about it by having Trine delete the email; and (3) any prejudice to Firman was minimal because there is no evidence Trine shared the contents of the email with anyone, Firman later confirmed that the information shared with Trine was only "confidential" (i.e., not AEO), and Firman later produced documents with the same information without designating that information AEO.

Movants contend the second disclosure violation is more blameworthy than the first because it was coupled with an alleged violation of the notification requirements set forth

---

[3]     Although the Court agrees with Movants that "a party who receives discovery subject to a protective order may not unilaterally decide not to comply with the protective order because that party has decided the material was improvidently designated as confidential," that principle only speaks to the first question the Court must address—i.e., whether a violation of the protective order occurred.  *DS Advanced Enters., Ltd. v. Lowe's Cos., Inc.*, 2025 WL 289470, *4 (S.D. Cal. 2025), *report and recommendation adopted sub nom.*, 2025 WL 586030 (S.D. Cal. 2025).  The fact the information disclosed to Trine in the first and second violations was later produced without an AEO designation speaks to the second question the Court must address—i.e., whether the imposition of sanctions for the violations is warranted.

in paragraph 15 of the protective order, which provides: "If Confidential Information is disclosed to any person other than a person authorized by this Order, the party responsible for the unauthorized disclosure must immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties . . . ." (Doc. 95 ¶ 15.) According to Schroeder's declaration, he learned of Ziolkowski's improper disclosure on November 19, 2025 but did not notify Firman's counsel until December 12, 2025. (Doc. 255 at 2 ¶¶ 6, 9.) Movants argue that Schroeder's notification was not "immediate[]" in the manner required under paragraph 15.

As an initial matter, it's debatable whether Schroeder's notification to Firman was untimely per paragraph 15. The protective order does not define "immediately." Some courts have held (albeit in other contexts) that the term "immediately" means in a "reasonable time." *Cucuzza v. Campbell*, 37 F.2d 31, 33 (2d Cir. 1930) ("To act immediately within this provision necessarily means within a reasonable time."); *Russodania Co. v. United Transp. Co.*, 281 F. 216, 216 (D. Del. 1992) ("'Immediately,' the time specified in the contract, does not mean instantly, but means within a reasonable time."). Schroeder's declaration seems to suggest that the delay between his instruction to Trine on November 19, 2025 to delete the email and his notification to Firman on December 12, 2025 was due to Ziolkowski's failure to "provide a notification to Firman under the Protective Order." (Doc. 255 at 2 ¶ 9.) On the one hand, Snell was counsel for Champion during this period and could have (and perhaps should have) notified Firman of the disclosure violation at some point during that approximately month-long period regardless of Ziolkowski's failure to do so. On the other hand, that Snell took it upon itself to notify Firman of the breach as soon as it realized Ziolkowski was not going to do so may be "reasonable" under the circumstances. Given this backdrop, even assuming without deciding that there was a violation of paragraph 15's timeliness requirement, the imposition of harsh sanctions based on that violation would be unjust. *Cf. Finjan*, 2019 WL 1429596 at *7 (declining to award sanctions where the violations "seem[ed] to be the result of an erroneous, but not unreasonable interpretation of the Protective Order" and the protective

order did not define the term that was subject to reasonable dispute).

This conclusion is underscored by the fact that Firman suffered no prejudice as a result of the delay in notification. Trine was instructed to delete the email, and avows that he did delete the email, on the same day that current counsel became aware of the disclosure (i.e., November 19, 2025). In other words, the situation did not go unaddressed for an entire month once counsel became aware of it. And on December 17, 2025, Firman's counsel confirmed in an email to Champion's counsel that "the information disclosed" to Trine was "confidential," *not* AEO. (Doc. 251 at 9.)

Of course, "lack of prejudice to the opposing party does not excuse liability under Rule 37." *Chubby Gorilla, Inc. v. FH Packaging LLC*, 2024 WL 3255008, *4 (C.D. Cal. 2025). Nevertheless, courts have declined to impose Rule 37 sanctions as unjust where the harm or prejudice to the other party was, at most, minimal. *See, e.g.*, *O.H. v. Secret Harbor*, 2024 WL 3812041, *4 (W.D. Wa. 2024) ("Alternatively, the Court finds that any violation was harmless and that imposing sanctions would be unjust . . . ."); *Glob. Master Int'l Grp.*, 2021 WL 1324435 at *2 (declining to impose Rule 37 sanctions as "unjust" where "any prejudice to Defendants was minimal"). Firman has pointed to no prejudice other than a general "loss in the integrity of the Court's orders." (Doc. 263 at 7.)[4]

## C.    **Third Alleged Violation**

Again, it's unclear whether Champion disputes that the third alleged violation was a "disclosure" prohibited by the protective order. On the one hand, Champion admits that "the email transmission should not have occurred" and refers to the incident as a "disclosure." (Doc. 254 at 5.) On the other hand, Champion also argues that "no disclosure of the AEO information actually occurred because . . . no one at Champion accessed the AEO document or information." (*Id.* at 2.)

---

[4]    *TRUSTID, Inc. v. Next Caller Inc.*, 2021 WL 11960341 (D. Del. 2021), cited by Firman, is distinguishable. There, the plaintiff's counsel violated the protective order by improperly disclosing source code. *Id.* at *1. As the court explained, source code "requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property." *Id.* (citation omitted). By Firman's own admission, the information disclosed to Trine in relation to the second violation was not even AEO (Doc. 251 at 9), much less Firman's most sensitive and most valuable property.

To the extent Champion's argument is that Ziolkowski's December 18, 2024 email to Trine was not a "disclosure" because Trine did not actually view the AEO documents enclosed as attachments, that argument is without merit.[5]  To be fair, Movants primarily focus their arguments on paragraph 5 of the protective order (Doc. 250 at 9), which states that AEO documents may only be "viewed" by five specified groups of people (Doc. 95 ¶ 5).  But paragraph 4 of the protective order provides that AEO materials "must not be *disclosed* by the receiving party to anyone other than those persons designated within this Order."  (*Id.* ¶ 5, emphasis added.)  The protective order does not define what it means to "disclose[]" an AEO document, but surely it cannot be synonymous with having the recipient "view[]" the document—that approach would create surplusage.  *Cf. Gray v. GC Servs., LP*, 540 P.3d 1240, 1244 (Ariz. Ct. App. 2023) ("In interpreting a contract, we . . . attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous.") (cleaned up); *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 975 (Ariz. Ct. App. 2010) ("It is a cardinal rule of contract interpretation that we do not construe one term of a contract to essentially render meaningless another term.").  Furthermore, Black's Law Dictionary defines "disclose" as "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal." *Disclose*, Black's Law Dictionary (12th ed. 2024).  Similarly, Merriam-Webster defines "disclose" as "to make known or public" or "to expose to view." *Disclose*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disclose [https://perma.cc/HED5-RQQX].  By directly emailing the seven AEO documents to Trine, Ziolkowski revealed them to Trine and exposed them to Trine's view.  That constituted a violation of the prohibition in paragraph 4 against "disclos[ing]" AEO documents to anyone other than those persons designated in paragraph 5, regardless of whether Trine proceeded to view them.

---

[5]    At least for the purposes of determining whether the protective order was violated, this conclusion makes it unnecessary to conduct a further factual inquiry into whether Trine in fact viewed the attached documents—something that Trine disavows in his declaration (Doc. 258 at 2 ¶ 6) but which Movants contend is "implausibl[e]" (Doc. 250 at 4).

As for the justness of sanctions, this violation is more concerning than the first two violation. First, Ziolkowski did not simply transmit a summary of information from AEO documents; instead, he sent the AEO documents themselves. The Court questions how an attorney could believe it was permissible to send seven AEO documents to his client's CEO. This is particularly so in a high-stakes patent infringement action between direct competitors.[6] Second, unlike the first two violations, there is no indication that the seven AEO documents sent to Trine were later de-designated or that the information contained within them was later produced in non-AEO documents. Third, Ziolkowski copied Fritz, another attorney at ZPS, on the email to Trine, yet for nearly a year, neither Ziolkowski nor Fritz recognized that this disclosure violated the protective order.

On the other hand, Ziolkowski is no longer counsel of record in this case, ZPS's access to Champion's document repository has been terminated, and Trine has stated under oath that he never reviewed nor forwarded the AEO documents to anyone. Given this backdrop, and as discussed in more detail in the final section of this order, the third disclosure violation does not justify the most severe sanctions sought by Movants.

Movants also argue that Champion violated paragraph 15 of the protective order with respect to the third disclosure violation because Champion's counsel did not "immediately" disclose "all pertinent facts relating to the unauthorized disclosure." (Doc. 250 at 11.) Specifically, Movants argue that "Champion's counsel first became aware of the first breach of Generac's AEO designation on December 4, 2025, but failed to notify Generac until December 19, 2025—more than two weeks later—and even then did not provide all pertinent facts," and "[o]nly after being repeatedly pressed for those facts on December 19, December 23, and January 6, did Champion disclose certain details, including the dates of the disclosure and the identification of the breach" but "[t]his information came a month after Champion discovered the violation, rather than 'immediately' as Paragraph 15 of the [Protective Order] requires." (*Id.* at 11.)

This argument is unavailing. As noted, paragraph 15 of the protective order requires

---

[6]     Champion and Generac are also direct competitors. (Doc. 128 at 1.)

"the party responsible for the unauthorized disclosure" to "immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties." (Doc. 95 at 10 ¶ 15.) It was reasonable for Champion's counsel to believe it did not yet have "all pertinent facts" to bring to Generac's attention until it received confirmation from Trine that the email had been deleted. That occurred on December 11, 2025—and Champion notified Generac a week later. Again, given that the protective order does not define "immediately," the Court is unwilling to find that Champion's notification to Generac a week after confirming that the email had been deleted, or even two weeks after discovering that the disclosure violation had occurred, violated paragraph 15 in a manner that would independently warrant sanctions (separate from the sanctions being imposed based on the disclosure violation itself).

Nor are sanctions warranted based on Champion's counsel purported failure to provide "all pertinent facts" to Generac. Once again, the protective order does not define "all pertinent facts." It was reasonable for Champion to believe it disclosed "all pertinent facts" to Generac on December 19, 2025 when it notified Generac (1) who made the disclosure (Ziolkowski); (2) which specific AEO documents were disclosed; and (3) that Champion was instructed to delete the email and confirmed it had done so. (Doc. 251 at 29.) Moreover, when Generac requested additional information about the violation (*id.* at 28), Champion responded three days later by further explaining that (1) Ziolkowski made the disclosure "prior to his withdrawal as counsel of record"; and (2) that Ziolkowski was "no longer involved with this matter and Champion's remaining counsel ha[d] removed [ZPS's] access to [Champion's] repository of case documents" (*id.* at 27). When Generac followed up on December 23, 2025, expressing that it needed more information (*id.* at 26-27), Champion's counsel responded that same day by further explaining that (1) Trine, Fritz, and a ZPS paralegal were "the only other individuals on the email" and "[t]here were no other Champion recipients"; and (2) "Trine did not open, access, forward, save, or otherwise access" the AEO document (*id.* at 25). Just after the holidays, and in response to two emails from Generac's counsel, Champion's counsel then explained that Champion

was "not refusing to answer basic questions" and further clarified that (1) "the transmission in question occurred on December 18, 2024"; (2) "Champion's counsel at Snell . . . discovered the transmission on December 4, 2025, and instructed Champion to delete the email sent by Mr. Ziolkowski the following day, December 5, 2025"; and (3) "[o]n December 11, 2025, Champion confirmed that the information was deleted." (*Id.* at 23.) On these facts, no additional sanctions are warranted based on the alleged violation of the "bring all pertinent facts" portion of paragraph 15. *Cf. Finjan*, 2019 WL 1429596 at *7.

### D.    Fourth And Fifth Violations

Movants identify an array of reasons why sanctions are warranted based on the fourth and fifth violations. One of those theories is that ZPS's act of uploading the AEO documents to Trine's OneDrive account violated the protective order. The Court agrees, for the reasons discussed in Part III.C above, that this act constituted a violation of paragraph four. There was an approximately two-hour window in which AEO documents were uploaded to Trine's OneDrive account and therefore revealed to him and exposed to his view. It is irrelevant (at least for purposes of the first step of the sanctions inquiry) that Trine avows he was unaware of the uploaded documents until after they were deleted and was unaware that the documents remained in his Preservation Hold Library after they were deleted. Even so, the imposition of harsh sanctions based on this violation would be unjust. There is no evidence the upload was done in bad faith; ZPS "promptly remedied the situation" by deleting the documents just two hours after they were uploaded; and the documents were never accessed by Trine or anyone else at Champion. *Glob. Master Int'l Grp.*, 2021 WL 1324435 at *2.

Movants also contend that Champion violated paragraph 15 of the protective order by failing to notify them of the disclosure violation. The relevant timeline is as follows. Schroeder avers that "[o]n or around November 12, 2025," he "observed that some of the [Consilien-captured documents] appeared to contain non-Champion AEO documents." (Doc. 255 at 3 ¶ 17.) Schroeder avers that Snell then "promptly conducted an investigation" and "learned of ZPS's upload of the July 8th documents." (*Id.* ¶ 18.)

However, because "[t]he investigation resulted with Consilien's confirmation that neither Mr. Trine nor anyone else at Champion ever accessed these documents" (Doc. 254 at 7, citing Doc. 257 ¶ 7), Champion's counsel apparently concluded there was no need to make any disclosures to Firman or Generac under paragraph 15.

On the one hand, because the Court has concluded that ZPS's act of uploading the AEO documents to Trine's OneDrive account violated paragraph 4 of the protective order, it follows that Champion had an obligation under paragraph 15 to provide notification the violation: "If [AEO] Information is disclosed to any person other than a person authorized by this Order, the party responsible for the unauthorized disclosure must immediately bring all pertinent facts relating to the unauthorized disclosure to the attention of the other parties . . . ." (Doc. 95 ¶ 15.)  On the other hand, it was reasonable for Champion's counsel to reach a different interpretation of paragraph 4, conclude that no violation had occurred, and thus conclude there was no corresponding notification obligation under paragraph 15. Under these circumstances, the imposition of harsh sanctions based on the paragraph-15 violation would be unjust.  *Cf. Finjan*, 2019 WL 1429596 at *7.

Another of Movants' theories is that Champion's re-production of the Generac- and Firman-produced AEO documents in the Wisconsin litigation violated the protective order. The Court agrees.  Under paragraph 4 of the protective order, AEO material "must not be used for any purpose other than in connection with this litigation."  (Doc. 95 ¶ 4.) Similarly, under paragraph 12, AEO material "shall be used solely for the prosecution or defense of this action."  (*Id.* ¶ 12.)  Under paragraph 15, "[t]o the extent [AEO material] has not been disclosed prior to and apart from this litigation, it must be used only for purposes of this action."  (*Id.* ¶ 15.)  Finally, under paragraph 21, AEO materials may be produced outside this litigation if "the party to whom [AEO material] has been produced thereafter becomes obligated to disclose the information in response to a lawful subpoena, *provided that the subpoenaed party gives prompt notice to Counsel for the party which made the designation, and permits Counsel for that party sufficient time to intervene and seek judicial protection from the enforcement of this subpoena and/or entry of an*

*appropriate protective order in the action in which the subpoena was issued.*" (*Id.* ¶ 21, emphasis added.)

Here, Champion's counsel knew as of November 12, 2025 that certain documents provided by Consilien contained non-Champion AEO documents, yet Champion proceeded to produce Generac- and Firman-produced AEO documents from this litigation in the Wisconsin litigation in January/February 2026 (Doc. 251 at 17, 31) and did so without giving notice to Firman and Generac as required by paragraph 21. What's worse, Champion produced those documents in the Wisconsin litigation without their AEO designations. Whether that was due to Firman's alleged failure to put the AEO designation in native file names, ZPS's failure to keep slipsheets attached to their respective native files before uploading AEO documents to Trine's OneDrive account, or some combination of both, the bottom line is that Champion's disclosure of those documents in the Wisconsin litigation violated paragraphs 4, 12, 15, and 21 of the protective order.

As for the fourth violation, the harm was minimal because Generac-produced AEO documents were simply re-produced back to Generac. But the fifth violation was more significant because a Firman-produced AEO document was produced to Generac without any confidentiality designation and Generac is a direct competitor of Firman. Moreover, Champion did not discover the breach—Generac did. The harm to Firman was minimized only because *Generac's counsel* acted promptly by (1) notifying Firman that it received a Firman-produced document that it believed might be AEO, and (2) agreeing to treat the document as AEO until Firman was able to investigate. Without Generac's candor and intervention in response to Champion's breach, the harm to Firman might have been even more significant.

Finally, Champion did not provide "all pertinent facts" to Movants once it became known that Champion had produced Generac- and Firman-produced AEO documents outside of this litigation in contravention of the protective order. Instead, Champion simply asserted that the documents were "erroneously produced" and that the documents weren't disclosed to Trine. (Doc. 251 at 15, 19, 21.) That explanation, however, only addresses

whether the upload to Trine's OneDrive account was a breach of the protective order—it does not address how or why AEO documents produced in this litigation, regardless of their custodianship, were re-produced without AEO designations for purposes other than this litigation.

E. **The Appropriate Sanctions**

As discussed above, Champion committed multiple violations of the protective order. It is concerning, to say the least, that these violations occurred. As one court aptly put it: "Reliance on protective orders and the diligence of counsel in observing them is fundamental to litigation between competitors. . . . If courts, counsel and parties could not rely on protection of confidential information, adjudication of disputes would be prevented in many instances and impaired in others. . . . Just like the thin yellow line in the middle of the highway, protective orders are an accepted standard that avoids disaster." *Systemic Formulas, Inc. v. Kim*, 2011 WL 9509, *2 (D. Utah 2011). "When an opponent ignores its obligations in handling information it receives under a protective order, the producing party's confidence that its sensitive information will be safeguarded erodes. The Court's confidence that its orders will be followed erodes as well." *U.S. ex rel. Johnson v. Golden Gate Nat. Sr. Care, L.L.C.*, 2013 WL 1182905, *7 (D. Minn. 2013).

With that said, it is also important to recognize that Movants overreached as to some of their violation theories; that even with respect to the subset of Movants' violation theories that proved valid, many turned on disputed interpretations of undefined terms; that some of the violations also involved material that was later de-designated as AEO or was simply re-produced (albeit in a procedurally improper manner) to the same party that initially produced it; and that Champion has taken affirmative steps to refashion its litigation team in an effort to prevent future violations.

Under these circumstances, the Court concludes that the first sanction sought by Movants—a full-blown audit "audit of Champion counsel's communications with Champion, including an audit of Dennis Trine's email and custodial documents, and an audit of Champion's e-discovery databases" (Doc. 250 at 13, footnote omitted)—would be

unnecessarily intrusive and unjust. Instead, within 14 days of the issuance of this order, Champion's counsel will be required file on the docket a declaration that (1) confirms that Champion's counsel has reviewed Champion's productions in the Wisconsin litigation against Generac, and in Champion's lawsuits against Westinghouse and Harbor Freight in the District of Nevada and Central District of California, respectively, and that there are no other AEO documents from this litigation that have been re-produced in those other cases;[7] and (2) identifies what steps Champion has taken, is taking, and will take to ensure that no further violations of the protective order occur.

The second sanction sought by Movants is "Champion's payment for [Movants'] fees and costs incurred in preparing this motion and reply, in an amount to be determined and submitted to the Court through an application consistent with Federal Rule of Civil Procedure 54(d) and Local Rules of Civil Procedure 54.1 and 54.2." (*Id.*) The Court agrees that such a fee award is warranted here. As noted, Rule 37(b)(2)(C) creates a presumptive entitlement to fees that can be overcome only if the violation was substantially justified or if other circumstances would make an award of expenses unjust. Here, although some of the individual violations may not alone have warranted fees, c*f. Finjan*, 2019 WL 1429596 at *7, other violations were more blameworthy (particularly Ziolkowski's decision to email seven AEO documents to Trine and Champion's production of Firman's AEO-designated material to Generac in the Wisconsin litigation). Although Movants may not have prevailed on all of their violation theories or succeeded in obtaining all of the sanctions they requested, they were, on balance, justified in seeking judicial relief based on Champion's overall course of conduct. As a result, they should be allowed to recover their motion-related fees. *Cf. Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 4684842, *8-10 (N.D. Cal. 2014).[8]

---

[7] If there have been any such re-productions, Champion shall, consistent with paragraph 15 of the protective order, provide the producing party with "all pertinent facts relating to the unauthorized disclosure" and confirm in its declaration that such notification has occurred.

[8] As noted, under Rule 37(b)(2)(C), "[t]he expense award may run against the party, the party's counsel, or both." Gensler, *supra*, § 37:23. Movants only request a fee award against Champion (Doc. 250 at 13) and Champion does not argue in response that its

The third and final specific sanction requested by Movants is a "warning that future Champion violations of the [protective order] will result in automatic monetary sanctions in the amount of $10,000 for each violation." (Doc. 250 at 13, cleaned up.)  The Court concludes this sanction is unwarranted in light of the other relief being granted in this order and in light of the fact that Champion took affirmative steps, before the motion was even filed, to refashion its litigation team in an effort to prevent future violations.  The Court has full confidence that Champion's current counsel recognize the critical importance of complying with the protective order and understand that serious consequences may arise should future violations occur.

Accordingly, **IT IS ORDERED** that:

1.    Movants' motion for an order to show cause (Doc. 250) is **granted in part and denied in part** consistent with this order.

2.    Within 14 days of the issuance of this order, Champion's counsel shall file on the docket a declaration that (1) confirms that Champion's counsel has reviewed Champion's productions in the Wisconsin litigation against Generac, and in Champion's lawsuits against Westinghouse and Harbor Freight in the District of Nevada and Central District of California, respectively, and that there are no other AEO documents from this litigation that have been re-produced in those other cases; and (2) identifies what steps Champion has taken, is taking, and will take to ensure that no further violations of the protective order occur.

…

…

…

…

…

---

counsel should be responsible for any award—it simply opposes Movants' request for fees, period (Doc. 254 at 15).  Accordingly, the Court will order Champion to pay the fee award and leave it to Champion and its current and former counsel to, if they deem it appropriate, privately determine the payment arrangements.

3.      Movants and Champion shall meet and confer concerning Movants' entitlement to recover their motion-related fees under Rule 37(b)(2)(C).  If the parties cannot come to an agreement regarding the size of the fee award, Movants shall file a motion (and supporting evidence) within 14 days of the issuance of this order.  Champion's response must be filed within 14 days of the motion.  No reply may be filed.

Dated this 3rd day of August, 2026.

Dominic W. Lanza
United States District Judge